IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHIRE VIROPHARMA LLC, | ) | Redacted: |
| | ) | Public Verison |
| Plaintiff, | ) | C.A. No. 17-414-MSG |
| | ) | |
| v. | ) | **CONSOLIDATED** |
| | ) | |
| CSL BEHRING LLC and | ) | ████████████████████ |
| CSL BEHRING GmbH, | ) | ████████████████████████ |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
***DAUBERT* MOTION TO EXCLUDE TESTIMONY OF**
**DR. GREGORY BELL, MR. ROBERT STOLL, AND DR. BERNHARDT TROUT**

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
COOLEY LLP
1299 Pennsylvania Ave., NW
Suite 700
(202) 842-7800
Washington, DC 20004

Amanda K. Murphy
Thomas J. Sullivan
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

Anthony C. Tridico
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
1 London Bridge
London SE1 9BG
United Kingdom
011.44.207.864.2800

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
*Attorneys for Defendants*

L. Scott Burwell
Ryan P. O'Quinn
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
(571) 203-2700

Dated: April 3, 2020

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................1

II.     LEGAL BACKGROUND ....................................................................................1

III.    FACTUAL BACKGROUND ...............................................................................2

IV.     OPINIONS OF DR. GREGORY BELL SHOULD BE EXCLUDED FOR
        FAILING TO APPORTION DAMAGES AND TO THE EXTENT THEY
        ADDRESS REGULATORY ISSUES ...................................................................3

        A.      Dr. Bell's Lost Profits and Reasonable Royalty Opinions Should Be
                Excluded for Failure to Properly Apportion Damages ...........................3

                1.      Dr. Bell Failed to Show Demand for Haegarda® Was Driven
                        by Patented Features Under the First *Panduit* Factor,
                        Rendering His Lost Profits Analysis Unreliable..........................4

                2.      Dr. Bell Failed to Apportion Either the Reasonable Royalty
                        Base or the Royalty Rate to Account for Patented Versus Non-
                        Patented Features .......................................................................8

        B.      Dr. Bell's Lost Profits and Reasonable Royalty Opinions Should Be
                Excluded to the Extent They Rely on Dr. Bell's Regulatory Opinions
                or on the Intent and Knowledge of Others ............................................11

V.      OPINIONS OF ROBERT STOLL ON TECHNICAL ISSUES, INTENT,
        AND LEGAL CONCLUSIONS SHOULD BE EXCLUDED .........................15

        A.      Mr. Stoll is Not Qualified to Testify Regarding Technical Issues.........15

        B.      Testimony Regarding Mental States and Legal Opinion is Excludable ...............19

VI.     OPINIONS OF DR. BERNHARDT TROUT ON UNEXPECTED RESULTS
        SHOULD BE EXCLUDED................................................................................22

        A.      Dr. Trout's Surprising and Unexpected Results Opinions Are Not
                Scientifically Supported or Supportable ...............................................23

        B.      As Dr. Trout Admits, His Unexpected Results Opinions Exceed His
                Technical Expertise and Should Be Excluded ......................................25

VII.    RESERVATION OF RIGHTS ..........................................................................25

VIII.   CONCLUSION...................................................................................................25

# TABLE OF AUTHORITIES

## CASES

Page

*AstraZeneca AB v. Apotex Corp.*,
    782 F.3d 1324 (Fed. Cir. 2015)...........................................................................................10

*AstraZeneca Pharm. LP v. Mylan Pharm. Inc.*,
    No. 08-1949-MDL, 2009 U.S. Dist. LEXIS 117355 (D. Del. Dec. 11, 2009) ...........12, 19, 22

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006)..............................................................................................20

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
    No. 15-152-RGA, 2018 U.S. Dist. LEXIS 167104 (D. Del. Sep. 28, 2018) ............................4

*Cornell Univ. v. Hewlett-Packard Co.*,
    609 F. Supp. 2d 279 (N.D.N.Y. 2009) ...................................................................................9

*Daubert v. Merrell Dow Pharm. Inc.*,
    509 U.S. 579 (1993)................................................................................................ *passim*

*E.I. Dupont de Nemours & Co. v. Monsanto Co.*,
    903 F. Supp. 680 (D. Del. 1995).........................................................................................23

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014)....................................................................................3, 8, 9

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
    879 F.3d 1332 (Fed. Cir. 2018)....................................................................................10, 11

*Finjan, Inc. v. Blue Coat Sys.*,
    879 F.3d 1299 (Fed. Cir. 2018)............................................................................................9

*Garretson v. Clark*,
    111 U.S. 120 (1884).............................................................................................................8

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970)..............................................................................10, 11

*HVLPO2, LLC v. Oxygen Frog, LLC*,
    949 F.3d 685 (Fed. Cir. 2020)............................................................................................19

*In re Cambridge Biotech Corp.*,
    186 F.3d 1356 (Fed. Cir. 1999)............................................................................................2

*In re Johnson*,
    747 F.2d 1456 (Fed. Cir. 1984)..........................................................................................23

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (Fed. Cir. 1994) ................................................................2

*In re Soni*,
    54 F.3d 746 (Fed. Cir. 1995) ...............................................................23

*In re Unisys Sav. Plan Litig.*,
    173 F.3d 145 (3d Cir. 1999) ..................................................................2

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*,
    315 F. Supp. 2d 589 (D. Del. 2004) ....................................................12

*Jaasma v. Shell Oil Co.*,
    412 F.3d 501 (3d Cir. 2005) ...................................................................1

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ..........................................................................2, 4

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ............................................................9, 10

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
    851 F.3d 1275 (Fed. Cir. 2017) .........................................................3, 4

*MiiCS & Partners, Inc. v. Funai Elec. Co.*,
    No. 14-804-RGA, 2017 U.S. Dist. LEXIS 201511 (D. Del. Dec. 7, 2017) ...........................11

*Odetics, Inc. v. Storage Tech. Corp.*,
    185 F.3d 1259 (Fed. Cir. 1999) ..............................................................2

*OSI Pharms., Inc. v. Mylan Pharm., Inc.*,
    858 F. Supp. 2d 341 (D. Del. 2012) ................................................18, 19

*Oxford Gene Tech., Ltd. v. Mergen Ltd.*,
    345 F. Supp. 2d 431 (D. Del. 2004) .............................................11, 12, 19, 20

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) ..................................................... *passim*

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    904 F.3d 965 (Fed. Cir. 2018) ...........................................................8, 9, 10

*Sundance, Inc. v. Demonte Fabricating Ltd.*,
    550 F.3d 1356 (Fed. Cir. 2008) ....................................................18, 19, 25

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ............................................................11

*VirnetX, Inc. v. Cisco Sys., Inc.,*
    767 F.3d 1308 (Fed. Cir. 2014)...............................................................................4, 5, 9

*WesternGeco L.L.C. v. ION Geophysical Corp.,*
    913 F.3d 1067 (Fed. Cir. 2019)......................................................................................4

**STATUTES AND RULES**

Del. L. R. 7.1.1. ..............................................................................................................1

Fed. R. Evid. 104(a) .......................................................................................................2

Fed. R. Evid. 702 ...................................................................................................*passim*

Fed. R. Evid. 704 ...........................................................................................................20

## I.     INTRODUCTION

Based on opinions provided both in expert reports and during deposition testimony, Defendants CSL Behring LLC and CSL Behring GmbH ("CSL") seek to exclude testimony of three experts retained by Plaintiff Shire Viropharma LLC ("Shire") in whole or in part. Shire's damages expert, Dr. Bell, has provided testimony based on unreliable methodology and contrary to established law. Shire's patent law expert, Mr. Stoll, plans to veer far beyond his expertise in USPTO procedures to opine instead on drug formulation experiments and the mental states of individuals with whom he has never spoken. Finally, Shire's formulation validity expert, Dr. Trout, has no scientifically sound bases for his opinions on surprising and unexpected results and concedes that his opinions are better left to clinicians. Thus, the testimony of Dr. Bell, Mr. Stoll, and Dr. Trout should be limited as set forth in this motion pursuant to *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993) and Fed. R. Evid. 702.

Pursuant to Delaware Local Rule 7.1.1, the parties met and confered via teleconference on March 30, 2020, to discuss the issues addressed herein. The parties made a reasonable effort to reach agreement on the matters set forth in this motion, but could not reach agreement.

## II.    LEGAL BACKGROUND

Pursuant to Federal Rule of Evidence 702, "if…the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" an expert "may testify in the form of an opinion or otherwise." Fed. R. Evid. 702. The Federal Rules effectively codify the U.S. Supreme Court's standard set forth in *Daubert v. Merrell Dow Pharms. Inc.*, which requires that expert testimony (1) must be based on sufficient facts and data; (2) must be the product of a reliable methodology; and (3) must demonstrate a relevant connection between that methodology and the facts of the case. *Jaasma v. Shell Oil Co.*, 412 F.3d 501, 513 (3d Cir. 2005) (referencing *Daubert*). As the Third Circuit has summarized,

experts must possess "qualifications, reliability, and fit" for opinions to be admissible.[1] *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 156 (3d Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994)).

The Supreme Court has held that district courts must play an important "gatekeeping" obligation, preventing juries from hearing inadmissible and irrelevant evidence. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999); Fed. R. Evid. 104(a). This responsibility extends to expert testimony, both scientific and non-scientific. *Kumho*, 526 U.S. at 141.

## III.    FACTUAL BACKGROUND

This is a patent case with three patents-in-suit: U.S. Patent Nos. 9,616,111 ( "'111 Patent"), 10,080,788 ("'788 Patent"), and 10,105,423 ("'423 Patent"), with ten asserted claims across the three patents. The asserted claims of the '111 and '788 patents generally relate to the prophylactic treatment of hereditary angioedema ("HAE"), a rare genetic condition, with subcutaneous administration of a composition comprising C1-esterase inhibitor ("C1-INH"). The asserted claims of the '423 patent relate to the composition itself. Fact discovery ended in August, 2019, and expert discovery concluded in March, 2020.

CSL's accused product, Haegarda®, is subcutaneously administered and is indicated for routine prophylaxis to prevent HAE attacks in adolescent and adult patients. Shire sells a competing C1-INH therapy, Cinryze®, which is intravenously administered and indicated for routine prophylaxis against angioedema attacks in adults, adolescents and pediatric patients. Additionally, Shire began but eventually ceased development of its own subcutaneous

---

[1] Evidentiary rulings, including those governing the admissibility of expert testimony, are typically governed by the law of the regional circuit, here, the Third Circuit. *See, e.g.*, *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276 (Fed. Cir. 1999). The exception is that issues of substantive patent law and associated procedural matters are determined by the law of the Federal Circuit. *See, e.g.*, *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1368 (Fed. Cir. 1999).

prophylactic C1-INH therapy, commonly and variably referred to as "Cinryze SC," "SHP616,"

or "TAK616 SC," █████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████.

## IV. OPINIONS OF DR. GREGORY BELL SHOULD BE EXCLUDED FOR FAILING TO APPORTION DAMAGES AND TO THE EXTENT THEY ADDRESS REGULATORY ISSUES

### A. Dr. Bell's Lost Profits and Reasonable Royalty Opinions Should Be Excluded for Failure to Properly Apportion Damages

The profits and reasonable royalty analyses performed by Shire's damages expert, Dr.

Gregory Bell, should be excluded under Rule 702 for failure to properly apportion damages.

"[A]pportionment is an important component of damages law generally, and …it is necessary in

both reasonable royalty and lost profits analysis." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851

F.3d 1275, 1287 (Fed. Cir. 2017) (citing *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226

(Fed. Cir. 2014) ("Apportionment is required even for non-royalty forms of damages.")). More

specifically, Dr. Bell failed to separately account for profits and royalties generated by demand

for the patented features of the accused infringing product–Haegarda®–and those profits and

royalties attributable to the other, non-patented, features of the product that have driven its

demand. Instead, Dr. Bell's lost profits analysis improperly assumed that demand for Haegarda®

was driven solely by claimed features of the patents-in-suit, particularly subcutaneous

administration. Further, Dr. Bell failed to apportion either the royalty base or the royalty rate in

his reasonable royalty analysis to account for the patented versus non-patented features of

Haegarda®, rendering those calculations unreliable as well. CSL's damages expert, Dr. Christine

Meyer, noted this significant deficiency, but Dr. Bell did not address it in his reply report. Ex. 2,

Meyer Rep. at ¶ 101. Thus, the entirety of Dr. Bell's damages opinions should be excluded by

the Court in the exercise of its gatekeeping authority under the Federal Rules and *Daubert*. *See*

*Kumho*, 526 U.S. at 141.

### 1.     Dr. Bell Failed to Show Demand for Haegarda® Was Driven by Patented Features Under the First *Panduit* Factor, Rendering His Lost Profits Analysis Unreliable

A patentee may be entitled to damages in the form of lost profits if it can establish that

"but-for" the infringement, it would have made additional profits on additional sales. One

common test requires the patentee to show: (1) demand for the patented product; (2) absence of

acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the

demand; and (4) the amount of profit it would have made. *Panduit Corp. v. Stahlin Bros. Fibre*

*Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).

In applying the *Panduit* test, the Federal Circuit has held that requiring patentees to prove

"demand for the product as a whole and the absence of non-infringing alternatives ties lost profit

damages to specific claim limitations and ensures that damages are commensurate with the value

of the patented features." *Mentor Graphics*, 851 F.3d at 1285. However, "[i]f the application of

the *Panduit* factors does not result in the separation of profits attributable to the patented

[features] and the profits attributable to providing other aspects of the [accused

product]…apportionment is necessary." *WesternGeco L.L.C. v. ION Geophysical Corp.*, 913

F.3d 1067, 1073 (Fed. Cir. 2019). Indeed, as Delaware courts have recognized, "[t]he Federal

Circuit has repeatedly emphasized the importance of apportionment as part of a district court's

gatekeeping function." *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-152-RGA, 2018 U.S.

Dist. LEXIS 167104, at *23-24 (D. Del. Sep. 28, 2018) (citing *VirnetX, Inc. v. Cisco, Sys.*, 767

F.3d 1308,1328 (Fed. Cir. 2014) ("[T]he district court should have exercised its gatekeeping

authority to ensure that only theories comporting with settled principles of apportionment were allowed to reach the jury.").

Dr. Bell's lost profits analysis is faulty because it fails to apportion the profits made by Haegarda® that are attributable to the claimed features of the patents-in-suit. One reason for this error is that Dr. Bell is essentially unaware of those claimed features.

Dr. Bell's analysis fails to consider that the scope of the asserted claims differs across the three patents-in-suit. As but one example, four of the ten claims Shire plans to assert at trial—claims 6, 18, 23, 24 of the '423 patent—are *pharmaceutical composition* claims that do not require, nor claim "subcutaneous administration" or "prophylaxis [treatment] of HAE." *See* Ex. 5, '423 patent at 13:21-14:46. Thus, nearly half of the asserted claims have nothing to do with the features Dr. Bell claims drive demand—and profits—for Haegarda®.[2]



---

[2] As further evidence of his misunderstanding of the scope of the claims and the parties' respective products, Dr. Bell stated at his deposition that ██████████████████████ ██████████████████████████. Ex. 3, Bell Dep. Tr., at 102:5-6 ████████████████████████████████████████████████████████ ████████████████████████████████████ *E.g.*, Ex. 5, '423 patent. This mistake, propagated throughout Dr. Bell's analyses, further undercuts any reliability those opinions may have.

███████████████ █████████████████████████████████████████████

█████████████████ .”). And as explained by Dr. Craig, during Phase III clinical trials, 40%

of subjects on Haegarda® experienced no HAE attacks, despite the lower bioavailability

associated with subcutaneous administration, whereas in Cinryze's Phase III clinical trials, only

18.8% of subjects experienced no HAE attacks. Ex.7, Craig Resp. Rep. ¶ 15. It is not disputed

that these differences in dosing and efficacy, which are significant drivers of demand for

Haegarda®, are not claimed by the patents-in-suit.

Another factor that drives the demand for Haegarda® as compared to Cinryze® is its

price. As ████████████████████████ █████████████████



Ex. 3, Bell Dep. Tr., at 176:15-23. Dr. Bell did not factor this significant price difference into his

lost profit analysis.



Dr. Bell also did not ███████████████████████████████

████████████. *Id.* at 170:23-171:18 ("███████

██████████████████████████████████████████

██████████████████████████████████████████

█████). Dr. Bell admitted he ██████████████████████

██████████████████████████████████. *Id.* at 171:23-

172:17. And when asked his own opinion as to why patients select Haegarda®, Dr. Bell █████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████ *Id.* at 172:18-23.

Dr. Bell attempted to satisfy the *Panduit* factors by performing a regression analysis. Ex.

4, Bell Op. Rep. at ¶¶ 48-49, Ex. E. This analysis, as explained by Dr, Bell, ████████████

███████████████



Ex. 3, Bell Dep. Tr. at 183:20-184:2. ███████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ This flawed assumption renders Dr. Bell's lost profits analysis unreliable under

*Daubert*, and that analysis should be excluded.

<h3>2. Dr. Bell Failed to Apportion Either the Reasonable Royalty Base or the Royalty Rate to Account for Patented Versus Non-Patented Features</h3>

A similar error also infects Dr. Bell's reasonable royalty opinions, and should similarly

result in their exclusion. As the Federal Circuit has recently reaffirmed, "[a] patentee is only

entitled to a reasonable royalty attributable to the infringing features . . . . [W]e have required

that royalties be apportioned between the infringing and noninfringing features of the product."

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977-80 (Fed. Cir.

2018) (internal citation omitted) (citing *Garretson v. Clark*, 111 U.S. 120, 121 (1884)); *see also*

*Ericsson*, 773 F.3d at 1226 ("[T]he governing rule is that the ultimate combination of royalty

base and royalty rate must reflect the value attributable to the infringing features of the product,

and no more."). The Federal Circuit has held that "[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). Accordingly, the general rule is that royalties will be based only on the "smallest salable patent-practicing unit." *Id.* (quoting *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009)).

    As discussed above, Dr. Bell centered his damages analysis on ███████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████ Ex. 4, Bell Op. Rep. at ¶ 43. Even if subcutaneous administration was absolutely *essential* to Haegarda® as a product, the law requires Dr. Bell to apportion either the royalty base, the royalty rate, or both to account for other non-patented features, and he did not. "Whether 'viewed as valuable, important, or even essential,' the patented feature must be separated." *VirnetX*, 767 F.3d at 1329 (quoting *LaserDynamics*, 694 F.3d at 68); *see also Finjan, Inc. v. Blue Coat Sys.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018) (excluding expert damages opinion because "[f]urther apportionment was required to reflect the value of the patented technology compared to the value of the unpatented elements."). The Federal Circuit has identified various avenues by which a proper royalty analysis may be performed, none of which Dr. Bell undertook. One means by which a patentee may apportion royalties appropriately is to prove that

---

[3] CSL's FDA expert, Mr. Lassman, explained that while Haegarda®'s Orphan Drug Exclusivity ("ODE") application included ███████████████████████████████████████ ███████████████████████████████████. Ex. 8, Lassman Dep. Tr. at 290:13-293:4. And importantly, when granting ODE, Mr. Lassman and Dr. Bell agreed that the FDA did not provide any reasons for its decision. Ex. 9, CSLHAE01071998; Ex. 10, Lassman Resp. Rep. at ¶¶ 34-35; Ex. 3, Bell Dep. Tr. at 166:3-17.

other non-patented features "*do not* cause consumers to purchase the product." *Power Integrations*, 904 F.3d at 979 (emphasis added) (quoting *LaserDynamics*, 694 F.3d at 69). Dr. Bell did not attempt this analysis, and as discussed above, non-patented features of Haegarda® *do* cause patients to use the product. *See* § IV.A.1., *supra*. In particular, Dr. Bell has made no attempt to show that Haegarda®'s lower monthly price—a non-patented feature that clearly drives Haegarda®'s demand—*does not* cause patients to purchase the product.

Apportionment for royalty purposes can also be done via "a proper analysis of the *Georgia-Pacific* factors." *See, e.g.*, *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp, LLC*, 879 F.3d 1332, 1348-49 (Fed. Cir. 2018). As both parties' damages experts noted, the court in *Georgia-Pacific Corp. v. U.S. Plywood Corp.* elucidated fifteen factors "that may affect the outcome of a hypothetical negotiation for a license to an infringed patent." 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); Ex. 2, Meyer Rep. at ¶ 67, n. 274. The Federal Circuit has noted that a "standard *Georgia-Pacific* reasonable royalty analysis takes account of the importance of the inventive contribution in determining the royalty rate that would have emerged from the hypothetical negotiation." *Exmark*, 879 F.3d at 1349 (quoting *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015)).

Dr. Bell, however, did not conduct a "standard" *Georgia-Pacific* analysis with respect to patented versus non-patented features. As but one example, the thirteenth *Georgia-Pacific* factor suggests that the parties would consider, in the course of a hypothetical negotiation, the "*portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements*, the manufacturing process, business risks, or significant features or improvements added by the infringer." *Georgia-Pacific*, 318 F. Supp. at 1120 (emphasis added). In his opening report, Dr. Bell addresses this factor, but provides opinions only regarding "the

manufacturing process, business risks, or significant features or improvements added by the infringer." There is no opinion given regarding the "portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements." Ex. 4, Bell Op. Rep., at ¶ 92. Nor are any such opinions provided in Dr. Bell's reply report.

Under similar circumstances, both the Federal Circuit and Delaware courts have excluded reasonable royalty analyses. In *Exmark*, the Federal Circuit found it "troublesome" when a patentee's damages expert "failed to conduct any analysis indicating the degree to which [non-patented] considerations impact the market value or profitability of the [accused product]." *Exmark*, 879 F.3d at 1350. Similarly, when an expert's analysis of the thirteenth *Georgia-Pacific* factor "lack[ed] any meaningful analysis or attempt to quantify the portion of realizable profit that should be attributed to the patented feature of the smallest salable unit," a Delaware court found the opinion "unreliable under *Daubert*" and excluded it. *MiiCS & Partners, Inc. v. Funai Elec. Co.*, Civil Action No. 14-804-RGA, 2017 U.S. Dist. LEXIS 201511, at *9-10 (D. Del. Dec. 7, 2017). The court found the opinion lacked "any 'reliable and tangible' evidence 'tending to separate or apportion [Defendants'] profits and the patentee's damages between the patented feature and the unpatented feature' of the [accused products]." *Id.* (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)). The same facts are present here, and the same result should hold. None of the *Georgia-Pacific* factors Dr. Bell analyzes in his reasonable royalty opinions properly apportion damages. For that reason, Dr. Bell's reasonable royalty analysis is flawed and unreliable, and should be excluded.

### B.   Dr. Bell's Lost Profits and Reasonable Royalty Opinions Should Be Excluded to the Extent They Rely on Dr. Bell's Regulatory Opinions or on the Intent and Knowledge of Others

"A party can only elicit expert testimony from someone who has specialized knowledge or training sufficient to qualify him or her to opine on an issue within their field of expertise, and

the expert's opinion must be confined to that field." *Oxford Gene Tech., Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 435 (D. Del. 2004). The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." *Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 600 (D. Del. 2004). Specialized knowledge extends to the substantive as well as the formal qualification of experts. *Id.* "However, "'at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman.'" *Id.* (citations omitted). Additionally, as a general rule, "expert witnesses are not permitted to testify regarding 'intent, motive, or state of mind, or evidence by which such state of mind may be inferred.'" *AstraZeneca Pharm. LP v. Mylan Pharm. Inc.*, 2009 U.S. Dist. LEXIS 117355 at *31 (D. Del. Dec. 11, 2009) (quoting *Oxford*, 345 F. Supp. 2d at 443).

As part of his damages analysis, Dr. Bell offers opinions based on his own interpretation of FDA regulatory issues. But Dr. Bell has no specialized knowledge on those issues. He explained his regulatory knowledge as follows:



Ex. 3, Bell Dep. Tr. at 18:1-11; *see also id.* at 168:3-4.

Although Shire retained Suzanne M. Sensabaugh, ostensibly to provide



(Ex. 11, Sensabaugh Op. Rep. at 1), Dr. Bell nonetheless offers a number of independent opinions that are unsupported by regulatory expert opinion. For instance, Dr. Bell does not rely on regulatory expert testimony for a central

theme of his report: ██████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████ ████████████ ████████████. These unqualified and unsupported

opinions color much of Dr. Bell's reports and testimony. ████████████

█████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ Ex.4, Bell Op. Rep., at ¶¶ 43, 74, 75, 77, 81, 85, 87.

Moreover, during his deposition, Dr. Bell appears to ████████████████

████████████████████████████████



Ex. 3, Bell Dep. Tr. at 166:3-17 (emphases added).

Dr. Bell also bases his opinions, particularly those pertaining to a reasonable royalty, on

the intent or knowledge of individuals he never spoke with, which is improper testimony under

Fed. R. Evid. 702. For example, Dr. Bell ███████████████████████████

---

[4] The FDA has never provided any statement regarding why ODE for Haegarda® was granted. Ex. 9, CSLHAE01071998; Ex. 10, Lassman Resp. Rep. at ¶ 34-35.

When asked at his deposition why Shire did not launch SHP616, he stated that it was ███████

██████████████████████████████████████████████████

███████████████████████████████████████ Ex. 3, Bell

Dep. Tr. at 251:14-22, 252:10-17.

Dr. Bell relies on a number of assumptions to bolster his opinions regarding Shire's decision not to launch SHP616, but several of those assumptions improperly rely on intent or mental states of Shire employees. For example, Dr. Bell appears to assume, without relying on any other witness or expert, ██████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ However, as Shire's FDA expert Ms. Sensabaugh notes, ████████████████████████████████████████████

█████████████████████████. Ex. 11, Sensabaugh Op. Rep. at 16 (citing Ex. 12, Shire_0793825-Shire_0793833). In other words, neither Shire nor CSL would have entered a hypothetical negotiation in July, 2017 with knowledge of whether SHP616 would demonstrate positive Phase III results, let alone secure FDA approval. The "loss of SHP616 revenues," whether due to "Haegarda receiving ODE" or any other reason, would therefore not have been a reasonable topic of discussion at that negotiation. Dr. Bell's assumptions to the contrary render his reasonable royalty analysis unreliable under *Daubert* and warrants the exclusion of that analysis.

14

Dr. Bell is not qualified as a regulatory expert from educational, professional or personal experience and cannot contend that he has specialized knowledge with regard to FDA issues. His unsupported opinions regarding FDA issues are unreliable and will only serve to confuse the jury. Furthermore, Shire retained Ms. Sensabaugh to provide FDA guidance to the extent FDA issues are implicated in Dr. Bell's opinions. Therefore, Dr. Bell should be precluded from providing unsupported testimony regarding regulatory issues at trial, and his opinions that rely on any such testimony should also be excluded.

## V.   OPINIONS OF ROBERT STOLL ON TECHNICAL ISSUES, INTENT, AND LEGAL CONCLUSIONS SHOULD BE EXCLUDED

Shire has retained Robert L. Stoll to provide expert opinions regarding ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ Ex. 13, Stoll Rep. at ¶ 18. Defendants do not dispute that it may be helpful to the factfinder to hear expert testimony regarding USPTO procedure, the patent prosecution history of the Patents-in-Suit, a basic understanding of the '111 and '788 *Inter Partes Review* proceedings and an objective explanation of patent prosecution concepts such as the duty of candor and how it applies to the factual circumstances of this case. However, Mr. Stoll's proposed testimony goes well beyond those boundaries, and he should accordingly be precluded from providing 1) any testimony on technical issues in which he is not a person of ordinary skill in the art; and 2) any testimony providing opinions on intents, motives, states of mind, or legal conclusions.

### A.   Mr. Stoll is Not Qualified to Testify Regarding Technical Issues

Shire did not disclose Mr. Stoll as a technical expert, and the only indication within his expert report that Mr. Stoll has any technical expertise at all is that ████████████

████████████████████████████████████████████████████████████

████████████████████    Ex. 13, Stoll Rep., ¶ 2. However, during his deposition, Mr. Stoll

asserted that ████████████████████████████████████████████████████████

███ . *See e.g.* Ex. 14, Stoll Dep. Tr., at 48:8-23. Mr. Stoll's educational and professional

qualifications do not qualify him as a person of ordinary skill in the relevant art, and his own

testimony makes evident that his basic scientific knowledge is limited to instances where his

testimony would be most helpful to Shire.

    Mr. Stoll's only technical scientific qualifications listed within his report and provided

during Mr. Stoll's deposition are his ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ . Ex. 13, Stoll

Rep., ¶ 2, Ex. A (Curriculum Vitae). In his expert report Mr. Stoll expressly stated, ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ " *Id.* at  ¶ 15. When asked about this

paragraph, Mr. Stoll testified:



Ex. 14, Stoll Dep. Tr. at 48:8-23. Mr. Stoll further testified, contrary to his report, ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████ . *Id.* at 48:24-

50:13.

Mr. Stoll's education and practical experience are insufficient to qualify him as a person of ordinary skill in the art as defined by Shire's expert, Dr. Trout, and CSL's expert, Dr. Illum. Ex. 15, Trout Rep., at ¶ 31; Ex. 16, Illum Op. Rep., at ¶ 103. Yet throughout his deposition, Mr. Stoll continued to deviate from reliance upon Dr. Trout and maintained a reliance upon his own "expertise" when offering technical opinions that a prior art stability research report ("the Sanquin Report") ███████████████████████████." Ex. 14, Stoll Dep. Tr. at 130:10-136:21; 149:14-24 (discussing Ex. 17, LBD0000978-985). Mr. Stoll testified,



*Id.* at 128:3-24 (emphases added).

Later in his deposition, Mr. Stoll began to provide more specific unqualified testimony with regard to his opinions on technical issues





*Id.* at 135:2-20 (emphases added).

While Mr. Stoll asserts that

. *Id.* at 260:24-261:2; 262:24-263:2.

Even on redirect, Shire's counsel attempted to clarify that Mr. Stoll would not testify as a scientific expert at trial, but Mr. Stoll declined to adhere to the constraints of his report:



*Id.* at 272:20-273:14.

Relevant case law makes clear that "[t]estimony proffered by a witness lacking the relevant technical expertise fails the standard of admissibility under Fed. R. Evid. 702." *Sundance Inc. v. Demonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008). Witnesses unqualified in the pertinent art may not testify as an expert on "…any of the underlying technical questions, such as the nature of the claimed invention, the scope and content of the prior art, the differences between the claimed invention and the prior art, or the motivation of one of the ordinary skill in the art to combine [them]." *OSI Pharm., Inc. v. Mylan Pharm., Inc.*, 858 F.

Supp. 2d 341, 360 (D. Del. 2012) (quoting *Sundance*, 550 F.3d at 1364). In the rare instances where patent law experts are also opining as technical experts, "…such a qualification must derive from a lawyer's technical qualifications in the pertinent art." *Sundance*, 550 F.3d at 1363. "The prohibition of unqualified witness testimony extends to the ultimate conclusions of infringement and validity as well as to the underlying technical questions." *HVLPO2, LLC v. Oxygen Frog, LLC*, 949 F.3d 685, 689 (Fed. Cir. 2020). Where an expert lacks the necessary expertise to be of assistance to the court or the jury on the technical aspects of the case, the court, "in its role as gatekeeper, must exclude expert testimony that is not reliable and not specialized, and which invades the province of the jury to find facts and that of the court to make ultimate legal conclusions." *Sundance*, 550 F.3d at 1364. "Allowing a patent law expert without any technical expertise to testify on the issues of infringement and validity amounts to nothing more than advocacy from the witness stand." *Id*. at 1364-65.

Mr. Stoll's professional and educational history are not one of ordinary skill in the art nor has his testimony demonstrated qualified knowledge of the technology at issue. Because Mr. Stoll is unqualified, he should be precluded from providing any independent testimony regarding the underlying technical aspects of this matter at trial.

### B.    Testimony Regarding Mental States and Legal Opinion is Excludable

As discussed above, testimony from experts regarding "intent, motive, or state of mind, or evidence by which such state of mind may be inferred" is impermissible and should be excluded. *AstraZeneca Pharm.*, 2009 U.S. Dist. LEXIS 117355 at *31 (quoting *Oxford*, 345 F. Supp. 2d at 443). While testimony with respect to the underlying facts regarding patent prosecution has been permitted, testimony regarding the mental states of the patentees and the intent of the parties prosecuting patent applications has been excluded. *Id.* at *33. "Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence

invades the province of the fact-finder." *Oxford*, 345 F. Supp. 2d at 435. Further, "[a]lthough Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (citation omitted).

Here, throughout his expert report and deposition testimony, Mr. Stoll usurps the role of the judge and jury by opining on the intents, motives and states of mind of various witnesses. Further, he opines regarding his interpretation of the law within the context of those facts. For instance, Mr. Stoll provided opinions supported by his subjective beliefs regarding whether relevant employees considered competitive intelligence to be accurate information or a "rumor":



Ex. 13, Stoll Rep. at ¶ 152.



*Id*. at ¶ 158.

Mr. Stoll also subjectively interpreted company emails to reach his ultimate conclusions regarding proper inventorship:



*Id.* at ¶ 175.



*Id.* at ¶ 178.

Mr. Stoll also based his conclusions regarding the materiality of certain prior art references on his own interpretations of whether inventors believed experiments to be a success:



*Id.* at ¶ 133.

On the subject of the materiality of relevant prior art references and whether said information was intentionally withheld from the PTO, Mr. Stoll's subjective interpretation of state of mind is evident when he testified:



Ex. 14, Stoll Dep. Tr. at 161:21-162:7.

Mr. Stoll further testified:



*Id.* at 180:7-180:25.

From statements made both in his expert report and during his deposition, it is clear that Mr. Stoll intends to inappropriately provide opinions regarding the mental states of the patentees and draw inferences regarding the intents of the parties during patent prosecution. *AstraZeneca Pharm.*, 2009 U.S. Dist. LEXIS 117355 at *33. Mr. Stoll's expert opinions at trial should be limited to issues of patent office practice and procedure and the objective underlying facts of the relevant patent prosecution. The Court should exclude the remainder of his opinions pursuant to Fed. R. Evid. 702.

## VI. OPINIONS OF DR. BERNHARDT TROUT ON UNEXPECTED RESULTS SHOULD BE EXCLUDED

Shire's validity expert, Dr. Bernhardt Trout, purports to provide opinions at trial regarding the "[s]urprising and [u]nexpected [r]esults" of the inventions claimed in the patents-in-suit. Ex. 15, Trout Rep., at ¶¶ 351-354. Dr. Trout's opinions, however, are neither scientifically or legally supportable. And as he repeatedly confirmed at his deposition, the medical and clinical aspects of those opinions are not within his expertise or ability—they ▮▮

▮▮▮▮▮▮ *See* Ex. 18, Trout Dep. Tr. at 240:13-249:18. Accordingly, the Court should

exercise its gatekeeper function to exclude Dr. Trout's opinions on surprising and unexpected results based on the medical and clinical aspects of the claimed inventions at trial.

A.     **Dr. Trout's Surprising and Unexpected Results Opinions Are Not Scientifically Supported or Supportable**

Dr. Trout's expert report purports to provide unexpected results relating to ███████

████████████████████████████████████████████████████. Ex. 15, Trout Rep., at ¶¶ 351-354. But this presentation is cursory, conclusory, and delves into the medical and clinical aspects of the claimed invention. To begin with, the asserted patents contain no example or actual data where any subject was administered, subcutaneously, the claimed C1-INH formulations. Ex. 19, Ruddy Dep. Tr. at 71:11-14. Thus, there is nothing in the patents-in-suit that can be called upon as reflecting the tolerability, bioavailability, or lack of injection pain of the claimed inventions, let alone to assert that they are "acceptable." There is simply no frame of reference of *how* or *why* the results are in any way surprising or unexpected. Additionally, Dr. Trout does not compare stability, viscosity, solubility, tolerability, bioavailability or lack of injection pain to the closest prior art—or indeed, to any prior art at all, as required by Federal Circuit precedent, to reach the conclusion that such features are surprising or unexpected. *In re Johnson*, 747 F.2d 1456, 1461 (Fed. Cir. 1984) (rebuttal of *prima facie* obviousness requires a comparison to the closed prior art); *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995) ("[I]t is well settled that unexpected results must be established by factual evidence. Mere argument or conclusory statements in the specification does not suffice." (citation omitted)). Without a comparison to the closest prior art, there is no basis for Dr. Trout to opine that these unclaimed features of the patented inventions are surprising or unexpected. *E.I. Dupont de Nemours & Co. v. Monsanto Co.*, 903 F. Supp. 680, 761-66 (D. Del. 1995) (finding no unexpected results when no comparison was made to closest prior art).

In part, these opinions are deficient because Dr. Trout has made no effort to define what *would* be expected. As but one example, Dr. Trout states █████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ Ex. 15, Trout Rep. at ¶ 353. This is essentially a naked opinion;

the citations that follow do not explain ████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████

Moreover, such opinions also run contrary to the scientific evidence. For example,

Shire's clinical expert, Dr. MacGinnitie ███████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ Ex. 20, MacGinnitie 2020 Dep. Tr. at 57:6-

60:13; 200:19-201:18; *see also, e.g.*, Ex. 21, MacGinnitie Resp. Rep. at ¶ 226 ██████████

█████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████ . Ex. 22, Cinryze Clinical Study Report

0624-200 Shire_0120813-Shire_0130929 at Shire_0130925-Shire_0130926; Ex. 23, Illum Reply

Rep. ¶ 39. This dearth of scientific information adds nothing to the facts and evidence on record

in this case, and unless excluded, Dr. Trout's opinions on unexpected results will only confuse the jury.

**B.    As Dr. Trout Admits, His Unexpected Results Opinions Exceed His Technical Expertise and Should Be Excluded**

As discussed above with respect to both Dr. Bell and Mr. Stoll, when a witness "lacking the relevant technical expertise" attempts to present technical opinions, that testimony is inadmissible under Fed. R. Evid. 702. *Sundance*, 550 F.3d at 1363. Dr. Trout testified that he lacked the technical expertise to answer questions on ██████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████. Ex. 18, Trout Dep. Tr. at 240:13-249:18. At multiple points, Dr. Trout stated that the questions he was being asked were ████ ████████████████████████" *Id.* at 243:11-14. Because Dr. Trout lacks the relevant technical expertise to address tolerability, bioavailability and injection site pain, the Court should and exclude his unqualified and unsupported opinions on unexpected results at trial.

**VII.    RESERVATION OF RIGHTS**

CSL understands that Shire intends to file a motion to exclude the testimony of five experts retained by CSL. CSL intends to oppose Shire's motion. However, to the extent arguments within Shire's *Daubert* motion equally apply to opinions provided by experts retained by Shire and the Court determines Shire's arguments are persuasive, CSL respectfully requests the Court exclude testimony of Shire experts on the same grounds when present.

**VIII.    CONCLUSION**

For the reasons stated above, CSL respectfully requests that the testimony of Dr. Bell, Mr. Stoll, and Dr. Trout should be limited as set forth in this motion pursuant to *Daubert* and Fed. R. Evid. 702.

<div style="float:right">

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
nhoeschen@shawkeller.com
*Attorneys for Defendants*

</div>

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
COOLEY LLP
1299 Pennsylvania Ave., NW
Suite 700
(202) 842-7800
Washington, DC 20004

Amanda K. Murphy
Thomas J. Sullivan
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

Anthony C. Tridico
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
1 London Bridge
London SE1 9BG
United Kingdom
011.44.207.864.2800

L. Scott Burwell
Ryan P. O'Quinn
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
(571) 203-2700

Dated: April 3, 2020

## CERTIFICATE OF SERVICE

I, Nathan R. Hoeschen, hereby certify that on April 3, 2020, this document was served on

the persons listed below in the manner indicated:

### BY EMAIL

Karen Jacobs
Derek J. Fahnestock
MORRIS, NICHOLS, ARSHT
 & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
kjacobs@mnat.com
dfahnestock@mnat.com

Eric J. Marandett
Daniel C. Winston
Anita M. C. Spieth
G. Mark Edgarton
Bryana T. McGillycuddy
Jennie D. Wilusz
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
(617) 248-5000
emarandett@choate.com
dwinston@choate.com
aspieth@choate.com
medgarton@choate.com
bmcgillycuddy@choate.com
jwilusz@choate.com

Edgar H. Haug
HAUG PARTNERS LLP
745 Fifth Avenue, 10th Floor
New York, NY 10105
(212) 588-0800
ehaug@haugpartners.com

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
nhoeschen@shawkeller.com
*Attorneys for Defendants*

# Exhibit 1

# Redacted In Its Entirety

Exhibit 2

RESTRICTED-OUTSIDE COUNSEL ONLY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

SHIRE VIROPHARMA INCORPORATED,

                    Plaintiff,

v.


CSL BEHRING LLC and
CSL BEHRING GmbH,

                    Defendants.

C.A. No. 17-414 (MSG)
CONSOLIDATED

**RESTRICTED—OUTSIDE COUNSEL ONLY**

**Expert Report of Christine S. Meyer, Ph.D.**

December 10, 2019

RESTRICTED-OUTSIDE COUNSEL ONLY

## I. Introduction

### A. Professional Qualifications and Experience

1. I am an economist and Managing Director and Chair of the Intellectual Property ("IP") Practice at National Economic Research Associates, Inc. ("NERA"). NERA is a firm of consulting economists that was founded in 1961 and provides research and analysis in economics, including analysis in the areas of competition, regulation, and finance. I joined the firm in 2000 and have worked since then mainly in the areas of the economics of IP, antitrust and competition issues, and the evaluation of commercial damages. I have testified as an expert witness in various United States District Courts, the Supreme Court of the State of New York, the Federal Court of Canada, and the High Court of Justice in England.

2. Since joining NERA, I have analyzed economic issues in a wide variety of cases involving economic damages arising from, among other claims, patent infringement, trademark infringement, false advertising, breaches of contract, and antitrust injury. I have conducted analyses, written expert reports related to, and testified about numerous IP issues to include lost profits, price erosion, reasonable royalties, commercial success, and irreparable harm in patent infringement matters. I have also written peer-reviewed articles and book chapters about economic issues and have been asked to speak about such issues on numerous occasions, including by the U.S. Federal Trade Commission in its hearings entitled, "The Evolving IP Marketplace." I have been involved in many cases involving a broad range of products and services to include large agricultural and construction equipment, engineering services, oil and gas extraction equipment, industrial chemicals, consumer products, and pharmaceuticals. I received my bachelor's degree with a concentration in economics from the United States Military Academy at West Point and my Ph.D. in economics from the Massachusetts Institute of Technology. I taught economics and statistics at Bentley College and Colgate University. A list of my prior testimony and publications can be found in my curriculum vitae, which is appended to this report as **Exhibit 1**.

2

RESTRICTED-OUTSIDE COUNSEL ONLY

### i. Primary drivers of Haegarda demand

44. Contrary to Dr. Bell's understanding, there were several principle elements of demand and benefits Haegarda offered in comparison to Cinryze beyond subcutaneous administration.



45. As Dr. Craig explained, Haegarda's efficacy is due, at least in part, to individualized, weight-based dosing.[180] Moreover, I understand that individualized, weight-based dosing is not covered by the Patents-in-Suit.



---

[176] Groeling Deposition, p. 43.

[177] Fudala Deposition, pp. 41-42, 74.

[178] Fudala Deposition, p. 105.

[179] Groeling Deposition, pp. 43, 58.

[180] Craig Responsive Report, ¶ 15.

[181] Groeling Deposition, pp. 1, 58, 80, 81, 83, 154, 157.

[182] Fudala Deposition, pp. 74-75.



46.

---

183  Deposition of Georg Henkel, June 20, 2019 ("Henkel Deposition"), p. 93. I understand that Dr. Henkel was Senior Director of Critical Care at CSL Behring GmbH.

184  CSLHAE02453594-693 at 603, 615.

185  Groeling Deposition, pp. 263-264, 267.

186  Groeling Deposition, p. 281-283, Exhibit 11, CSLHAE01085982-6033 at 5991, 6013, 6014.

187  Groeling Deposition, p. 282.

188  CSLHAE00382560-89 at 63.

189  CSLHAE00151158-215 at 59-60.

190  CSLHAE00151266-92 at 75.

RESTRICTED-OUTSIDE COUNSEL ONLY

### B.    Reasonable Royalty

#### 1.    Overview of Hypothetical Negotiation

66. As a matter of economics, a reasonable royalty is the expected outcome of a licensing negotiation between the infringer and the patent owner, had the two parties negotiated a license for the infringer's right to practice the patent prior to the first act of infringement. I understand that, as a legal matter, the negotiation is hypothesized to take place on the eve of first infringement and that both parties are assumed to believe that the patent is valid and would be infringed.

67. The hypothetical negotiation is assumed to take place in the so-called but-for world, where CSL Behring is assumed not to infringe the Patents-in-Suit, but instead to license them from Shire. As such, the hypothetical negotiation is designed to mimic a real-world licensing negotiation that both parties willingly enter with the understanding that the Patents-in-Suit are valid and infringed by CSL Behring. This is embodied in *Georgia-Pacific* factor 15:

> "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee who desire, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit which amount would have been acceptable by a prudent patentee who was willing to grant a license."[274]

68. I follow that method here, understanding that not all of the factors may be relevant to a particular calculation of a reasonable royalty, and some factors may be more important than others. While I consider all the factors, I find that certain factors are more indicative of what the parties would have considered, as I discuss further below.

---

[274]    I understand that the court in *Georgia-Pacific* set forth a set of 15 factors that may affect the outcome of a hypothetical negotiation for a license to an infringed patent. See, *Georgia Pacific Corp v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

RESTRICTED-OUTSIDE COUNSEL ONLY

launch a product for HAE treatment. ██████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████ However, Dr. Bell's analysis of the impact of orphan drug exclusivity is incomplete, as discussed above, and as a result, his analysis overestimates the impact of this factor on the reasonable royalty rate in this matter.

100. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████

101. Even if Cinryze SC were blocked by Haegarda's orphan drug exclusivity as Dr. Bell suggests, to the extent that the value of Haegarda's orphan drug exclusivity is not entirely due to the Patents-in-Suit, as discussed earlier, Dr. Bell does not apportion the loss of Cinryze SC accordingly. As such, Dr. Bell should apportion either the royalty base or royalty rate to account for, as I understand it, the fact that orphan drug exclusivity is not entirely due to the Patents-in-Suit.

102. In addition, to the extent that Cinryze and Haegarda are in "direct competition" as stated by Dr. Bell, the relevance of that fact has been accounted for in the lost profits calculation.[328] As stated by Dr. Bell, "an award of lost profits is appropriate when a patent owner can establish by a reasonable probability that but for the activities of the infringer, the patent owner would have made the allegedly infringing sales."[329] Thus, based on Dr. Bell's own understanding and the construction of his reasonable royalty negotiation in this matter, once lost profits have been accounted for, the remaining sales

---

[326]  Bell Report, ¶ 83.

[327]  Bell Report, ¶ 82; Shire_0662471, p. 5.

[328]  Bell Report, ¶ 83.

[329]  Bell Report, ¶ 4.

Exhibit 3

Redacted In Its Entirety

Exhibit 4

Redacted In Its Entirety

Exhibit 5



US010105423B2

(12) **United States Patent**
Ruddy et al.

(10) Patent No.: **US 10,105,423 B2**
(45) Date of Patent: ***Oct. 23, 2018**

(54) **C1-INH COMPOSITIONS AND METHODS FOR THE PREVENTION AND TREATMENT OF DISORDERS ASSOCIATED WITH C1 ESTERASE INHIBITOR DEFICIENCY**

(71) Applicant: **Shire ViroPharma Incorporated**, Lexington, MA (US)

(72) Inventors: **Stephen Ruddy**, Exton, PA (US); **Mark Cornell Manning**, Johnstown, CO (US); **Ryan Erik Holcomb**, Fort Collins, CO (US)

(73) Assignee: **Shire ViroPharma Incorporated**, Lexington, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/837,693**

(22) Filed: **Dec. 11, 2017**

(65) **Prior Publication Data**

US 2018/0085441 A1      Mar. 29, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/411,744, filed on Jan. 20, 2017, which is a continuation of application No. 14/855,168, filed on Sep. 15, 2015, now Pat. No. 9,616,111, which is a continuation of application No. PCT/US2014/030309, filed on Mar. 17, 2014.

(60) Provisional application No. 61/791,399, filed on Mar. 15, 2013.

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 38/00* | (2006.01) |
| *A61P 7/00* | (2006.01) |
| *A61K 38/55* | (2006.01) |
| *C07K 14/81* | (2006.01) |
| *A61K 38/57* | (2006.01) |
| *A61K 9/00* | (2006.01) |
| *A61K 47/02* | (2006.01) |
| *A61K 47/12* | (2006.01) |
| *A61K 47/18* | (2017.01) |
| *A61K 47/22* | (2006.01) |
| *A61K 38/17* | (2006.01) |
| *A61K 9/08* | (2006.01) |
| *A61P 31/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A61K 38/57* (2013.01); *A61K 9/0019* (2013.01); *A61K 9/08* (2013.01); *A61K 38/00* (2013.01); *A61K 38/1709* (2013.01); *A61K 47/02* (2013.01); *A61K 47/12* (2013.01); *A61K 47/18* (2013.01); *A61K 47/183* (2013.01); *A61K 47/22* (2013.01); *A61P 31/00* (2018.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,090,777 A | 7/2000 | Hack et al. | |
| 6,875,432 B2 | 4/2005 | Liu et al. | |
| 7,067,713 B2 | 6/2006 | Nuijens et al. | |
| 7,544,853 B2 | 6/2009 | Nuijens | |
| 7,837,992 B2 | 11/2010 | Gurewich et al. | |
| 7,897,561 B2 | 3/2011 | Kotwal et al. | |
| 8,071,532 B2 | 12/2011 | Mannesse et al. | |
| RE43,691 E | 9/2012 | Nuijens | |
| 8,283,319 B2 | 10/2012 | Schulte et al. | |
| 8,415,288 B2 | 4/2013 | Mannesse et al. | |
| 8,501,705 B2 | 8/2013 | Christadoss et al. | |
| 8,652,477 B2 | 2/2014 | Schwaeble et al. | |
| 9,616,111 B2* | 4/2017 | Ruddy ................. | A61K 38/57 |
| 2001/0019839 A1 | 9/2001 | Schoenhofer et al. | |
| 2002/0168352 A1 | 11/2002 | Winkler et al. | |
| 2005/0288218 A1 | 12/2005 | Davis et al. | |
| 2006/0142187 A1 | 6/2006 | Davis et al. | |
| 2006/0233776 A1 | 10/2006 | Heimburger et al. | |
| 2007/0093443 A1 | 4/2007 | Madison et al. | |
| 2007/0192882 A1 | 8/2007 | Dewald | |
| 2010/0143325 A1 | 6/2010 | Gurewich | |
| 2012/0171206 A1 | 7/2012 | Tomlinson et al. | |
| 2012/0244139 A1 | 9/2012 | Madison et al. | |
| 2013/0244941 A1 | 9/2013 | Mannesse et al. | |
| 2014/0234293 A1 | 8/2014 | Basta et al. | |
| 2014/0242062 A1 | 8/2014 | Madison et al. | |
| 2014/0309175 A1 | 10/2014 | Zhao et al. | |
| 2014/0315826 A1 | 10/2014 | Zhao et al. | |
| 2014/0371425 A1 | 12/2014 | Kleinschnitz et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 2968434 | 6/2017 |
| WO | WO-1992/06203 A1 | 4/1992 |
| WO | WO-1992/22320 A1 | 12/1992 |

(Continued)

OTHER PUBLICATIONS

Jiang et al. "Subcutaneous infusion of human C1 inhibitor in swine" Clinical Immunology 136:323-328. (Year: 2010).*

(Continued)

*Primary Examiner* — Christina Bradley

*Assistant Examiner* — Zachary J Miknis

(74) *Attorney, Agent, or Firm* — Proskauer Rose LLP; Fangli Chen; Julio J. Mendez

(57)      **ABSTRACT**

Compositions and methods for the treatment and/or prevention of disorders associated with C1 esterase inhibitor deficiency are disclosed.

**29 Claims, 2 Drawing Sheets**

**Specification includes a Sequence Listing.**

## US 10,105,423 B2

Page 2

(56)                  **References Cited**

U.S. PATENT DOCUMENTS

2015/0023977 A1     1/2015  Fraunhofer et al.

FOREIGN PATENT DOCUMENTS

| WO | WO-1995/06479 | A1 | 3/1995 |
|----|---------------|----|--------|
| WO | WO-1997/22347 | A1 | 6/1997 |
| WO | WO-2001/46219 | | 6/2001 |
| WO | WO-2001/57079 | | 8/2001 |
| WO | WO-2004/034971 | A2 | 4/2004 |
| WO | WO-2004/110356 | A2 | 12/2004 |
| WO | WO-2007/047995 | A2 | 4/2007 |
| WO | WO-2007/073186 | A2 | 6/2007 |
| WO | WO-2009/073569 | | 6/2009 |
| WO | WO-2011/003098 | A1 | 1/2011 |
| WO | WO-2011/107591 | A1 | 9/2011 |
| WO | WO-2011/116291 | A1 | 9/2011 |
| WO | WO-2013/013017 | A2 | 1/2013 |
| WO | WO-2013/138694 | A1 | 9/2013 |
| WO | WO-2013/138730 | A1 | 9/2013 |
| WO | WO-2013/138731 | A1 | 9/2013 |
| WO | WO-2014/160499 | A2 | 10/2014 |

OTHER PUBLICATIONS

Anonymous "Subcutaneous" The Pharmaceutics and Compounding Laboratory. http://pharmlabs.unc.edu/labs/parenterals/subcutaneous. htm. (Year: 2010).*
D'Agnillo F "Summary Basis for Regulatory Action—CINRYZE" FDA. (Year: 2008).*
Anonymous "Cinryze" European Medicines Agency. CHMP assessment report for paediatric use studies submitted according to Article 46 of the Regulation (EC) No. 1901/2006. (Year: 2013).*
Aberer, W., Hereditary angioedema treatment options: The availability of new therapies, Annals of Medicine, 44:523-529 (2012).
Agostoni, A. et al., Hereditary and acquired angioedema: Problems and progress: Proceedings of the third C1 esterase inhibitors deficiency workshop and beyond, Journal of Allergy and Clinical Immunology, 114(3): S51-S131 (2004).
Anonymous. Wikipedia extract: https://en.wikipedia.org/wiki/C1-inhibitor.
Anonymous, Subcutaneous, http://pharmlabs.unc.edu/labs/parenterals/subcutaneous.htm. Published Jun. 14, 2010.
Anonymous. http://www.cslbehring.com/s1/cs/enco/1255923338532/news/1255928832614/prdetail.htm?tabSelections=1255923338570&currentPage=2 ; May 3, 2012.
Anonymous, Phases of Clinical Trials, http://www.virginia.edu/vpr/irb/HSR_docs/CLINICAL_ TRIALS_Phases.pdf. Published Jun. 12, 2012.
Anonymous. News Release, Halozyme Therapeutics (2012). http://www.halozyme.com/investors/news-releases/news-release-details/2012/ViroPharma-and-halozyme-Therapeutics-Announce-Initiation-of-Phase-2b-Dose-Ranging-Combination-Study-for-Subcutaneous-Administration-of-Cinryze-C1-esterase-inhibitor-human-with-hyaluronidase-rhuPH20/default.aspx.
Anonymous. "ViroPharma and Holozyme Therapeutics Announce Initiation of Phase 2b Dose Ranging Combination Study for Subcutaneous Administration of Cinryze ® (C1 esterase inhibitor [human]) with Hyaluronidase (rHuPH20)" Press release, published Dec. 19, 2012.
Anonymous. CINRYZE™ prescribing information, Nov. 2012.
Anonymous. Observations under Section 21 in relation to the patentability of GB1519921.9 of Shire Viropharma Incorporated. Notice from the Observations mailed on Dec. 19, 2016 by the Great Britain Intellectual Property Office.
Anonymous, Third Party Observations in relation to EP 14762343. 3, acknowledged by European Patent Office dated Jan. 19, 2017.
Anonymous, Press Release by BMI Research on Mar. 5, 2012, "Subcutaneous Cinryze with rHuPH20 produced positive effects in prevention of HAO," in connection with poster titled "Safety,

Pharmacokinetics (PK), and Pharmacodynamics (PD) of Subcutaneous (SC) Cinryze® (C1 Esterase Inhibitor [Human]) with Recombinant Human Hyaluronidase (rHuPH20) in Subjects with Hereditary Angioedema (HAE)."
Anonymous, CSL R&D Briefing, Dec. 5, 2012.
Anonymous, ViroPharma Press release, ViroPharma Provides Update on Phase 2 Clinical Evaluation of Subcutaneous Cinryze® (C1 esterase inhibitor [human]) with Recombinant Human Hyaluronidase (rHuPH20), Aug. 1, 2012.
Anonymous, "Subcutaneous" http://pharmlabs.unc.edu/labs/parenterals/subcutaneous.htm. Published Jun. 14, 2010.
Anonymous, "Plasma Derived Proteins and Enzymes" Bio Files 2006, 1.5, 2. Sigma Aldrich. Published 2006.
Anonymous, "C1 Esterase Inhibitor from human plasma" Sigma Aldrich E0518. Published 2006.
Banerji, A., Current treatment of hereditary angioedema: An update on clinical studies, Allergy and Asthma Proceedings, 31(5):398-406 (2010) (abstract only).
Berinert® approval letter, FDA, Oct. 9, 2009, available at https://www.fda.gov/BiologicsBloodVaccines/BloodBloodProducts/ApprovedProducts/LicensedProductsBLAs/FractionatedPlasmaProducts/ucm186265.htm (downloaded on May 25, 2017).
Berinert® Prescribing Information, CSL Behring, Jul. 2012.
Berinert UK summary-product-characteristics Sep. 2015, available at http://www.medicines.org.uk/emc/print- document?documentId=21650 (downloaded on May 22, 2017).
Bernstein, J.A., Hereditary angioedema: a current state-of-the-art review, VIII: current status of emerging therapies, Annals of Allergy, Asthma & Immunology, 100:S41-S46 (2008).
Bock, S.C. et al., Human C1 Inhibitor: Primary Structure, cDNA Cloning, and Chromosomal Localization, 25 BIOCHEM. 4292-301 (1986). ("Bock").
Bork, K. et al., A Review of Hereditary Angioedema and Recombinant Human C1-Inhibitor Treatment, Hereditary Angioedema, European Respiratory Disease, 32-35 (2011).
Bork, K. et al., Treatment of acute edema attacks in hereditary angioedema with a bradykinin receptor-2 antagonist (Icatibant), J Allergy Clin Immunol, 119(6):1497-1503 (2007).
Bork, K., German Guideline for Hereditary Angioedema a due to C1-INH Deficiency, German Association of Scientific Medical Societies, 1-24 (2011).
Bowen, T. et al., 2010 International consensus algorithm for the diagnosis, therapy and management of hereditary angioedema, Allergy, Asthma & Clinical Immunology, 6(24):1-13 (2010).
Bowen, T., Hereditary angioedema: beyond international consensus—circa Dec. 2010—The Canadian Society of Allergy and Clinical Immunology Dr. David McCourtie Lecture, Allergy, Asthma & Clinical Immunology, 7(1):1-14 (2011).
Brackertz, D. & Kueppers, F., Hereditary angioneurotic oedema, 302(7830) LANCET 680 (1973).
Bygum, A., Hereditary Angioedema—Consequences of a New Treatment Paradigm in Denmark, Acta Derm Venerol, 94:436-441 (2014).
Caballero, T. et al., Consensus Statement on the Diagnosis, Management, and Treatment of Angioedema Mediated by Bradykinin. Part II. Treatment, Follow-up, and Special Situations, J Investig Allergol Clin Immunol, 21(6):422-441 (2011).
Castellano, G. et al., Endothelial-To-Mesenchymal Transition in Swine Renal Ischemia Reperfusion Injury is Mediated by Complement and AKT Pathway, Nephrology Dialysis Transplantation, 27(2):ii1-ii2 (2012).
Caspi et al. (2010). P&T, vol. 35, Issue 7, Jul. 2010, Product Profiler: Berinert™.
Castellano, G. et al., Therapeutic Targeting of Classical and Lectin Pathways of Complement Protects from Ischemia-Reperfusion-Induced Renal Damage, The American Journal of Pathology, 176(4):1648-1659 (2010).
Choi, G. et al., Recombinant human C1-inhibitor in the treatment of acute angioedema attacks, Transfusion Practice, 47:1028-1032 (2007).
Cicardi, M. et al., Evidence-based recommendations for the therapeutic management of angioedema owing to hereditary C1 inhibitor

# US 10,105,423 B2

Page 3

## (56) References Cited

### OTHER PUBLICATIONS

deficiency: consensus report of an International Working Group, European Journal of Allergy and Clinical Immunology, 67:147-157 (2011).

Cinryze® approval letter, FDA, Oct. 10, 2008, available at https://www.fda.gov/biologicsbloodvaccines/bloodbloodproducts/approvedproducts/licensedproductsblas/fractionatedplasmaproducts/ucm093602.htm (downloaded on May 25, 2017).

"Cinryze (C1-esterase Inhibitor) Developed by Lev Approved to Launch in the U.S.", Progress in Pharmaceutical Sciences, 33 (4), Dec. 31, 2009.

Cinryze® FDA Briefing Document, Blood Products Advisory Committee Meeting, May 1-2, 2008, available at https://www.fda.gov/ohrms/dockets/ac/08/briefing/2008-4355B2-1b.htm (downloaded on May 23, 2017).

Cinryze® Prescribing Information, ViroPharma Incorporated, Nov. 2012. ("Cinryze® label").

ClinicalTrials.gov Identifier: NCT01912456, A Study to Evaluate the Clinical Efficacy and Safety of Subcutaneously Administered C1-esterase Inhibitor in the Prevention of Hereditary Angioedema, (received Jul. 29, 2013), available at https://clinicaltrials.gov/ct2/show/NCT01912456 (downloaded on May 25, 2017).

ClinicalTrials.gov Identifier: NCT00748202, Berinert® P Study of Subcutaneous Versus Intravenous Administration (PASSION), (Sep. 4, 2008), available at https://clinicaltrials.gov/ct2/show/NCT00748202 (downloaded on Feb. 19, 2016).

ClinicalTrials.gov Identifier: NCT01756157, Subcutaneous CINRYZE With Recombinant Human Hyaluronidase for Prevention of Angioedema Attacks, (Jun. 29, 2012), available at https://clinicaltrials.gov/ct2/show/NCT01756157 (downloaded on May 25, 2017).

Connolly, B. D. et al., Weak Interactions Govern the Viscosity of Concentrated Antibody Solutions: High-Throughput Analysis Using the Diffusion Interaction Parameter, 103 BIOPHYS. J. 69-78 (Jul. 2012).

Craig, Curriculum Vitae of Dr. Timothy Craig, D.O.

Craig, Declaration of Dr. Timothy Craig.

Craig, T. et al., WAO Guideline for the Management of Hereditary Angioedema, WAO Journal, 182-199 (2012).

Craig, T. et al., When is prophylaxis for hereditary angioedema necessary?, Annals of Allergy, Asthma & Immunology, 102:366-372 (2009).

Cruz, M.P., Conestat Alfa (Ruconest) First Recombinant C1 Esterase Inhibitor for the Treatment of Acute Attacks in Patients with Hereditary Angioedema, Pharmacy and Therapeutics, 40(2):109-111, 114 (2015).

CSL Behring GmbH and CSL Behring LLC, Petitioners v. Shire Viropharma Inc., Patent Owner, Petition for Inter Partes Review, U.S. Pat. No. 9,616,111, filed May 31, 2017, pp. 1-79.

CSL Behring Press Release dated May 3, 2012: "CSL Behring Initiates Study of Subcutaneous Administration of C1-esterase Inhibitor in Patients With Hereditary Angioedema".

CSL Ltd. Half Year Update 2016-2017, signed by John Shine, Apr. 2017, available at http://www.csl.com.au/docs/954/57/CSL_HYR17_sec.pdf.

D'Agnilo F. "Summary Basis for Regulatory Action—Cinryze" FDA. Published Oct. 9, 2008.

Davis, A.E. III, New treatments addressing the pathophysiology of hereditary angioedema, Clinical and Molecular Allergy, 6(2):1-7 (2008).

Dec. 2012 Update to Clinical Trial NCT01756157, Subcutaneous Cinryze With Recombinant Human Hyaluronidase for Prevention of Angioedema Attacks, (Dec. 24, 2012), available at https://clinicaltrials.gov/archive/NCT01756157/2012_12_24 (downloaded on May 25, 2017).

European Medicines Agency, Jun. 24, 2010, EMA/CHMP/450053/2010, Evaluation of Medicines for Human Use, CHMP Assessment Report, Ruconest®, Procedure No. EMEA/H/C/001223, available at http://www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Public_assessment_report/human/001223/WC500098546.pdf.

European Patent Application No. 14762343.3, Shire Reply dated Mar. 2, 2017.

European Search Report for EP14762343.3, 9 pages (dated Jan. 28, 2016).

Excerpt from ClinicalTrials.gov archive (dated Apr. 11, 2012) for NCT01576523.

Extract from "Ansel's Pharmaceutical Dosage Forms and Drug Delivery Systems"; ninth edition; 2001; Chapter 5, pp. 162-170; Eds. Allen Jr. et al.

Farkas, H. et al., Short-term prophylaxis in hereditary angioedema due to deficiency of the C1-inhibitor—a long-term survey, Allergy, 67:1586-1593 (2012).

Farkas, H., Pediatric hereditary angioedema due to C1-inhibitor deficiency, Allergy, Asthma & Clinical Immunology, 6(18):2-10 (2010).

Farrell, C. et al., Population pharmacokinetics of recombinant human C1 inhibitor in patients with hereditary angioedema, British Journal of Clinical Pharmacology, 76:897-907 (2013).

Fay, A. and Abinun, M., Current management of hereditary angio-oedema (C1 esterase inhibitor deficiency), J Clin Pathol, 55:266-270 (2002).

Feussner, etal. (2014). Biochemical comparison of four commercially available C1 esterase inhibitor concentrates for treatment of hereditary angioedema. Transfusion 54: 2566-2573. Oct. 2014.

Firszt, R. & Frank, M. M., An Overview of Novel Therapies for Acute Hereditary Angioedema, 11(6) Am. J. Clin. Dermatol. 383-88 (2010).

Frank, M. M. Declaration of Michael M. Frank, excerpted from the prosecution history of U.S. Pat. No. 9,616,111.

Frank, M.M., Recombinant and Plasma-Purified Human C1 Inhibitor for the Treatment of Hereditary Angioedema, WAO Journal, S29-S33 (2010).

Gatlin, L. A. & Brister Gatlin, C. A., Formulation and Administration Techniques to Minimize Injection Pain and Tissue Damage Associated with Parenteral Products, Chapter 17 in Injectable Drug Development Techniques to Reduce Pain and Irritation 401-21 (Pramod K. Gupta & Gayle A. Brazeau, eds., CRC Press 1999). ("Gatlin").

GenBank: CAA30314.

Gesuete, R. et al., Recombinant C1 Inhibitor in brain ischemic injury, Annals of Neurology, 66(3):332-342 (2009).

Ghannam, A. et al., C1 Inhibitor as a glycoprotein: The influence of polysaccharides on its function and autoantibody target, 71 Mol. Immunol. 161-65 (2016).

Ghazi, A. and Grant, J.A., Hereditary angioedema: epidemiology, management, the role of icatibant, Biologics: Targets and Therapy, 7:103-113 (2013).

Giatlin et al., "Formulation and Administration Techniques to Minimize Injection Pain and Tissue Damage Associated with Parenteral Products," extract from "Injectable Drug Development. Techniques to Reduce Pain and irritation"; Chapter 17.

Gomella, L. G. & Haist, S. A., Clinician's Pocket Reference (McGraw-Hill Professional 9th ed. 2002).

Gower, R.G. et al., Hereditary Angioedema cause by C1-Esterase Inhibitor Deficiency: A Literature-Based Analysis and Clinical Commentary on Prophylaxis Treatment Strategies, World Allergy Organization Journal, 4(2): S9-S21 (2011).

Gurevich, V. et al., Recombinant human C1-inhibitor prevents non-specific proteolysis by mutant pro-urokinase during optimal fibrinolysis, Thrombosis and haemostasis, 102(2):279-286 (2009) (abstract only).

Hack, C.E. et al., Target levels of functional C1-inhibitor in hereditary angioedema, Allergy, 67:123-130 (2012).

Hack, E. et al., Immuno-Safety of Recombinant Human C1 Inhibitor in Patients With Hereditary Angioedema: An Integrated Analysis, World Allergy Organization, S45 (2012).

Harrison, R.A., Human C1 Inhibitor: Improved Isolation and Preliminary Structural Characterization, 22 BIOCHEMISTRY 5001-07 (1983).

Hofstra, J.J. et al., Pharmacokinetics, clinical efficacy and safety of C1 inhibitor concentrate (C1-esteraseremmer-N) for treatment of hereditary (and acquired) angioedema, Academic Medical Centre Amsterdam, Sanquin Division of Plasma Products, 43.

## US 10,105,423 B2
Page 4

(56)  **References Cited**

OTHER PUBLICATIONS

Hofstra, J. J. et al., Pharmacokinetics, Clinical Efficacy and Safety of Plasma-Derived Nanofiltered C1 Inhibitor Concentrate for Treatment of Hereditary and Acquired Angioedema, Blood. 112(11): 694-694 (2008).

Hollingsworth, C., Dyax Pushes Toward Front of Race for HAE Therapy, Bioworld Today, (Sep. 25, 2008) <http://search.proquest.com/professional/docview/1079003946?ac>.

Hossler, P. et al., Optimal and consistent protein glycosylation in mammalian cell culture, 19(9) GLYCOBIOLOGY 936-49 (2009).

Informed Consent Form for Enrollment for Adults (dated Apr. 20, 2012), for Study No. CSL839_2001, corresponding to ClinicalTrials.gov (National Institutes of Health) identification No. NCT01576523.

International Search Report for PCT/US2014/030309, 5 pages (dated Nov. 7, 2014).

Jiang, H. et al., Subcutaneous infusion of human C1 inhibitor in swine, Clinical Immunology, 136:323-328 (2010).

Jiang, H. et al., Subcutaneous (SQ) versus intravenous (IV) infusion of C1 Inhibitor (inh) on blood levels in swine, 6th C1 Inhibitor Deficiency Workshop 46 (May 2009).

Johann Wolfgang Goethe University Hospitals, Berinert P Study of Subcutaneous Versus Intravenous Administration (PASSION), ClinicalTrials.gov—NCT00748202, (2011).

Jolles, S. et al., New Frontiers in Subcutaneous Immunoglobulin Treatment, 1(1) Biol Ther 1-15 (2011).

Karadi, et at, 5th C1 Inhibitor Deficiency Workshop, 1-80 (May 31-Jun. 3, 2007).

Kawalec, P. et al., Administration of conestat alfa, human C1 esterase inhibitor and icatibant in the treatment of acute angioedema attacks in adults with hereditary angioedema due to C1 esterase inhibitor deficiency. Treatment comparison based on systematic review results, Pneumonol Alergol Pol, 81:95-104 (2013) (abstract only).

Koles, K. et al., Influence of lactation parameters on the N-glycosylation of recombinant human C1 inhibitor isolated from the milk of transgenic rabbits, Glycobiology, 14(11):979-986 (2004).

Koles, K. et al., N- and O-glycans of recombinant human C1 inhibitor expressed in the milk of transgenic rabbits, Glycobiology, 14(1):51-64 (2004).

Kreuz, J, Berinert P Study of Subcutaneous Versus Intravenous Administration (PASSION) ClinicalTrials.gov NCT00748202, published Sep. 4, 2008.

Latypov, R. F. et al., Elucidation of Acid-induced Unfolding and Aggregation of Human Immunoglobulin IgG1 and IgG2 Fc, 287 J. Biol. Chem. 1381-96 (2012).

Le Bas-Bernardet, S. et al., Xenotransplantation of Galactosyl-Transferase Knockout, CD55, CD59, CD39, and Fucosyl-Transferase Transgenic Pig Kidneys Into Baboons, Transplantation Proceedings, 43:3426-3430 (2011).

Levi, M. et al., Self-administration of C1-inhibitor concentrate in patients with hereditary or acquired angioedema caused by C1-inhibitor deficiency, 117 J. Allergy Clin. Immunol. 904-08 (2006). ("Levi").

Lev Pharmaceuticals, Inc, Clinical Pharmacology Review, Division of Hematology Office of Blood Review & Research, 1-8 (Dec. 4, 2007).

Li, H. H., Declaration of Dr. Huamin Henry Li (dated May 12, 2015).

Li, H. H., Self-administered C1 esterase inhibitor concentrates for the management of hereditary angioedema: usability and patient acceptance, 10 Patient Preference and Adherence 1727-37 (2016).

Lis, H. & Sharon, N., Protein glycosylation Structural and functional aspects, 218 Eur. J. Biochem. 1-27 (1993).

Longhurst, H. J. et al., C1ι inhibitor concentrate home therapy for hereditary angioedema: a viable, effective treatment option, 147(1) Clin. Exp. Immunol. 11-7 (2007).

Longhurst, H. J. et al, HAE international home therapy consensus document, 6(22) Allergy Asthma Clin. Immunol. 1-7 (2010).

Longhurst, H. J. et al., Prevention of Hereditary Angioedema Attacks with a Subcutaneous C1 Inhibitor, 376(12) N. Engl. J. Med. 1131-40 (2017).

Longhurst, H., Rhucin, a recombinant C1 inhibitor for the treatment of hereditary angioedema and cerebral ischemia, Current Opinion in Investigational Drugs, 9(3):310-323 (2008).

Lucca, J.J.D. et al., Effects of C1 Inhibitor on Tissue Damage in a Porcine Model of Controlled Hemorrhage, Shock, 38(1):82-91 (2012).

Lumry, W. et al., Nanofiltered C1-Esterase Inhibitor for the Acute Management and Prevention of Hereditary Angioedema Attacks due to C1-Inhibitor Deficiency in Children, The Journal of Pediatrics, 162(5):1017-1022 (2013).

Machinig, T. and Waldhauser, H., Declaration of Dr. Thomas Machinig and Hanno Waldhauser.

Mahmood, I, Clinical Pharmacology Review, Published Dec. 4, 2007.

Martinez-Saguer et al., Pharmacokinetic Berinert P Study of Subcutaneous Versus Intravenous Administration in Subjects with Moderate Hereditary Angioedema—The Passion Study, 127 Allergy Clin. Immunol. AB104 (Feb. 2011) (Abstract 389).

Martinez-Saguer, I. et al., Pharmacokinetic Berinert P study of subcutaneous versus intravenous administration in subjects with moderate hereditary angioedema—the passion study, Journal of Allergy and Clinical Immunology, 127: AB104 (2011).

Martinez-Saguer, I. et al., Pharmacokinetics of plasma-derived C1-esterase inhibitor after subcutaneous versus intravenous administration in subjects with mild or moderate hereditary angioedema: the PASSION study, TRANSFUSION, 54:1552-1561 (2014).

Material Safety Data Sheet (MSDS) for Berinert® with a date of issue of Sep. 23, 2009.

Maurer, M. and Magerl, M., Long-term prophylaxis of hereditary angioedema with androgen derivates: a critical appraisal and potential alternatives, JDDG, 9:99-107 (2011).

Metzner, Curriculum Vitae of Dr. Hubert Metzner, Ph.D.

Metzner, Declaration of Dr. Hubert Metzner.

Myers, J. K. et al., Denaturant m values and heat capacity changes: Relation to changes in accessible surface areas of protein unfolding, 4 Protein Sci. 2138-48 (1995).

Moldovan, D. et al., Efficacy and safety of recombinant human C1-inhibitor for the treatment of attacks of hereditary angioedemas: European open-label extension study, Clinical & Experiential Allergy, 42(6):929-935 (2012) (abstract only).

Monkos, K., Concentration and temperature dependence of viscosity in lysozyme aqueous solutions, 1339 Biochimica Et Biophysica Acta 304-10 (1997).

Monkos, K., Viscometric study of human, bovine, equine and ovine haemoglobin in aqueous solution, 16(1) Int. J. Biol. Macromol. 31-5 (1994).

Monkos, K., Viscosity analysis of the temperature dependence of the solution conformation of ovalbumin, 85 Biophysical Chemistry 7-16 (2000).

Monkos, K., Viscosity of bovine serum albumin aqueous solutions as a function of temperature and concentration, 18 Int. J. Biol. Macromol. 61-8 (1996).

Nadeau et al. Cowen Biotechnology Report, Oct. 2010.

NewsRx, Parental Infusions; Studies from Duke University, Department of Pediatrics parenteral infusions, ProQuest Newsstand Professional, (Sep. 4, 2010) <http://search.proquest.com/professional/docview/746811428?acc>.

Nilsson, T. & Wiman, B., Purification and Characterization of Human C1-Esterase Inhibitor, 705 Biochim. Biophys. Acta 271-76 (1982).

Nzeako, U.C., Diagnosis and management of angioedema with abdominal involvement: A gastroenterology perspective, World J Gastroenterol, 16(39):4913-4921 (2010).

Over, J. et al., C1-Inhibitor, Chapter 17 in Production of Plasma Proteins for Therapeutic Use, 241-58 (Joseph Bertolini et al., eds., John Wiley & Sons, Inc. 2013).

Perkins, S.J. et al., Two-Domain Structure of the Native and Reactive Centre Cleaved Forms of C1 Inhibitor of Human Complement by Neutron Scattering, 214 J. Mol. Biol. 751-63 (1990).

## US 10,105,423 B2

Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

Pharming Technologies B.V., Recombinant Human C1 Inhibitor for the Treatment of Acute Attacks in Patients with Hereditary Angioedema, ClinicalTrials.gov—NCT00225147, (2005).

Poster presented in Mar. 2012 and entitled "Safety, Pharmacokinetics (PK), and Pharmacodynamics (PD) of Subcutaneous (SC) Cinryze® (C1 Esterase Inhibitor [Human]) with Recombinant Human Hyaluronidase (rHuPH20) in Subjects with Hereditary Angioedema (HAE)" (p. 1 is the entire poster, pp. 2 to 4 are enlargements of portions of p. 1).

Pragst, Declaration of Ingo Pragst dated Dec. 15, 2016, filed in Observations in Great Britain application No. GB1519921.9.

Press release by BMI Research dated Mar. 6, 2012 "Subcutaneous Cinryze® with rHuPH20 Produces Positive Effects in Prevention of HAO".

Press Release, CSL Behring, CSL Behring announces completion of national marketing authorizations of Berinert® after MRP in 23 European countries (May 27, 2010), available at http://www.cslbehring.com/s1/cs/enco/1255923338532/news/1255924303464/prdetail.htm?tabSelections=1255923338570&current tPage=4 (downloaded on May 23, 2017).

Press Release, CSL Behring, CSL Behring Initiates Study of Subcutaneous Administration of C1-esterase inhibitor in Patients with Hereditary Angioedema (May 3, 2012), available at http://www.cslbehring.com/news-room/Study-of-C1-INH-as- SubQ-Formulation (downloaded on Jan. 10, 2017).

Press Release, Roche, Roche's Herceptin given by subcutaneous injection offers greater convenience to patients and reduces overall healthcare costs compared to standard IV infusion (Mar. 23, 2012) available at http://www.roche.com/media/store/releases/med-cor-2012-03- 23.htm.

Press Release, ViroPharma Inc., ViroPharma and Halozyme Therapeutics Announce Initiation of Phase 2b Dose Ranging Combination Study for Subcutaneous Administration of Cinryze® (C1 esterase inhibitor [human]) With Hyaluronidase (rHuPH20) (Dec. 19, 2012) available at http://www.halozyme.com/investors/news-releases/news-release- details/2012/ViroPharma-and-Halozyme-Therapeutics-Announce-Initiation-of-Phase-2b-Dose-Ranging-Combination-Study-for-Subcutaneous-Administration-of-Cinryze-C1-esterase-inhibitor-human-With-Hyaluronidase-rHuPH20/default.aspx (downloaded on Feb. 19, 2016).

Press Release, ViroPharma Inc., ViroPharma Announces Completion of Enrollment in Phase 2 Study Evaluating Subcutaneous Delivery of Cinryze® (C1 Esterase Inhibitor [Human]), (Oct. 25, 2010) available at http://www.prnewswire.com/news-releases/viropharma- announces-completion-of-enrollment-in-phase-2-study- evaluating-subcutaneous-delivery-of-cinryze-c1-esterase-inhibitor-human-105666398.html (downloaded on Mar. 20, 2017).

Press Release, ViroPharma Inc., ViroPharma Provides Update on Phase 2 Clinical Evaluation of Subcutaneous Cinryze® (C1 esterase inhibitor [human]) with Recombinant Human Hyaluronidase (rHuPH20) (Aug. 1, 2012) available at http://www.prnewswire.com/news-releases/viropharma-provides-update-on-phase-2-clinical-evaluation-of-subcutaneous-cinryze- c1-esterase-inhibitor-human-with-recombinant-human- hyaluronidase-rhuph20-164636346.html (downloaded on May 25, 2017).

Prosecution History of U.S. Pat. No. 9,616,111.

Protest and Submission of Prior Art Submitted in Canadian Patent Application No. 2,904,543, filed Sep. 27, 2017.

R & D Focus Drug News, CSL Behring phase change I/II. USA (angioedema), IMSworld Publications Ltd., (Jun. 14, 2012) <http://search.proquest.com/professional/docview/1020661991?ac>.

R & D Focus Drug News, recombinant human C1 esterase inhibitor, Pharming Pharming submitted (angioedema), IMSworld Publications Ltd., (Jul. 31, 2006) <http://search.com/professional/docview/670195890?ac>.

R & D Focus Drug News, recombinant human C1 esterase inhibitor, Pharming Pharming Fast Track, USA (angioedema), IMSworld Publications Ltd., (Aug. 7, 2006) <http://search.proquest.com/professional/docview/771275903?accou>.

Relan, A. et al., Recombinant C1-Inhibitor Effects on Coagulation and Fibrinolysis in Patients with Hereditary Angioedema, Biodrugs, 26(1):43-52 (2012).

Research & Development Slides, CSL Behring, Dec. 6, 2012.

Reshef, A. et al., Clinical Efficacy of Recombinant Human C1 Inhibitor in Patients with Acute Hereditary Angioedema Attacks, World Allergy Organization, S45 (2012).

Reshef, A. et al., Recombinant human C1 inhibitor for the prophylaxis of hereditary angioedema attacks: a pilot study, Allergy, 68:118-124 (2013).

Reuter, G. & Gabius, H.-J., Eukaryotic glycosylation: whim of nature or multipurpose tool?, 55 CMLS, Cell. Mol. Life Sci. 368-422 (1999).

Riedl, M. A. et al., Subcutaneous administration of human C1 inhibitor with recombinant human hyaluronidase in patients with hereditary angioedema, 37(6) Allergy Asthma Proc. 489-500 (2016).

Roberts, C. J., Declaration of Dr. Christopher J. Roberts.

Roberts, C. J., Curriculum Vitae of Dr. Christopher J. Roberts, Ph.D.

Rossi, V. et al., Functional Characterization of the Domain: Insights into Heparin Binding Recombinant Human C1 Inhibitor Serpin, J. Immunol, 184: 4982-4989 (2010).

Sanquin, Scientific Report, Blood and Beyond, 1-226 (2007).

Sardana, N. & Craig, T. J., Recent Advances in Management and Treatment of Hereditary Angioedema, 128(6) Pediatrics 1173-80 (2011).

Schellekens, H., Why some proteins have sugars: Epoetins, from alfa to zeta, 19(6) EJHP Practice 29-35 (2008).

Schrantz, Declaration of Dr. Jennifer Schrantz dated Sep. 15, 2015, including Exhibit B referred to in that Declaration (obtained from USPTO online file of U.S. Appl. No. 14/855,168).

Schrantz, Declaration of Dr. Jennifer Schranz, excerpted from the prosecution history of U.S. Pat. No. 9,616,111.

Schrantz et al. (2012). J Allergy Clin Immunology 129(2), AB369, Abstract L21.

Schrantz et al. (2012). Poster presented at American Academy of Allergy, Asthma & Immunology Annual Meeting, Orlando FL, Mar. 2-Mar. 6, 2012.

Schranz, J. et al., Safety, Pharmacokinetics (PK), and Pharmacodynamics (PD) of Subcutaneous (SC) CINRYZE® (C1 Esterase Inhibitor [Human])with Recombinant Human Hyaluronidase (rHuPH20) in Subjects with Hereditary Angioedema (HAE), ViroPharma Incorporated, Poster L21 presented at the 2012 American Academy of Allergy, Asthma & Immunology annual meeting. ("Schranz").

Schreiber et al. (1973). Inhibition by C1INH of Hageman Factor Fragment Activation of Coagulation, Fibrinolysis, and Kinin Generation, J.Clin. Inv. 52: 1402-1409.

Shalaev, E. Y. et al., Thermophysical properties of pharmaceutically compatible buffers at sub-zero temperatures: implications for freeze-drying, 19(2) Pharmaceutical Res. 195- 201 (2002).

Shire, S.J., Formulation and manufacturability of biologics, 20 Current Opinion in Biotechnology, 708-14 (2009).

Solá, R. J. and Griebenow, K., Effects of Glycosylation on the Stability of Protein Pharmaceuticals, 98(4) J. Pharm. Sci. 1223-45 (2009).

Späth, P.J. et al., Quantification of C1-Inhibitor Functional Activities by Immunodiffusion Assay in Plasma of Patients with Hereditary Angioedema—Evidence of a Functionally Critical Level of C1-Inhibitor Concentration, 1 Complement 147-59 (1984).

Strengers, P., Sanquin, C1 -Esteraseremmer-N for the Treatment of Hereditary (and Acquired) Angioedema, ClinicalTrials.gov Identifier: NCT00125541, 4 pages (Jul. 29, 2005).

Subcutaneous CINRYZE with Recombinant Human Hyaluronidase for Prevention of Angioedema Attacks, https://clinicaltrials.gov/ct2/show/results/NCT01756157?term=NCT01756157&rank=1, Accessed Mar. 23, 2016.

Tillou, X. et al., Recombinant human C1-inhibitor prevents acute antibody-mediated rejection in alloimmunized baboons, Kidney International, 78: 152-159 (2010).

Van Doorn, M.B.A. et al., A phase I study of recombinant human C1 inhibitor in asymptomatic patients with hereditary angioedema (HAE), Br J Clin Pharmacol, 59(1):136 (2004).

## US 10,105,423 B2

Page 6

(56)        **References Cited**

OTHER PUBLICATIONS

Van Doorn, M.B.A. et al., A phase I study of recombinant human C1 inhibitor in asymptomatic patients with hereditary angioedema, J. Allergy Clin. Immunol., 116(4): 876-883 (2005).

United Kingdom Patent Application No. 1519921.9, Shire Reply dated Mar. 2, 2017.

United States Securities and Exchange Commission, Form 10-K for the fiscal year ended Dec. 31, 2012, ViroPharma Inc.

United States Securities and Exchange Commission, Form 10-Q for the quarterly period ended Jun. 30, 2011, ViroPharma Inc.

United States Securities and Exchange Commission, Form 10-Q for the quarterly period ended Jun. 30, 2013, ViroPharma Inc.

ViroPharma Incorporated, Cinryze, Presentation, 76 pages (Mar. 19, 2010).

Vivaglobin® Prescribing Information, CSL Behring, Apr. 2010.

Wahn, V. et al., Hereditary angioedema (HAE) in children and adolescents—a consensus on therapeutic strategies, European Journal of Pediatrics, 171: 1339-1348 (2012).

Wang, W., Protein Aggregation and Its Inhibition in Biopharmaceutics, 289 Int. J. Pharm. 1-30 (2005).

WC500098546, CHMP assessment report, European Medicines Agency, EMA/CHMP/450053/2010, (Jun. 24, 2010).

WC500103884, Cinryze C1 inhibitor, human, European Medicines Agency, EMA/CHMP/217963/2011 (Mar. 17, 2011).

WC500108895, Annex I Summary of Product Characteristics, 1-33.

WC500108896, Appendix, EU/1/11/688/001.

WC500108897, Annex Conditions or Restrictions with Regard to the Safe and Effective Use of the Medicinal Product to be Implemented by the Member States, 1-3.

WC500108898, Assessment Report Cinryze, EMEA/H/C/001207.

WC500108899, Cinryze C1 inhibitor (human), EMA/244001/2011 and EMEA/H/C/001207.

WC500142079, Cinryze (C1 Inhibitor (human)), European Medicines Agency, EMA/175539/2013, (Feb. 21, 2013).

Weiss IV, W. F. et al., Principles, Approaches, and Challenges for Predicting Protein Aggregation Rates and Shelf Life, 98(4) J. Pharm. Sci. 1246-77 (2009).

Wolff, M.W. et al., Expression of C1 esterase inhibitor by the baculovirus expression vector system: preparation, purification, and characterization, Protein Expression and Purification, 22(3):414-421 (2001).

Vugmeyster et al., "Pharmacokinetics and toxicology of therapeutics: advances and challenges," World J. Biol. Chem. 3:73-92. Published Apr. 26, 2012.

Yadav, S. et al., Viscosity Analysis of High Concentration Bovine Serum Albumin Aqueous Solutions, 28 Pharm. Res. 1973-83 (2011).

Zuraw, B. L. et al., Nanofiltered C1 Inhibitor Concentrate for Treatment of Hereditary Angioedema, 363(6) N. Engl. J. Med. 513-22 (2010). ("Zuraw").

Zuraw, B. L. et al. Phase II study results of a replacement therapy for hereditary angioedema with subcutaneous C1-inhibitor concentrate, 70 Allergy 1319-28 (2015).

Zuraw, B.L. et al., Recombinant human C1-inhibitor for the treatment of acute angioedema attacks in patients with hereditary angioedema, J. Allergy Clin. Immunol., 126(4): 821-827 (2010).

Zuraw, B.L., HAE therapies: past present and future, Allergy, Asthma & Clinical Immunology, 6(23): 1-8 (2010).

Zuraw, Hereditary Angioedema, N Engl J Med, 359(10):1027-1036 (2008).

Jiang et al., "Subcutaneous infusion of human C1 inhibitor in swine", Clinical Immunology, 2010; 136: 323-328.

The Pharmaceutics and Compounding Laboratory (2010); "Subcutaneous"; UNG; http://pharmlabs.unc.edu/labs/parenterals/subcutaneous.htm.

Extract from "Ansel's Pharmaceutical Dosage Forms and Drug Delivery Systems"; ninth edition; 2001; Chapter 5, pp. 162-170.

Poster entitled "Safety, Pharmacokinetics (PK), and Pharmacodynamics (PD) of Subcutaneous (SC) Ginryze® (C1 Esterase Inhibitor [Human]) with Recombinant Human Hyaluronidase (rHuPH20) in

Subjects with Hereditary Angioedema (HAE)" (p. 1 is the poster, pp. 2-3 are enlargements of p. 1 and p. 3 is an enlargement of Figure 1 of the poster).

Publication of the abstract L21 in J Allergy Cun Mmunol, vol. 129, No. 2 (Feb. 2012).

Press Release by BMI Research on Mar. 6, 2012.

Austria Codex Fachinformation 1997/1998, pp. 355-366 (Berinert P).

Lunn et al., "Cinryze™ as the first approved C1 inhibitor in the USA for the treatment of hereditary angioedema: approval, efficacy and safety", Journ. Blood Medicine, 2010; 1; 163-170.

CSL Behring® —Hizentra—Zusammenfassung der Merkmale des Arzneim ittels.

Poster entitled "Comparison of the viscosity of three subcutaneous immunoglobulin brands (SCIG) Potential implications in clinical use" by Haag et al. presented at the occasion of the XIIth Meeting of the ESID, Oct. 4-7, 2006, Budapest, Hungary.

Drouet et al., "A sensitive method to assay blood complement C1 Inhibitor activity", Clinica Chimica Acta, 1988; 174; 121-130.

Cardona et al., "Recent developments in the treatment of acute abdominal and facial attacks of hereditary angioedema: focus on human C1 esterase inhibitor", The Application of Clinical Genetics, 2010: 3; 133-146.

Burckbuchler et al., "Rheological and syringeability properties of highly concentrated human polyclonal immunoglobulin solutions", European Journal of Pharmaceutics and Biopharmaceutics, 2010; 76 :351-356.

CINRYZE® Highlights of prescribing information.

European Pharmacopoeia Fourth Edition, Sep. 20, 2001 (Human Albumin Solution).

Austria Codex Fachinformation 1997/1998, pp. 354-355 and 1460-1461 (Beriglobin, Human Albumin).

De Serres et al., "Safety and efficacy of pasteurized C1 inhibitor concentrate (Berinert® P) in hereditary angioedema: a review", Transfusion and Apheresis Science, 2003, 29: 24 7-254.

Craig declaration and exhibits (Annex A: Haegarda® Prescribing Information ; Annex B: Web page for the CSL Behring trial CSL830 2001 NCT01576523 Annex C: Informed Consent Form; Annex D: Informed Consent Form (signed by a patient taking part in the trial: identity of patient has been masked); Annex E:Zuraw et al, 2015 (see E3)).

Informed Consent Form for enrolment of adults for CSL830 2001 clinical trial sponsored by CSL Behring : US site : Hershey Medical Center, Hershey, PA (signed by a patient taking part in the trial; identity of patient has been masked); Informed Consent Form for enrolment of adults for CSL830 2001 clinical trial sponsored by CSL Behring: Germany site: Johann Wolfgang Goethe University Hospital, Frankfurt, Germany.

Zuraw B.L., et al. (2015) Allergy, 1319-1328, *Phase II study results of a replacement therapy for hereditary angioedema with subcutaneous C1-inhibitor concentrate*, including Supplementary Appendixes S1 and S2.

Clinical Trials web page from https://clinicaltrials.gov for the CSL Behring CSL830 2001 trial NCT01576523 as available on Jan. 18, 2013 at https://clinicaltrials.gov/archive/NCT01576523/2013_01_18.

Martinez-Saguer et al., Transfusion, vol. 54, Jun. 2014, p. 1552-1561 (Document "D18" in Examination proceedings): the PAS-SION study.

Schranz et al. abstract L21 in J Allergy Clin Mmunol, vol. 129, No. 2 (Feb. 2012) (Document D5a in Examination proceedings).

Schranz et al Poster entitled "*Safety, Pharmacokinetics (PK), and Pharmacodynamics (PD) of Subcutaneous (SC) Cinryze® (C1 Esterase Inhibitor* [*Human*]) *with Recombinant Human Hyaluronidase* (*rHuPH20*) *in Subjects with Hereditary Angioedema* (*HAE*)" presented on Tuesday Mar. 6, 2012 at the AAAAI meeting in Orlando, Florida, USA during the poster-session; Press Release by BMI Research on Mar. 6, 2012, in connection with the Poster.

Clinical Trials web page for study NCT01095497 as available on Mar. 7, 2012: https://clinicaltrials.gov/archive/NCT01095497/2012_03_07 and https://clinicaltrials.gov/archive/NCT01095497.

Cinryze: EMN602545/2013 "CHMP assessment report for paediatric use studies submitted according to Article 46 of the Regulation (EC)

(56) **References Cited**

OTHER PUBLICATIONS

Nº 1901/2006", Jul. 25, 2013 available at http://www.ema.europa.eu/docs/en GB/document library/EPAR—Assessment Report—Variation/human/001207/WC500152686.pdf.
Product Information for Berinert® (version available as of 2012); Summary of Berinert® Product Characteristics (Germany); Berinert® Package Insert (United States).
Cinryze®: Summary of Product Characteristics (EMA) first published in Jul. 2011; current version available at: http://www.ema.europa.eu/ema/index.jsp?curl=pages/medicines/human/medicines/001207/human_med_001448.jps&mid=WC0b01ac058001d124.
Martinez-Saguer et al. (2011), Journal of Allergy & Clinical Immunology 127: AB104 (Passion Abstract).
Martinez-Saguer et al., Poster entitled "Pharmacokinetic Berinert® study of subcutaneous versus intravenous administration in patients with moderate hereditary angioedema—the PASSION study" presented at the AAAAI meeting in San Francisco in Mar. 2011.
Extract from WIPO on-line file for WO2014/145519 (PCT application underlying contested patent EP2968434)—PCT Request as initially filed.
Extract from WIPO on-line file for W02014/145519—1st request for correction of the applicant, from ViroPharma Incorporated to Shire Orphan and Rare Diseases GmbH.
Extract from WIPO on-line file for WO2014/145519—substituted sheets of the request, issued by WIPO.
Extract from WIPO on-line file for WO2014/145519—2nd request for correction of the applicant, from Shire Orphan and Rare Diseases GmbH to Viropharma Holdings Limited.
Extract from WIPO on-line file for WO2014/145519—substituted sheets of the request.
Extract from WIPO on-line file for WO2014/145519—Request for registering the assignment from Viropharma Holdings Limited to Shire Viropharma Incorporated.
Martinez-Saguer Declaration I and exhibits (Annex 1: Site-specific Informed Consent Form, Annex 2) (Google machine translation included).
Guide "Patienten in klinischen Studien" issued by VFA (Verband Forschender Arzneimittelhersteller). (Google machine translation included).
Zuraw et al (2010). Allergy, Asthma & Clinical Immunology, 2010, 6:23. "HAE Therapies: past present and future".
Extract from "Injectable Drug Development. Techniques to Reduce Pain and irritation"; 1999; Chapter 17; Gatlin et al. "Formulation and Administration techniques to minimize Injection Pain and Tissue Damage Associated with Parenteral Products".
Cardona et al (2010). The Application of Clinical Genetics 2010:3; 133-146. "Recent developments in the treatment of acute abdominal and facial attacks of hereditary angioedema: focus on human C1 esterase inhibitor".
Jiang et al (2010). Clinical Immunology 136, 323-328. "Subcutaneous infusion of human C1 inhibitor in swine".
CSL Behring Press Release, May 3, 2012. "CSL Behring Initiates Study of Subcutaneous Administration of C1-esterase inhibitor in Patients with Hereditary Angioedema".
Viropharma Incorporated Investor Day presentation, available at https://www.sec.gov/Archives/edgar /data/946840/000119312512399193/d414342dex991.htm, The slides were disclosed to the SEC as part of a Form 8-K; the lodging date of the 8-K and associated documents, and the 8-K form can be found at https://www.sec.gov/Archives/edgar/data/946840/000119312512399193/0001193125-12-399193-index.htm.
Infringement complaint filed by Shire Viropharma Incorporated, 300 Shire Way, Lexington, MA 02421, USA at the Munich Regional Court I on Jun. 26, 2017, against CSL Behring GmbH, Emil-von-BehringStrasse 76, 35041, Marburg, Germany, in relation to European patent EP 2 968 434. (Google machine translation included).
Martinez-Saguer Declaration II and exhibits (Annex 1: ClinicalTrials.gov extract for the PASSION Study; Annex 2: Poster presented at the AAAAI meeting in San Francisco in Mar. 2011 and abstract; Annex 3: Poster presented at the EAACI meeting in Istanbul in Jun.

2011 and abstract; Annex 4: Slide presentation presented at Budapest during a workshop in May 2011, and associated program).
Waldhauser declaration and exhibits (Exhibit A: Hanno Waldhauser's badge; Exhibit B: Meeting Summary; Exhibit C: Schranz poster; Exhibit D: Enlargement of Figure 1 of Schranz poster; Exhibit E: Photograph of Schranz poster; Exhibit F: Abstract of the Schranz poster; Exhibit G Viropharma and Halozyme Press Release, Mar. 6, 2012).
Martinez-Saguer et al. slide presentation ("Parmacokinetics of plasmaderived C1-esterase inhibitor after subcutaneous versus intravenous administration in patients with moderate hereditary angioedema"), presented in Budapest during a HAE workshop in May 2011.
Martinez-Saguer et al. Poster ("Parmacokinetics of plasma-derived C1-esterase inhibitor after subcutaneous versus intravenous administration in subjects with moderate hereditary angioedema"), presented at the EAACI meeting in Istanbul in Jun. 2011, and associated abstract.
FDA web page "Informed Consent for Clinical Trials" available at: https://www.fda.gov/forpatients/clinicaltrials/informedconsent/default.htm.
Program of Poster-Session of 2012 AAAAI meeting in Orlando, Florida, USA (Tuesday Mar. 6, 2012).
Viropharma Study Synopsis dated Sep. 6, 2011, made public on Shire's website after completion of ViroPharma acquisition in 2014 at http://www.shiretrials.com/media/files/clinical%20trials/clinicaltrialsen/clinical%20study%20reports/shire-0624-200-clinical-study-report-redact.pdf.
Herget declaration and exhibits (Exhibit A: clinical trial web page NCT01576523; Exhibit B: Site-specific Informed Consent form (Germany) ; Exhibit C: File note Parexel; Exhibit D: Monitoring plan Parexel for CSL830_2001 study, with sign-off sheet).
Nolte declaration and exhibit (Exhibit 1: Site-specific Informed Consent Form, Germany).
Van Doorn et al. (2005).J. Allergy Cli. Immunol. 116:4; 876-883. "A phase I study of recombinant human C1 inhibitor in asymptomatic patients with hereditary angioedema".
Tourangeau & Zuraw (2011). Curr. Allergy Asthma Rep 11:345-351. "The New Era of C1 Esterase Inhibitor Deficiency Therapy".
Shire S.J. et al. (Jun. 2004). J. Pharm. Sci. vol. 93, nº6, pp. 1390-1402. "Challenges in the Development of High Concentration Formulations".
Sola R.J. and Griebenow K. (2009). J Pharm Sci. 98(4):1223-45. "Effects of Glycosylation on the Stability of Protein Pharmaceuticals".
Bioonnews: CSL Behring Initiates Study of Subcutaneous Administration of C1-esterase Inhibitor in Patients with Hereditary Angioedema (Google machine translation included).
Opposition against European Patent No. EP2968434, filed by CSL Behring GmbH on Mar. 28, 2018.
Second Protest and Submission of Prior Art in Canadian Patent Application No. 2,904,543, filed on Apr. 16, 2018.
Petition for Inter Partes Review of U.S. Pat. No. 9,616,111, filed by CSL Behring GmbH and CSL Behring LLC on May 31, 2017.
Decision Denying Institution for Inter Partes Review of U.S. Pat. No. 9,616,111, entered on Dec. 7, 2017.
Opposition against European Patent No. EP2968434, filed by Octapharma AG on Mar. 28, 2018.
Infringement complaint filed by Shire Viropharma Incorporated, 300 Shire Way, Lexington, MA 02421, USA at the Munich Regional Court I on Jun. 26, 2017, against CSL Behring GmbH, Emil-von-BehringStrasse 76, 35041, Marburg, Germany, in relation to European patent EP 2 968 434.
English translation of: Infringement complaint filed by Shire Viropharma Incorporated, 300 Shire Way, Lexington, MA 02421, USA at the Munich Regional Court I on Jun. 26, 2017, against CSL Behring GmbH, Emil-von-BehringStrasse 76, 35041, Marburg, Germany, in relation to European patent EP 2 968 434.
English translation of: Martinez Saguer Declaration II and exhibits (Annex 1: ClinicalTrials.gov extract for the PASSION Study; Annex 2: Poster presented at the AAAAI meeting in San Francisco in Mar. 2011 and abstract; Annex 3: Poster presented at the EAACI meeting

## US 10,105,423 B2

Page 8

(56)          **References Cited**

OTHER PUBLICATIONS

in Istanbul in Jun. 2011 and abstract; Annex 4: Slide presentation presented at Budapest during a workshop in May 2011, and associated program).

English translation of: CSL Behring® —Hizentra—Zusammenfassung der Merkmale des Arzneim ittels.

Austria Codex Fachinformation 1997/1998, pp. 355, 356 and 469 (Berinert P).

English translation of: Austria Codex Fachinformation 1997/1998, pp. 355, 356 and 469 (Berinert P).

English translation of: Austria Codex Fachinformation 1997/1998, pp. 354-355 and 1460-1461 (Beriglobin, Human Albumin).

Informed Consent Form for enrollment of adults for CSL830 2001 clinical trial sponsored by CSL Behring : US site : Hershey Medical Center, Hershey, PA (signed by a patient taking part in the trial; identity of patient has been masked); Informed Consent Form for enrollment of adults for CSL830 2001 clinical trial sponsored by CSL Behring: Germany site: Johann Wolfgang Goethe University Hospital, Frankfurt, Germany.

English translation of: Informed Consent Form for enrollment of adults for CSL830 2001 clinical trial sponsored by CSL Behring : US site : Hershey Medical Center, Hershey, PA (signed by a patient taking part in the trial; identity of patient has been masked); Informed Consent Form for enrollment of adults for CSL830 2001 clinical trial sponsored by CSL Behring: Germany site: Johann Wolfgang Goethe University Hospital, Frankfurt, Germany.

Guide "Patienten in klinischen Studien" issued by VFA (Verband Forschender Arzneimittelhersteller).

English translation of: Guide "Patienten in klinischen Studien" issued by VFA (Verband Forschender Arzneimittelhersteller).

Martinez Saguer Declaration I and exhibits (Annex 1: Site-specific Informed Consent Form, Annex 2).

English translation of: Martinez Saguer Declaration I and exhibits (Annex 1: Site-specific Informed Consent Form, Annex 2).

English translation of: Nolte declaration and exhibit (Exhibit 1: Site-specific Informed Consent Form, Germany).

English translation of: Herget declaration and exhibits (Exhibit A: clinical trial web page NCT01576523; Exhibit B: Site-specific Informed Consent form (Germany) ; Exhibit C: File note Parexel; Exhibit D: Monitoring plan Parexel for CSL830_2001 study, with sign-off sheet).

Patient information on the clinical study: "Prostate and lymphatic flow radiation with integrated boost IMRT after neoadjuvant hormonal therapy" PLATIN, Therapy arm PLAT1N-4.

English translation of: Patient information on the clinical study: "Prostate and lymphatic flow radiation with integrated boost IMRT after neoadjuvant hormonal therapy" PLATIN, Therapy arm PLAT1N-4.

VFA. Die forschenden Pharma-Untemehmen "The path to a new drug".

English translation of: VFA. Die forschenden Pharma-Untemehmen "The path to a new drug".

Extract European and German Patent Register (EP 2 968 434) cited as Exhibit LL01 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

Decision to grant the European Patent pursuant to Art. 97 (1) EPC cited as Exhibit LL02 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Patent specification, claims and drawings (Communication pursuant to Rule 71 (3) EPC) cited as Exhibit LL03 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

CSL press release re. US litigation dated Apr. 12, 2017 cited as Exhibit LL05 in the Infringement complaint filed by Shire Viropharma

Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Shire entity details, State of Delaware cited as Exhibit LL06 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Website extracts of CSL Behring cited as Exhibit LL07 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

Trade register excerpt of CSL Behring GmbH cited as Exhibit LL08 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

Meeting minutes of the analysts Seeking Alpha (regarding conference call Aug. 11, 2015) cited as Exhibit LL09 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Meeting minutes between CSL Ltd. nad Analysts of S&P Capital IQ dated Nov. 30, 2016 cited as Exhibit LL10 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Meeting minutes re. half-year result 2016 dated Feb. 14, 2017 cited as Exhibit LL11 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Clinical study protocol CSL830_3001 cited as Exhibit LL14 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

ClinicalTrials.gov Study Protocol re. NCT02316353 cited as Exhibit LL15 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

CSL Behring press release dated Mar. 22, 2017 NEJM Publishes Pivotal Data on Preventing HAE Attacks cited as Exhibit LL16 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Frankfurter Allgemeine Newspaper Article "Pharmauntemehmen baut Marburger Standort aus" (Pharma-Company expands Marburg place of business) cited as Exhibit LL17 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

CSL's manufacturer's authorization (EudraGMP) cited as Exhibit LL18 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Press Article of Oberhessische Presse Online Feb. 23, 2017 "Sie nimmt der Krankheit ihre Macht; Kathrin Schön leidet an HAE" (She takes away the power from the disease; Kathrin Schön suffers from HAE) cited as Exhibit LL19 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

Extract Trade Mark Register re. HAEGARDA cited as Exhibit LL20 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Map showing HAE-Patients living in Germany cited as Exhibit LL21 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017,

## US 10,105,423 B2

Page 9

(56)          **References Cited**

OTHER PUBLICATIONS

against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

List of HAE specialized treatment centres and doctors cited as Exhibit LL22 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

CSL job advertisement sales representatives cited as Exhibit LL23 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

Claim construction cited as Exhibit LL24 in the Infringement complaint filed by Shire Viropharma Incorporated, at the Munich Regional Court I on Jun. 22, 2017, against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

ZLB Behring Memo from Kanzy and Metzner to Vohwinkel, Schulte and Seemann re. Berinert P 10-fold concentrated (500U/mL) feasibility/stability dated Mar. 30, 2006.

Picture of HAEGARDA Packaging cited as Exhibit K28 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

EU Summary of Products Characteristics Berinert 2000/3000; EU Package Leaflet re. Berinert 2000; EU Labels Berinert 2000; EU Package Leaflet Berinert 3000; EU Labels Berinert 3000 cited as Exhibit K29 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

CSL Biotherapies information on Mix2Vial cited as Exhibit K30 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Legal opinion of Prof Leistner re. Sec. 3 para 4 German Patent Act cited as Exhibit K31 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

BLA Approval letter CSL dated Jun. 22, 2017 cited as Exhibit K32 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

MRFG Flow Chart of the Decentralised Procedure cited as Exhibit K33 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Head of Medicine Agency regarding Berinert 2000 cited as Exhibit K34 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Credit Suisse R&D Investor Briefing Dec. 5, 2017 cited as Exhibit K35 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

CSL JP Morgan Conference Jan. 10, 2018 presentation cited as Exhibit K36 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Photographs of Presentation of the 22 Conference of the German Society for Agioedema cited as Exhibit K37 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434. (English translation included).

ClinicalTrials.gov Glossary of Common Site Terms cited as Exhibit K40 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Clinical Development Success Rates 2006-2015 cited as Exhibit K42 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Exhibit to the Notification of the EPO dated Nov. 16, 2016 cited as Exhibit K43 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

CSL Third Party Observation re. EP 14 762 434.4 cited as Exhibit K44 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Reply to Third Party Observation (Shire's reply) dated Mar. 2, 2017 cited as Exhibit K45 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Exhibit to the Notification of the EPO dated Apr. 28, 2017 cited as Exhibit K46 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

EPO Intention to Grant dated May 19, 2017 cited as Exhibit K47 in the Reply Brief filed by Shire Viropharma Incorporated on Jan. 30, 2018, against CSL Behring GmbH, in relation to European patent EP 2 968 434.

Berinert SC Prophylaxis Meeting Minutes (Apr. 30, 2010) cited as Exhibit rop10 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

CSL Minutes Kick-off Meeting Berinert, volume-reduced (Jun. 25, 2010) cited as Exhibit rop11 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

Presentation Berinert Feasibility Study cited as Exhibit rop12 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

CSL Meeting Minutes PharmaPlan Committee Meeting Sep. 9-13, 2010 cited as Exhibit rop13 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

CSL 21st Project Review Committee Minutes Oct. 5, 2010 cited as Exhibit rop14 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

CSL Internal Target Product Profile cited as Exhibit rop15 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

CSL Monthly Project Report Berinert P/Sc Oct. 2010 and further reports cited as Exhibit rop16 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

CSL Minutes Berinert SC Project Team Kick-Off Meeting Dec. 1, 2010 and additional documents cited as Exhibit rop17 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

22nd Project Review Committee Meeting Feb. 10, 2011 and Minutes cited as Exhibit rop18 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

22nd Project Review Committee Meeting Feb. 10, 2011 Presentation cited as Exhibit rop19 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

23rd Project Review Committee Jun. 21 and 22, 2011 and final minutes and presenation cited as Exhibit rop20 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

24th Project Review Committee Oct. 7, 2011, presentation, 25th Project Review Committee Feb. 17, 2012, Research and Development Jul. 2, 2012 and R&D Sep. 11, 2012, R&D Feb. 11, 2013 cited

## US 10,105,423 B2

Page 10

(56)        **References Cited**

OTHER PUBLICATIONS

as Exhibit rop21 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

Center for Biologics and Research Application to FDA for Type B pre-IND Meeting cited as Exhibit rop22 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

ClinicalTrials.gov Archive NCT01760343 cited as Exhibit rop23 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

CSL Scientific Advise Meeting Oct. 13, 2011 re CSL830, Meeting Minutes cited as Exhibit rop24 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

Email Marco Cicardi Dec. 10, 2012 cited as Exhibit rop25 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

Email Thomas Craig Mar. 6, 2013, Summary and Follow up of CSL830 Steering Committee Meeting cited as Exhibit rop26 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

EMA Guideline for good clinical Practice cited as Exhibit rop28 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

Approval of Ethics Committee re. CSL830_2001 cited as Exhibit rop29 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

Press release ViroPharma dated Mar. 22, 2011 re AAAI Meeting San Francisco cited as Exhibit rop30 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

ClinicalTrials.gov NCT00748202 cited as Exhibit rop31 in the Reply Brief filed by CSL Behring GmbH on Apr. 3, 2018, against Shire Viropharma Incorporated in relation to European patent EP 2 968 434.

Patient Information re. Berinert 2000 and 3000 cited in Triplik brief (Hoyng Rokh Monegier) date Apr. 30, 2018 (English translation included).

EMEA General Consideration for Clinical Trials cited in Triplik brief (Hoyng Rokh Monegier) date Apr. 30, 2018.

Notice from the EPO dated Jul. 5, 2017 re. Filing and Processing of TPOs under Art. 115 EPC cited in Triplik brief (Hoyng Rokh Monegier) date Apr. 30, 2018.

CSL Summary Basis for Regulatory Action Jun. 22, 2017 cited in Triplik brief (Hoyng Rokh Monegier) date Apr. 30, 2018.

Confirmatory Assignment and Owner's Rights Agreement cited in Triplik brief (Hoyng Rokh Monegier) date Apr. 30, 2018.

PCT Notifications under Rule 92bis.1 cited in Triplik brief (Hoyng Rokh Monegier) date Apr. 30, 2018.

Information brochure Federal Office for Drugs and Medical Products re. Clinical trials (non-commercial) cited in Quadruplik brief (rospatt osten press) dated Jun. 7, 2018 (English translation included).

CSL Certificate of IMP Release CSL830 1500 IU cited in Quadruplik brief (rospatt osten press) dated Jun. 7, 2018.

Excerpts of analyst reports 2012 cited in Quadruplik brief (rospatt osten press) dated Jun. 7, 2018.

Screenshot of the program of the project management CSL cited in Quadruplik brief (rospatt osten press) dated Jun. 7, 2018 (English translation included).

Excerpt CSL annual report 2010-2011 cited in Quadruplik brief (rospatt osten press) dated Jun. 7, 2018.

Trade register excerpt of ZLB Behring cited in Quadruplik brief (rospatt osten press) dated Jun. 7, 2018 (English translation included).

FDA Current Shortages cited in Quadruplik brief (rospatt osten press) dated Jun. 7, 2018.

Email Lisa Sjoberg (Shire) to Swedish Approval Authority dated Dec. 18, 2017 cited in Quadruplik brief (rospatt osten press) dated Jun. 7, 2018.

Cinryze 500 Unidades Polvy y Disolvente Para Solucion Inyectable cited in Quadruplik brief (rospatt osten press) dated Jun. 7, 2018 (English translation included).

EPO Boards of Appeal Decision T239/16 cited in Quadruplik brief (rospatt osten press) dated Jun. 7, 2018.

Patient Consent Form Novartis (re. Descision T239/16) cited in Quadruplik brief (rospatt osten press) dated Jun. 7, 2018.

Legal Opinion of Prof. Leistner re. Section 12 German Patent Act (Prior use Right) cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier) (English translation included).

EMA Update Shortage of Cinryze resolved Oct. 31, 2017 cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

CSL Drug Information to Healthcare Professionals Oct. 2, 2017 cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

EPA Case law regarding public availability cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier) (English translation included).

Email and draft Sanquin report cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

Sanquin report (final) May 15, 2009 cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

Daugherty et al. Formulations and delivery issues for monoclonal antibody therapeutics cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

Haller PharmTech.com Converting Intravenous Dosing to Subcutaneous Dosing with Recombinant Human Hyalurondiase cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

Kling Highly Concentrated Protein Formulations: Finding Solutions for the Next Generation of Parental Biologics cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

Sassin et al. Hypodermoclysis: An Alternative Infusion Technique cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

Shapiro Subcutaneous Immonoglobulin Therapy by Rapid Push is Preferred to Infusion by Pump: A Retrospective Analysis cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

Frost Recombinant human hyaluronidas (rHuPH20): an enabling platform for subtaneous drug and fluid administration cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

Contracts of the inventors and German translations of the highlighted parts cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

Label templates for CSL830_2001 with German comments cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

Email Dorothy Scott (FDA) re. Haegarda supply Sep. 1, 2017 cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

PRC Report R&D Dec. 11, 2012 cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

WIPO Section 325 of the administrative instructions under the PCT cited in Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier).

Request for an extension of deadline (rospatt osten press) dated Jul. 31, 2017 (English translation included).

Statement of Defense (rospatt osten press) dated Oct. 27, 2017 (English translation included).

Brief dated Nov. 7, 2017 regarding process costs (Hoyng Rokh Monegier) (English translation included).

Brief dated Nov. 13, 2017 regarding submission of patent spec. (Hoyng Rokh Monegier) (English translation included).

Brief dated Nov. 13, 2017 regarding acknowledgement of paying security (Hoyng Rokh Monegier) (English translation included).

Brief dated Jan. 2, 2018 regarding security for proceedings (Hoyng Rokh Monegier) (English translation included).

Replik brief (Hoyng Rokh Monegier) dated Jan. 30, 2018 (English translation included).

Duplik brief (rospatt osten press) dated Apr. 3, 2018 (English translation included).

Brief submitting exhibit rop 32 in full dated Apr. 9, 2018 (English translation included).

Triplik brief (Hoyng Rokh Monegier) date Apr. 30, 2018 (English translation included).

## US 10,105,423 B2
Page 11

(56)         References Cited

OTHER PUBLICATIONS

Request for an extension of deadline (rospatt osten pross) dated May 25, 2018 (English translation included).
Brief regarding CSL's request extension of deadline (Hoyng Rokh Monegier) dated May 30, 2018 (English translation included).
Brief regarding CSL's request extension of deadline (rospatt osten pross) dated May 30, 2018 (English translation included).
Quadruplik brief (rospatt osten pross) dated Jun. 7, 2018 (English translation included).
Brief dated Jun. 22, 2018 (Hoyng Rokh Monegier) (English translation included).
Brief regarding impartiality of reporting judge (Hoyng Rokh Monegier) dated Jun. 29, 2018 (English translation included).
Brief dated Jul. 4, 2018 (rospatt osten pross) (English translation included).
Statement of Claim (Linklaters) dated Jun. 6, 2017 (English translation included).
Haller, Converting Intravenous Dosing to Subcutaneous Dosing with Recombinant Human Hyaluronidase, Pharmaceutical Technology, vol. 31(10).
Kling, Highly Concentrated Protein Formulations: Finding Solutions for the next Generation of Parenteral Biologics, BioProcess International, 12(5), 2014.
Ruconest® FDA Product Label.
Shire et al., Challenges in the Development of High Protein Concentration Formulations, Journal of Pharmaceutical Sciences, vol. 93(6), 2004.

Farkas et al., Z Gastroenterol. 1999, 37(6): 513-8.
Consent for Research ("Informed Consent") form (version date Jul. 9, 2012), for the enrollment of patients in Study No. CSL830_2001, which corresponds to ClinicalTrials.gov (National Institutes of Health) identification No. NCT01576523.
Notice of Service of Defendants' Initial Invalidity Contention, *Shire ViroPharma Incorporated* (Plaintiff) v. *CSL Behring LLC and CSL Behring GmbH* (Defendants), filed Apr. 3, 2018 in the United States District Court for the District of Delaware.
CSL Behring's Opening Claim Construction Brief, *Shire ViroPharma Incorporated* (Plaintiff) v. *CSL Behring LLC and CSL Behring GmbH* (Defendants), filed Jun. 18, 2018 in the United States District Court for the District of Delaware.
Declaration of Andrew MacGinnitie, M.D., Ph.D., Regarding Claim Construction, *Shire ViroPharma Incorporated* (Plaintiff) v. *CSL Behring LLC and CSL Behring GmbH* (Defendants), filed Jun. 18, 2018 in the United States District Court for the District of Delaware.
Plaintiff Shire ViroPharma Inc.'s Opening Claim Construction Brief, *Shire ViroPharma Incorporated* (Plaintiff) v. *CSL Behring LLC and CSL Behring GmbH* (Defendants), filed Jun. 25, 2018 in the United States District Court for the District of Delaware.
Minutes taken at the public hearing of the Landgericht München I, 7th Civil Division on Thursday, Dec. 7, 2018 (Jul. 12, 2018) in Munich, in the legal dispute Shire Viropharma Incorporated versus CSL Behring GmbH.

* cited by examiner

**U.S. Patent**     Oct. 23, 2018     Sheet 1 of 2     US 10,105,423 B2

SEQ ID NO: 1

```
  1 MASRLTLLTL LLLLLAGDRA SSNPNATSSS SQDPESLQDR GEGKVAPTVI SKMLFVEPIL
 61 EVSSLPTTNS TTNSATKITA NTTDEPTTQP TTEPTTQPTI QPTQPTTQLP TDSPTQPTTG
121 SFCPGPVTLC SDLESHSTEA VLGDALVDFS LKLYNAPSAM KKVETNMAFS PFSIASLLTQ
181 VLLGAGENTK TNLESILSYP KDFTCVHQAL KGFTTKGVTS VSQIPHSPDL AIRDTFVNAS
241 KTLYSSSPRV LSNNSDANLE LINTWVAKNT NNKISRLLDS LPSDTRLVLL NAIYLSAKWK
301 TTFDPKKTRM EPFHFKNSVI KVPMMNSKKY PVAHPIDQTL KAKVGQLQLS HNLSLVILVP
361 QNLKHRLEDM EQALSPSVFK AIMEKLEMSK FQPTLLTLPR IKVTTSQDML SIMEKLEFFD
421 FSYDLNLCGL TEDPDLQVSA MQHQTVLELT ETQVEAAAAS AISVARTLLV FEVQQPFLFV
481 LWDQQHKFPV FMGRVYDPRA
```

**Figure 1**



Figure 2

US 10,105,423 B2

1

# C1-INH COMPOSITIONS AND METHODS FOR THE PREVENTION AND TREATMENT OF DISORDERS ASSOCIATED WITH C1 ESTERASE INHIBITOR DEFICIENCY

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuous application of U.S. patent application Ser. No. 15/411,744, filed on Jan. 20, 2017, which is a continuation of U.S. patent application Ser. No. 14/855,168, filed on Sep. 15, 2015, now U.S. Pat. No. 9,616,111, which is a continuation of International Patent Application No. PCT/US14/30309, filed Mar. 1, 2014 which claims priority under 35 U.S.C. § 119(e) to U.S. Provisional Patent Application No. 61/791,399, filed Mar. 15, 2013. The foregoing application is incorporated by reference herein.

## INCORPORATION-BY-REFERENCE-OF-SEQUENCE LISTING

The contents of the file named "SHR-1204US_ST25.txt", which was created on Jan. 20, 2017 and is 5 KB in size, are hereby incorporated by reference in their entirety.

## FIELD OF THE INVENTION

The present invention relates to the field of therapeutic agents and methods of use thereof. Specifically, the instant invention provides compositions and methods for the treatment and/or prevention of disorders associated with C1 esterase inhibitor deficiency.

## BACKGROUND OF THE INVENTION

Several publications and patent documents are cited throughout the specification in order to describe the state of the art to which this invention pertains. Full citations of these references can be found throughout the specification. Each of these citations is incorporated herein by reference as though set forth in full.

Hereditary angioedema (HAE) is a rare, life-threatening, genetic disorder caused by a deficiency of the C1esterase inhibitor (see generally www.haei.org and www.haea.org). At least 6,500 people in the United States and at least 10,000 people in Europe have HAE. HAE patients experience recurrent, unpredictable, debilitating, life-threatening attacks of inflammation and submucosal/subcutaneous swelling. The inflammation is typically of the larynx, abdomen, face, extremities, and urogenital tract. This genetic disorder is a result of a defect in the gene controlling the synthesis of the C1 esterase inhibitor. Accordingly, restoring the levels of active C1 esterase inhibitor in these patients to or near normal levels is an effective measure for treating HAE. Still, new and improved methods of treating and preventing disorders associated with a deficiency of the C1esterase inhibitor, such as HAE, are desired.

## SUMMARY OF THE INVENTION

In accordance with the instant invention, methods for inhibiting, treating, and/or preventing a disorder associated with a deficiency in C1 esterase inhibitor in a subject are provided. In a particular embodiment, the method comprises administering a composition comprising at least one. C1 esterase inhibitor.

2

In accordance with the instant invention, therapeutic compositions are also provided. In a particular embodiment, the composition comprises at least one C1 esterase inhibitor and, optionally, at least one pharmaceutically acceptable carrier for subcutaneous delivery (e.g. intravenous or subcutaneous delivery). Kits comprising a composition comprising at least one C1 esterase inhibitor are also provided herein.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 provides an amino acid sequence of human C1 esterase inhibitor.

FIG. 2 provides a graph of the effect of protein concentration on viscosity for initial spin concentration samples.

## DETAILED DESCRIPTION OF THE INVENTION

The restoration of active C1 esterase inhibitor levels in patients having a disorder associated with deficient or reduced levels of active C1 esterase inhibitor (e.g., HAE) is an effective measure for treating such disorders. Currently, C1 esterase inhibitor (such as Cinryze® (ViroPharma, Inc.; Exton, Pa.)) is administered to a patient intravenously by a medical professional. Herein, formulations of a C1 esterase inhibitor (such as Cinryze®) are provided which are also effective for subcutaneous (SC) administration. Surprisingly, the subcutaneous administration of the C1 esterase inhibitor is sufficient to maintain the blood levels of the C1 esterase inhibitor. The SC administration of a C1 esterase inhibitor fulfills an unmet medical need due to the limitations of intravenous administration in HAE patients.

In accordance with the instant invention, compositions and methods for inhibiting (e.g., reducing or slowing), treating, and/or preventing a disorder associated with C1 esterase inhibitor deficiency in a subject are provided. In a particular embodiment, the methods comprise administering (e.g., subcutaneously or intravenously) to a subject in need thereof at least one C1 esterase inhibitor. In a particular embodiment, the C1 esterase inhibitor is administered subcutaneously after an initial administration of the C1 esterase inhibitor intravenously.

C1 esterase inhibitors are also known as C1 inhibitors (C1 INH). C1 esterase inhibitors are inhibitors of complement C1 and belong to the superfamily of serine proteinase inhibitors. Human C1 esterase inhibitor is a protein of 500 amino acids, including a 22 amino acid signal sequence (Carter et al, (1988) Eur. J. Biochem., 173:163). In plasma, the C1 esterase inhibitor is a heavily glycosylated glycoprotein of approximately 76 kDa (Perkins et al. (1990) J. Mol. Biol., 214:751). The activity of a C1 esterase inhibitor may be assayed by known methods (see, e.g., Drouet et al. (1988) Clin. Chim. Acta., 174:121.30). In a particular embodiment, the C1 esterase inhibitor is human. An amino acid sequence of human C1 esterase inhibitor is provided in GenBank Accession No. CAA30314 (see also GeneID: 710, which also provides nucleotide sequences of the C1 esterase inhibitor) and FIG. 1. A C1 esterase inhibitor for use in the methods of the instant invention may have an amino acid sequence that has at least 65, 70, 75, 80, 85, 90, 95, 98, 99, or 100% identity with the amino acid sequence of FIG. 1. The C1 esterase inhibitor may be isolated or purified from plasma (e.g., human plasma) or recombinantly produced. When purified from plasma, the C1 esterase inhibitor may be nanofiltered and pasteurized. In a particular embodiment, the plasma-derived C1 esterase inhibitor is Cinryze®. In a particular embodiment, the C1 esterase inhibitor is present

US 10,105,423 B2

3

in the compositions of the instant invention at high concentration. Indeed, compositions comprising very high levels of C1 esterase inhibitor have been determined to be surprisingly stable and active. In a particular embodiment, the C1 esterase inhibitor is present at about 250 U/ml to about 1000 U/ml, about 400 U/ml to about 600 U/ml, or about 500 U/ml.

In a particular embodiment, the compositions of the instant invention do not contain citrate or citric acid. The compositions lacking citrate and citric acid are particularly useful for the subcutaneous administration of the C1 esterase inhibitor as citrate/citric acid can cause an injection site reaction. In a particular embodiment, the buffer of the instant compositions is sodium phosphate (e.g., about 5 mM to about 50 mM sodium phosphate, about 10 mM to about 30 mM sodium phosphate, or about 20 mM sodium phosphate). In a particular embodiment (e.g., for intravenous administration), the buffer of the instant compositions comprises a carboxylic group. For example, the buffer may be, without limitation, citrate, succinate, tartarate, maleate, acetate, and salts thereof. In a particular embodiment, the buffer of the instant composition is citrate or sodium citrate (e.g., about 5 mM to about 50 mM sodium citrate, about 10 mM to about 30 mM sodium citrate, or about 20 mM sodium citrate).

The compositions of the instant invention may have a pH range of about 6.5 or higher, particularly about 6.5 to about 8.0, particularly about 6.5 to about 7.5, and more particularly about 6.5 to about 7.0.

The compositions of the instant invention may also comprise polysorbate 80 (TWEEN). Compositions comprising polysorbate 80 are particularly useful as they reduce/mitigate, protein aggregation. Polysorbate 80 can also limit protein interactions when the composition comes into contact with silicon containing lubricants/oils such as those used in syringes and other administration devices.

Compositions comprising polysorbate 80 are also useful for lyophilized preparations. In a particular embodiment, the polysorbate 80 is present at a concentration of about 0.01% to about 0.1%, particularly about 0.025% to about 0.075%, particularly about 0.05%.

The compositions of the instant invention may also comprise sucrose. Sucrose can be added as a "bulking" agent as well as a lyo-protectant. In a particular embodiment, sucrose is added to compositions to be lyophilized. In a particular embodiment, the compositions comprise about 25 mM to about 125 mM sucrose, particularly about 50 mM to about 100 mM sucrose.

The compositions of the instant invention may also comprise at least one amino acid or salt thereof, particularly methionine and/or arginine. Arginine carries a positive charge on its side chain can be used to buffer solutions with phosphate. Methionine acts as a stabilizer (e.g., by limiting oxidation). The amino acids may be present in the composition as individual amino acids or present as short peptides (e.g., 2 to about 5 amino acids, particularly di-peptides or tri-peptides).

As stated hereinabove, the instant invention encompasses methods of treating, inhibiting, and or preventing any condition or disease associated with an absolute or relative deficiency of functional C1 esterase inhibitor. Such disorders include, without limitation, acquired angioedema (AAE) and hereditary angioedema (HAE). In a particular embodiment, the disorder is HAE and/or the attacks associated therewith. As stated hereinabove, HAE is a life-threatening and debilitating disease that manifests as recurrent, submucosal/subcutaneous swelling attacks due to a deficiency of C1 esterase inhibitor (Zuraw, B. L. (2008) N. Engl. J. Med., 359:1027-1036). In a particular embodiment,

4

the hereditary angioedema is type I or type II. Both type I and type II have a defective gene for the synthesis of C1 esterase inhibitor that produce either no C1 inhibitor (HAE type I) or a dysfunctional C1 inhibitor (HAE type II) (Rosen et al. (1965) Science 148: 957-958; Bissler et al. (1997) Proc. Assoc. Am. Physicians 109: 164-473; Zuraw et al. (2000) J. Allergy Clin. Immunol. 105: 541-546; Bowen et al. (2001) Clin. Immunol. 98: 157-163).

The methods of the instant invention encompass the administration of at least one C1 esterase inhibitor. Compositions comprising at least one C1 esterase inhibitor and, optionally, at least one pharmaceutically acceptable carrier (e.g., one suitable for subcutaneous or intravenous administration) are encompassed by the instant invention. Such compositions may be administered, in a therapeutically effective amount, to a patient in need thereof for the treatment of a disorder associated with C1 esterase inhibitor deficiency. The instant invention also encompasses kits comprising at least one composition of the instant invention, e.g., a composition comprising at least one C1 esterase inhibitor and, optionally, at least one pharmaceutically acceptable carrier (e.g., one suitable for intravenous or subcutaneous administration). The kits may further comprise at least one reconstitution buffer(s), syringes (e.g., disposable) for parenteral (e.g., subcutaneous) injection, and instruction material. In a particular embodiment, the kit comprises at least one pre-loaded syringe comprising the C1 esterase inhibitor and at least one pharmaceutically acceptable carrier. For example, a syringe may be loaded with at least one C1 esterase inhibitor with at least one pharmaceutically acceptable carrier for administration (e.g., intravenous or subcutaneous administration). Alternatively, a single syringe may be loaded with lyophilized C1 esterase inhibitor. In a particular embodiment, the preloaded syringes have a pharmaceutical composition that contains polysorbate 80 as a component (e.g., in an amount that prevents protein-silicone interaction or protein aggregation).

The agents and compositions of the present invention can be administered by any suitable route, for example, by injection (e.g., for local (direct) or systemic administration. In a particular embodiment, the composition is administered subcutaneously or intravenously. In general, the pharmaceutically acceptable carrier of the composition is selected from the group of diluents, preservatives, solubilizers, emulsifiers, adjuvants and/or carriers. The compositions can include diluents of various buffer content (e.g., Tris HCl, acetate, phosphate), pH and ionic strength; and additives such as detergents and solubilizing agents (e.g., Tween 80, Polysorbate 80), antioxidants (e.g., ascorbic acid, sodium metabisulfite), preservatives (e.g., Thimersol, benzyl alcohol) and bulking substances (e.g., lactose, mannitol). The pharmaceutical composition of the present invention can be prepared, for example, in liquid form, or can be in dried powder form (e.g., lyophilized for later reconstitution).

In a particular embodiment, the compositions are formulated in lyophilized form. Where the compositions are provided in lyophilized form, the compositions are reconstituted prior to use (e.g., within an hour, hours, or day or more of use) by an appropriate buffer (e.g., sterile water, a sterile saline solution, or a sterile solution comprising the appropriate pharmaceutically acceptable carriers (e.g., to reconstitute the compositions as described hereinabove). The reconstitution buffer(s) may be provided in the kits of the instant invention or may be obtained or provided separately.

As used herein, "pharmaceutically acceptable carrier" includes any and all solvents, dispersion media and the like

US 10,105,423 B2

5

which may be appropriate for the desired route of administration of the pharmaceutical preparation, as exemplified in the preceding paragraph. The use of such media for pharmaceutically active substances is known in the art. Except insofar as any conventional media or agent is incompatible with the molecules to be administered, its use in the pharmaceutical preparation is contemplated.

Selection of a suitable pharmaceutical preparation depends upon the method of administration chosen. In this instance, a pharmaceutical preparation comprises the molecules dispersed in a medium that is compatible with the tissue to which it is being administered. Methods for preparing parenterally or subcutaneously administrable compositions are well known in the art (see, e.g., Remington's Pharmaceutical Science (E.W. Martin, Mack Publishing Co., Easton, Pa.)).

As stated hereinabove, agents of the instant invention are administered parenterally—for example by intravenous injection into the blood stream and/or by subcutaneous injection. Pharmaceutical preparations for parenteral, intravenous, and subcutaneous injection are known in the art. If parenteral injection is selected as a method for administering the molecules, steps should be taken to ensure that sufficient amounts of the molecules reach their target cells to exert a biological effect.

Pharmaceutical compositions containing a compound of the present invention as the active ingredient in intimate admixture with a pharmaceutical carrier can be prepared according to conventional pharmaceutical compounding techniques. The carrier may take a wide variety of forms depending on the form of preparation desired for administration, e.g., parenterally or subcutaneous. For parenterals, the carrier will usually comprise sterile water, though other ingredients, for example, to aid solubility or for preservative purposes, may be included. Injectable suspensions may also be prepared, in which case appropriate liquid carriers, suspending agents and the like may be employed.

A pharmaceutical preparation of the invention may be formulated in dosage unit form for ease of administration and uniformity of dosage. Dosage unit form, as used herein, refers to a physically discrete unit of the pharmaceutical preparation appropriate for the patient undergoing treatment. Each dosage should contain a quantity of active ingredient calculated to produce the desired effect in association with the selected pharmaceutical carrier. Dosage units may be proportionately increased or decreased based on the weight of the patient. Appropriate concentrations for alleviation of a particular pathological condition may be determined by dosage concentration curve calculations. Appropriate dosage unit may also be determined by assessing the efficacy of the treatment.

The pharmaceutical preparation comprising the molecules of the instant invention may be administered at appropriate intervals, for example, daily, every other day, every three days, five out of every 7 days, or at least one, two or three times a week or more until the pathological symptoms are reduced or alleviated, after which the dosage may be reduced to a maintenance level. The appropriate interval in a particular case would normally depend on the condition of the patient.

In a particular embodiment, the C1 esterase inhibitor is present in the composition or is administered in the range of about 100 Units to about 10,000 Units; about 500 Units to about 5,000 Units; about 1,000 Units to about 3,500 Units, or about 1,500 Units to about 2,500 Units. In a particular embodiment, at least about 2,000 Units is used. In a particular embodiment, a high initial dose of the C1 esterase

6

inhibitor (as listed above (may be administered intravenously) is used, followed by lower maintenance doses. For example, the high initial dose may be at least 1.5, 2, 3, 4, or 5 times the subsequent doses. In a particular embodiment, the C1 esterase inhibitor is present in the maintenance composition or is administered far maintenance in the range of about 100 Units to about 5,000 Units; about 250 Units to about 2,000 Units; about 250 Units to about 1,000 Units; or about 500 Units. The high initial does of the C1 esterase inhibitor is optional in the methods of the instantly claimed invention (e.g., may be optional with prophylactic methods).

In a particular embodiment, the C1 esterase inhibitor is administered with a frequency and dosage so as to increase the C1 esterase inhibitor level to at least about 0.3 or, more particularly, 0.4 U/ml or more up to about 1 U/ml (1 Unit/ml is the mean quantity of C1 inhibitor present in 1 ml of normal human plasma) in the blood of the subject. For example, the C1 esterase inhibitor level may be kept at or above 0.4 U/ml for at least 50%, at least 75%, at least 90%, at least 95% or more of time or all of the time during which drug is being administered). For example, the administration of a 2000 U initial dose of C1 esterase inhibitor followed by 250 U everyday or 500 U every other day results in the maintenance of just below 0.4 U/ml in blood. Further, the administration of a 2000 U initial dose of C1 esterase inhibitor followed by 1000 U every 3 days results in the maintenance of about 0.4 U/ml in blood. Notably, for ease of use by the patient, less frequent administrations may be preferred. The administration of a 2000 U initial dose of C1 esterase inhibitor followed by 500 U everyday with weekend holidays from administration (i.e., 5 out of 7 days) also results in the maintenance of about 0.4 U/ml or higher in blood. Notably, the administration of only the maintenance doses leads to increased and physiologically relevant blood levels of the C1 esterase inhibitor, but delayed compared to those receiving an initial high dose.

Definitions

The singular forms "a," "an," and "the" include plural referents unless the context clearly dictates otherwise.

As used herein, the term "about" may refer to ±5%, ±2%, or ±1%.

As used herein, the terms "host," "subject," and "patient" refer to any animal, including humans.

As used herein, the term "prevent" refers to the prophylactic treatment of a subject who is at risk of developing a condition (e.g., HAE or HAE attack) resulting in a decrease in the probability that the subject will develop the condition.

The term "treat" as used herein refers to any type of treatment that imparts a benefit to a patient afflicted with a disorder, including improvement in the condition of the patient (e.g., in one or more symptoms), delay in the progression of the condition, etc. In a particular embodiment, the treatment of HAE results in at least a reduction in the severity and/or number of HAE attacks.

The phrase "effective amount" refers to that amount of therapeutic agent that results in an improvement in the patient's condition. A "therapeutically effective amount" of a compound or a pharmaceutical composition refers to an amount effective to prevent, inhibit, treat, or lessen the symptoms of a particular disorder or disease.

"Pharmaceutically acceptable" indicates approval by a regulatory agency of the Federal or a state government or listed in the U.S. Pharmacopeia or other generally recognized pharmacopeia for use in animals, and more particularly in humans.

US 10,105,423 B2

7

A "carrier" refers to, for example, a diluent, adjuvant, preservative (e.g., Thimersol, benzyl alcohol), anti-oxidant (e.g., ascorbic acid, sodium metabisulfite), solubilizer (e.g., TWEEN 80, Polysorbate 80), emulsifier, buffer (e.g., Tris acetate, phosphate), water, aqueous solutions, oils, bulking substance (e.g., lactose, mannitol), cryo-/lyo-protectants, tonicity modifier, excipient, auxiliary agent or vehicle with which an active agent of the present invention is administered. Suitable pharmaceutical carriers are described in "Remington's Pharmaceutical Sciences" by E.W. Martin (Mack Publishing Co., Easton, Pa.); German), A. R., Remington: The Science and Practice of Pharmacy, (Lippincott, Williams and Wilkins); Liberman, et al., Eds., Pharmaceutical Dosage Forms, Marcel Decker, New York, N.Y.; and Kibbe, et al., Eds., Handbook of Pharmaceutical Excipients, American Pharmaceutical Association, Washington.

The term "isolated" may refer to protein, nucleic acid, compound, or cell that has been sufficiently separated from the environment with which it would naturally be associated (e.g., so as to exist in "substantially pure" form). "Isolated" does not necessarily mean the exclusion of artificial or synthetic mixtures with other compounds or materials, or the presence of impurities that do not interfere with the fundamental activity, and that may be present, for example, due to incomplete purification.

The term "substantially pure" refers to a preparation comprising at least 50-60% by weight of a given material (e.g., nucleic acid, oligonucleotide, protein, etc.). In certain embodiments, the preparation comprises at least 75% by weight, particularly 90-95% or more by weight of the given compound. Purity is measured by methods appropriate for the given compound (e.g. chromatographic methods, agarose or polyacrylamide gel electrophoresis, HPLC analysis, and the like).

The following example is provided to illustrate various embodiments of the present invention. The example is illustrative and is not intended to limit the invention in any way.

EXAMPLE

Spin Concentration Studies

The protein was loaded into the spin concentrators and rotated at 10,500 rpms for 5 to 10 minutes. When the samples stopped rotating, the final volumes in the spin concentrators were recorded and a rough protein concentration was calculated for each one. Additional protein was added to the spin concentrators and rotated until the desired protein concentration was reached, at which point a UV measurement was made. At each target protein concentration a UV and viscosity measurement was performed. The above procedure continued until the viscosity of the protein prevented the sample from being further concentrated.

Viscosity Measurements

Viscosity was determined by measuring the amount of time the sample took to be drawn to a predetermined distance in a gel loading pipette tip. In order to calculate the sample viscosity, a standard curve was first prepared using a set of standards with known viscosities. Sucrose (or Brix) solutions are suitable for preparing such a curve, but any material with known viscosity at a defined temperature should be appropriate.

In order to make a measurement, the pipette plunger is depressed, the pipette tip is inserted into the sample vial, the plunger is released, and the time for the fluid to travel a predetermined distance in the pipette tip was measured with a stop watch. The distance used for these experiments was

8

30 µL of water. In important note, a pipette tip is only reliable for a single measurement, so multiple tips are used to make replicate measurements of a sample. Also, the volume to be drawn into the pipette tip should be larger than the volume marked on the tip to ensure a uniform pull on the sample during a measurement. For a 30 µL volume mark on the pipette tip, the micropipette was set to draw 42 µL.

Results

The instant example determined the ability to develop a higher concentration liquid formulation of C1 INH as a monoformulation. The initial studies focused on concentration of the stock solution of C1 INH using a spin concentration method. The solutions were initially adjusted for pH but no other excipient was added. Three pH values were investigated (pH 5.9, 6.9, and 7.9). Upon spin concentration, all of the solutions remained clear up to concentrations up ~500 U/ml (approximately 100 nag/ml) for all pH values tested (Table 1). While the solubility limit was not reached in these studies, there were measurable increases in viscosity as the concentrations exceeded 300 U/ml (FIG. **2**). At all pH values, the viscosity begins to increase markedly when the C1 INH concentration goes above 400 U/ml.

TABLE 1

Final concentrations (in U/mL) and viscosities for samples prepared during the spin concentration experiments. These values were based on the initial 160 U/mL concentration of the initial bulk drug.

| 7.9 U/mL | viscosity | 6.9 U/mL | viscosity | 5.9 U/mL | viscosity |
|---|---|---|---|---|---|
| 93.12 | 0.99 | 182.4 | 4.23 | 187.2 | 2.36 |
| 415.18 | 3.95 | 289.4 | 4.90 | 296.9 | 7.71 |
| 454.81 | 13.74 | 378.6 | 12.08 | 396.7 | 5.46 |
| 501.17 | 30.43 | 479.0 | 14.67 | 478.8 | 24.09 |

A larger feasibility study was performed examining different buffers (20 mM phosphate, 20 mM citrate, and 20 mM Tris) at each of the three target values. Samples of both 400 U/ml and 500 U/ml were prepared and evaluated for stability after one week at 40° C. and after two weeks at 25° C. The initial viscosity levels were well above the values for pure water (~1 mPa-s), but well within the limits usually set for use as an injectable product (Table 2). The viscosity values for the 400 U/ml samples were less than at 500 U/ml, usually by 7 to 1.0 mPa-s. Upon storage at 40° C. for one week, the viscosity of all of the samples increased. At pH 5.9, all of the same gelled, likely due to thermally induced aggregation. For the remaining formulations, the viscosity increased to some degree. In some cases these values exceeded 30 mPa-s. The increase in viscosity was less upon 25° C. storage than at 40° C. There was little, if any change, for the samples at pH 6.9, indicating that pH 6.9 may be more favorable for long-term storage stability.

TABLE 2

Viscosity at t0 and after one week of storage at 40° C. (t1). Viscosity is reported in mPa-s.

| pH | [C1 INH] | Buffer | t0 | t1 | t2 |
|---|---|---|---|---|---|
| 5.9 | 400 | phosphate | 13.3 ± 0.6 | gel | 17.4 ± 2.1 |
| | 500 | | 24.6 ± 1.5 | gel | 36.9 ± 7.3 |
| | 400 | histidine | 14.7 ± 0.8 | gel | 19.1 ± 2.5 |
| | 500 | | 27.7 ± 3.8 | gel | 27.7 ± 3.8 |
| 6.9 | 400 | phosphate | 12.2 ± 1.5 | 16.1 ± 0.6 | 11.9 ± 3.0 |
| | 500 | | 20.8 ± 2.0 | 35.3 ± 2.1 | 32.1 ± 7.7 |
| | 400 | citrate | 7.4 ± 0.8 | 9.2 ± 0.7 | 7.1 ± 0.6 |
| | 500 | | 14.4 ± 3.2 | 19.8 ± 1.1 | 12.6 ± 0.5 |

US 10,105,423 B2

9

TABLE 2-continued

Viscosity at t0 and after one week of storage at 40° C. (t1).
Viscosity is reported in mPa-s.

| pH | [C1 INH] | Buffer | t0 | t1 | t2 |
|---|---|---|---|---|---|
| 7.9 | 400 | phosphate | 8.2 ± 1.2 | 12.8 ± 0.7 | 22.0 ± 3.5 |
|  | 500 |  | 16.2 ± 1.4 | 23.1 ± 2.1 | 25.5 ± 7.5 |
|  | 400 | tris | 14.1 ± 0.7 | 18.7 ± 0.7 | 30.0 ± 3.8 |
|  | 500 |  | 20.5 ± 0.9 | 33.3 ± 6.2 | 31.0 ± 1.8 |

Notably, at pH 6.9, citrate formulations had lower viscosity values than for phosphate, while at pH 7.9, phosphate buffer produced lower viscosities than his buffer. Higher viscosities will mean greater force will be required to deliver a specified volume of the drug within a certain time frame.

The purity by RP HPLC was initially near 86 to 87% for the formulations at pH 6.9 and above (Table 3). The initial levels were lower at pH 5.9, suggesting that some degradation had already occurred just in the process of preparing the samples. Upon storage for one week at 40° C., the pH 5.9 samples gelled, making analysis by RP HPLC impossible. For all of the other samples, the percent purity was essentially unchanged, indicating that little, if any, chemical degradation occurs for storage under these conditions.

TABLE 3

Percent purity by RP HPLC upon storage at 25° C. (t2) or 40° C. (t1)

| pH | [C1 INH] | Buffer | t0 | t1 | t2 |
|---|---|---|---|---|---|
| 5.9 | 400 | phosphate | 82.87 ± 0.75 | gel | 81.10 ± 2.11 |
|  | 500 |  | 84.74 ± 1.24 | gel | 83.61 ± 1.02 |
|  | 400 | histidine | 84.11 ± 1.53 | gel | 85.34 ± 1.55 |
|  | 500 |  | 86.36 ± 0.76 | gel | 82.99 ± 0.64 |
| 6.9 | 400 | phosphate | 87.14 ± 0.67 | 88.59 ± 0.29 | 85.19 ± 2.00 |
|  | 500 |  | 86.44 ± 1.49 | 85.65 ± 1.32 | 84.07 ± 1.24 |
|  | 400 | citrate | 86.67 ± 1.36 | 82.92 ± 1.48 | 86.03 ± 0.87 |
|  | 500 |  | 86.89 ± 1.24 | 86.74 ± 0.88 | 84.42 ± 1.19 |
| 7.9 | 400 | phosphate | 86.09 ± 1.14 | 85.29 ± 0.84 | 85.98 ± 0.90 |
|  | 500 |  | 86.47 ± 1.15 | 83.57 ± 1.33 | 84.00 ± 0.97 |
|  | 400 | tris | 87.14 ± 0.98 | 81.74 ± 7.89 | 86.14 ± 0.81 |
|  | 500 |  | 88.74 ± 0.82 | 87.24 ± 1.47 | 87.30 ± 0.95 |

For samples stored for two weeks at 25° C., there were small losses, comparable to what was seen at t1. Together, the RP HPLC data indicate that there are small losses due to chemical degradation. Higher pH seems to diminish the rate of degradation and there may be some sensitivity to buffer composition.

While the chemical stability of C1 TNH seems to be unchanged upon storage, there is come physical instability observed as indicated by SEC (Table 4). There are other proteins present in the C1 INH mixture, leading to an overall 'purity' of about ~67% at t0. Upon storage at 40° C. for one week (t1), the overall monomer content of the samples decreased to 54-56% for the samples with pH 6.9 and higher. There was little difference between the two different pH conditions, the different buffers and the two protein concentrations. When stored for two weeks at 25° C. (t2), the pH

10

5.9 samples did not gel, as they did at the higher storage temperature. However, there was appreciably higher degradation, especially with histidine buffer. For these at pH 6.9 or 7.9, the loss as measured by SEC was about 2% or so, compared to the 10-12% loss at the higher temperature for half of the time.

TABLE 4

Monomer content by SEC upon storage at 25° C. (t2) or 40° C. (t1).

| PH | [C1 INH] | Buffer | t0 | t1 | t2 |
|---|---|---|---|---|---|
| 5.9 | 400 | phosphate | 68.32 ± 1.04 | gel | 62.56 ± 0.94 |
|  | 500 |  | 67.19 ± 0.14 | gel | 61.46 ± 0.14 |
|  | 400 | histidine | 64.68 ± 0.42 | gel | 46.58 ± 1.09 |
|  | 500 |  | 66.60 ± 0.08 | gel | 44.48 ± 1.04 |
| 6.9 | 400 | phosphate | 67.85 ± 0.22 | 55.29 ± 0.36 |  |
|  | 500 |  | 67.41 ± 0.36 | 54.79 ± 0.14 | 65.45 ± 0.23 |
|  | 400 | citrate | 67.82 ± 0.07 | 56.14 ± 0.41 | 65.49 ± 0.16 |
|  | 500 |  | 67.43 ± 0.30 | 56.59 ± 0.33 | 65.03 ± 0.36 |
| 7.9 | 400 | phosphate | 67.85 ± 0.09 | 54.96 ± 0.52 | 61.31 ± 0.25 |
|  | 500 |  | 67.58 ± 0.40 | 55.57 ± 0.56 | 64.98 ± 0.50 |
|  | 400 | tris | 67.63 ± 0.27 | 55.40 ± 0.30 | 65.70 ± 0.56 |
|  | 500 |  | 67.67 ± 0.47 | 56.18 ± 0.64 | 66.19 ± 0.84 |

The data indicate that the rate of degradation will be about 13-fold to 35-fold slower at 4° C. than at 25° C. The higher estimate comes from using an Arrhenius plot. The lower estimate comes from determine the average loss as the temperature is decreased by 5° C. and extrapolating to a storage temperature of 40° C. Using the current data as an indicator, this predicts a loss of about 3 to 10% loss after two years at refrigerated temperatures. In other words, a liquid formulation appears to be quite stable based on these data. Furthermore, the degradation rates are roughly comparable between the 400 U/mL and 500 U/ml samples, suggesting that developing the higher concentration formulation is just as viable.

The degradation rate is much faster at pH 5.9, leading to gelation at 40° C. and greater losses at 25° C., Thus, further pH/buffer screening will focus on the pH 6.5 to 8.0 range. There is a clear buffer effect on viscosity and possibly also on stability.

The studies demonstrated that there is not a solubility limit to preparing C1 INH at concentrations up to 500 U/ml. There is an increase in viscosity once the concentrations reach the 400-500 U/ml range (which is buffer dependent with citrate being better than phosphate which is better than Tris), but they are manageable and still allow facile delivery by injection for standard syringe systems. In general, C1 INH is relatively stable to chemical degradation, as determined by RP HPLC.

While certain of the preferred embodiments of the present invention have been described and specifically exemplified above, it is not intended that the invention be limited to such embodiments. Various modifications may be made thereto without departing from the scope and spirit of the present invention, as set forth in the following claims.

SEQUENCE LISTING

<160> NUMBER OF SEQ ID NOS: 1

<210> SEQ ID NO 1
<211> LENGTH: 500
<212> TYPE: PRT

US 10,105,423 B2

**11**                                                           **12**

-continued

---

<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 1

```
Met Ala Ser Arg Leu Thr Leu Leu Thr Leu Leu Leu Leu Leu Leu Ala
1               5                   10                  15

Gly Asp Arg Ala Ser Ser Asn Pro Asn Ala Thr Ser Ser Ser Ser Gln
            20                  25                  30

Asp Pro Glu Ser Leu Gln Asp Arg Gly Glu Gly Lys Val Ala Thr Thr
        35                  40                  45

Val Ile Ser Lys Met Leu Phe Val Glu Pro Ile Leu Glu Val Ser Ser
    50                  55                  60

Leu Pro Thr Thr Asn Ser Thr Thr Asn Ser Ala Thr Lys Ile Thr Ala
65                  70                  75                  80

Asn Thr Thr Asp Glu Pro Thr Thr Gln Pro Thr Thr Glu Pro Thr Thr
                85                  90                  95

Gln Pro Thr Ile Gln Pro Thr Gln Pro Thr Thr Gln Leu Pro Thr Asp
            100                 105                 110

Ser Pro Thr Gln Pro Thr Thr Gly Ser Phe Cys Pro Gly Pro Val Thr
        115                 120                 125

Leu Cys Ser Asp Leu Glu Ser His Ser Thr Glu Ala Val Leu Gly Asp
    130                 135                 140

Ala Leu Val Asp Phe Ser Leu Lys Leu Tyr His Ala Phe Ser Ala Met
145                 150                 155                 160

Lys Lys Val Glu Thr Asn Met Ala Phe Ser Pro Phe Ser Ile Ala Ser
                165                 170                 175

Leu Leu Thr Gln Val Leu Leu Gly Ala Gly Glu Asn Thr Lys Thr Asn
            180                 185                 190

Leu Glu Ser Ile Leu Ser Tyr Pro Lys Asp Phe Thr Cys Val His Gln
        195                 200                 205

Ala Leu Lys Gly Phe Thr Thr Lys Gly Val Thr Ser Val Ser Gln Ile
    210                 215                 220

Phe His Ser Pro Asp Leu Ala Ile Arg Asp Thr Phe Val Asn Ala Ser
225                 230                 235                 240

Arg Thr Leu Tyr Ser Ser Ser Pro Arg Val Leu Ser Asn Asn Ser Asp
                245                 250                 255

Ala Asn Leu Glu Leu Ile Asn Thr Trp Val Ala Lys Asn Thr Asn Asn
            260                 265                 270

Lys Ile Ser Arg Leu Leu Asp Ser Leu Pro Ser Asp Thr Arg Leu Val
        275                 280                 285

Leu Leu Asn Ala Ile Tyr Leu Ser Ala Lys Trp Lys Thr Thr Phe Asp
    290                 295                 300

Pro Lys Lys Thr Arg Met Glu Pro Phe His Phe Lys Asn Ser Val Ile
305                 310                 315                 320

Lys Val Pro Met Met Asn Ser Lys Lys Tyr Pro Val Ala His Phe Ile
                325                 330                 335

Asp Gln Thr Leu Lys Ala Lys Val Gly Gln Leu Gln Leu Ser His Asn
            340                 345                 350

Leu Ser Leu Val Ile Leu Val Pro Gln Asn Leu Lys His Arg Leu Glu
        355                 360                 365

Asp Met Glu Gln Ala Leu Ser Pro Ser Val Phe Lys Ala Ile Met Glu
    370                 375                 380

Lys Leu Glu Met Ser Lys Phe Gln Pro Thr Leu Leu Thr Leu Pro Arg
385                 390                 395                 400
```

US 10,105,423 B2

**13**                                                                **14**

-continued

```
Ile Lys Val Thr Thr Ser Gln Asp Met Leu Ser Ile Met Glu Lys Leu
            405                 410                 415

Glu Phe Phe Asp Phe Ser Tyr Asp Leu Asn Leu Cys Gly Leu Thr Glu
            420                 425                 430

Asp Pro Asp Leu Gln Val Ser Ala Met Gln His Gln Thr Val Leu Glu
        435                 440                 445

Leu Thr Glu Thr Gly Val Glu Ala Ala Ala Ala Ser Ala Ile Ser Val
    450                 455                 460

Ala Arg Thr Leu Leu Val Phe Glu Val Gln Gln Pro Phe Leu Phe Val
465                 470                 475                 480

Leu Trp Asp Gln Gln His Lys Phe Pro Val Phe Met Gly Arg Val Tyr
            485                 490                 495

Asp Pro Arg Ala
            500
```

20

What is claimed is:

**1**. A pharmaceutical composition comprising C1 esterase inhibitor, sodium citrate, and having a pH ranging from 6.5-8.0, wherein the C1 esterase inhibitor has a concentration of about 500 U/mL, and wherein the C1 esterase inhibitor comprises the amino acid sequence of residues 23 to 500 of SEQ ID NO: 1.

**2**. The pharmaceutical composition of claim **1**, wherein the pH is between about 6.5 to about 7.5.

**3**. The pharmaceutical composition of claim **1**, wherein the pH is between about 6.5 to about 7.0.

**4**. The pharmaceutical composition of claim **1**, wherein the sodium citrate is present at about 10 mM to about 30 mM.

**5**. The pharmaceutical composition of claim **1**, wherein the sodium citrate is present at 10 mM to 30 mM.

**6**. The pharmaceutical composition of claim **1**, wherein the sodium citrate is present at about 10 mM.

**7**. The pharmaceutical composition of claim **1**, wherein the composition further comprises at least one amino acid or salt thereof.

**8**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor is present in the composition in the range of about 1500 U to about 2500 U.

**9**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor is present in the composition in at least about 2000 U.

**10**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor is present in the composition at about 2000 U.

**11**. The pharmaceutical composition of claim **9**, wherein the C1 esterase inhibitor is present in the composition less than about 5000 U.

**12**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor is present in the composition in about 5000 U.

**13**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor is isolated or purified from human plasma.

**14**. The pharmaceutical composition of claim **13**, wherein the C1 esterase inhibitor isolated or purified from human plasma is nanofiltered.

**15**. The pharmaceutical composition of claim **13**, wherein the C1 esterase inhibitor isolated or purified from human plasma is pasteurized.

**16**. The pharmaceutical composition of claim **1**, wherein the pharmaceutical composition is prepared in liquid form.

**17**. The pharmaceutical composition of claim **1**, wherein the pharmaceutical composition is reconstituted with water from at least one lyophilized powder.

**18**. The pharmaceutical composition of claim **1**, wherein the composition has a viscosity of less than about 20 mPa-s.

**19**. The pharmaceutical composition of claim **1**, wherein the composition has a viscosity of less than about 10 mPa-s.

**20**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor present in the composition comprises at least 50-60% of the total protein in the composition.

**21**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor present in the composition comprises at least 75% of the total protein in the composition.

**22**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor has less than a 10% loss in monomer content when stored for two years at 4° C.

**23**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor has less than about 20% loss in monomer content loss when stored for one week at 40° C.

**24**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor has less than about 10% loss in monomer content loss when stored for two weeks at 25° C.

**25**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor has less than about 2% loss in purity when stored for one week at 40° C.

**26**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor has less than about 1% loss in purity when stored for one week at 40° C.

**27**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor has less than about 2% loss in purity when stored for two weeks at 25° C.

**28**. The pharmaceutical composition of claim **1**, wherein the C1 esterase inhibitor has less than about 1% loss in purity when stored for two weeks at 25° C.

**29**. The pharmaceutical composition of claim **1**, wherein the pharmaceutical composition is a monoformulation of active pharmaceutical ingredient, wherein said active pharmaceutical ingredient consists essentially of C1 esterase inhibitor.

* * * * *

# Exhibit 6

# Redacted In Its Entirety

Exhibit 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| SHIRE VIROPHARMA INCORPORATED, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 17-00414-MSG |
| v. | ) | CONSOLIDATED |
| | ) | |
| CSL BEHRING LLC and | ) | |
| CSL BEHRING GmbH, | ) | **RESTRICTED - OUTSIDE COUNSEL** |
| | ) | **ONLY** |
| Defendants. | ) | |
| _____ | ) | |

## RESPONSIVE EXPERT REPORT OF TIMOTHY CRAIG, D.O.
## ON THE ISSUE OF INFRINGEMENT

RESTRICTED - OUTSIDE COUNSEL ONLY

approved for the intended use.  The FDA in fact permits doctors and other health care providers to use medications off-label.

14.     Patients and physicians were also concerned with the safety and drug product quality of Cinryze®.



.[3]  Although Shire claims to have resolved all manufacturing issues with Cinryze®, patients and physicians remained wary as to its safety and drug product quality.  Based upon public documents, Shire moved production away from Stichting Sanquin Bloedvoorziening ("Sanquin") because problems with the contractor led to the 2017 Cinryze® supply shortage.  (Ex. 21—Eric Palmer, *Shire set for in-house production of rare disease drug Cinryze after shortage issues*, FIERCEPHARMA (Jan. 24, 2018), *available at* https://www.fiercepharma.com/manufacturing/shire-readies-production-rare-disease-drug-cinryze-after-shortage-issues (CSLHAE03031128–CSLHAE03031132) at CSLHAE03031128.)

15.     Moreover, based on reported efficacy from phase III clinical trials, physicians and patients generally view Cinryze® as less efficacious than Haegarda®.  Data from Cinryze®'s



[3]

Phase III trial showed that patients given Cinryze® still experienced 6.26 HAE attacks per twelve-week period compared to 12.73 attacks while on placebo.  (Ex. 22—Bruce L. Zuraw et al., *Nanofiltered C1 Inhibitor Concentrate for Treatment of Hereditary Angioedema*, 363(6) N. ENGL. J. MED. 513, 513 (2010) (CSLHAE00077744–CSLHAE00077753) at CSLHAE00077744.)  Cinryze®'s label also showed that only 4 out of 22 patients, or 18.18%, in its Phase III study experienced a total elimination of HAE attacks.  (Ex. 11—Cinryze® Label at § 14 (CSLHAE00132506).)  In contrast, results from Haegarda®'s Phase III trial showed that Haegarda®, administered at 60 IU/kg, resulted in a 95% median reduction (84% mean reduction) in HAE attacks compared to placebo.  (Ex. 23—Hilary J. Longhurst et al., *Prevention of Hereditary Angioedema Attacks with a Subcutaneous C1 Inhibitor*, 376(12) N. ENGL. J. MED. 1131 (2017) (CSLHAE00185916-CSLHAE00185940) ("*Longhurst*") at CSLHAE00185921.)  The Phase 3 CSL830 publication also demonstrated that 60 IU/kg Haegarda® reduced the mean (95% CI) time-normalized attacks per month to 0.52 (*id.*) and 40% of patients in the 60 IU/kg treatment arm experienced no HAE attacks at all (*id.* at CSLHAE00185920).  In my opinion, this improved efficacy for Haegarda® derives principally from its weight-based dosing regimen.  (*See e.g.*, *id.* at CSLHAE00185921 (indicating patients receiving 60 IU/kg achieved greater reduction in attacks than patients receiving 40 IU/kg).)  Haegarda® achieves this apparent improved efficacy even though it is subcutaneously delivered with corresponding bioavailability less than that of intravenously administered Cinryze® (intravenously administered drugs are considered 100% bioavailable).  (*See* Ex. 24—Haegarda® Label (Shire_0668988-Shire_0669010) at § 12.3 (Shire_0668998).)  In other words, Haegarda® achieves its high efficacy despite its subcutaneous presentation and associated lower bioavailability compared to intravenous injection.  The higher efficacy of Haegarda® compared to the originally approved dose of Cinryze® led to decrease risk

of death associated with recurrent pain and swelling.  In my opinion, this data and related efficacy perceptions of both patients and physicians was a reason why some former Cinryze® patients did not return to Cinryze® after the supply shortage was resolved.

16.     Based on reported pricing to wholesalers, Cinryze® is an expensive treatment option. Following the recommended dosage (1000 U by intravenous injection twice weekly), Cinryze® costs nearly $575,000 per year at $5,517.60 per 1000 U vial.  (Ex. 25—*Haegarda - A Subcutaneous C1 Esterase Inhibitor for Prevention of Hereditary Angioedema*, 60 (1541) MED. LETT. DRUGS THER. 39 (2018) (CSLHAE03031135-CSLHAE03031137) at CSLHAE03031136.) But this 1000 U dosing regimen achieved only about a 50% reduction in attacks in Cinryze's® phase III trial.  (*See* ¶ 15, *supra*.)  To achieve a level of attack prevention on par with that reported for Haegarda® (95% reduction in attacks), generally requires dosing Cinryze® patients at about 1500 U to 2500 U, with an associated doubling in the cost of treatment to over $1,000,000 for some patients.  (Ex. 25—*Haegarda - A Subcutaneous C1 Esterase Inhibitor for Prevention of Hereditary Angioedema*, 60 (1541) MED. LETT. DRUGS THER. 39 (2018) (CSLHAE03031135-CSLHAE03031137) at CSLHAE03031136.)  In contrast, the annual cost of Haegarda® based on reported wholesaler pricing is roughly $500,000 to achieve the same if not greater reduction in attacks.  (*Id*.)  Cinryze® treatment is also significantly more expensive that other treatment options including off-label Berinert® and androgens.  This cost-benefit consideration is yet another reason why physicians prescribing Cinryze® would not have returned to Cinryze® and instead used alternate medications that were more cost-effective—especially in light of the 2017 shortages.

17.     Accordingly, I disagree that all former Cinryze® patients would have returned to Cinryze® after supply was restored but for Haegarda®'s presence on the market.  To sum up,

Exhibit 8

Redacted In Its Entirety

Exhibit 9

Redacted In Its Entirety

Exhibit 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| SHIRE VIROPHARMA INCORPORATED, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 17-00414-MSG |
| v. | ) ) | CONSOLIDATED |
| CSL BEHRING LLC and | ) ) | **RESTRICTED - OUTSIDE COUNSEL ONLY** |
| CSL BEHRING GmbH, | ) ) | |
| Defendants. | ) ) | |

_____

## EXPERT REPORT OF SCOTT M. LASSMAN

## QUALIFICATIONS

1.      I am the Principal at Lassman Law+Policy, a Washington, D.C. law firm that specializes in FDA law and policy.  I have over 25 years' experience working on administrative law issues regarding the U.S. Food and Drug Administration (FDA) and am a recognized expert in this field. My CV is attached to this report as Exhibit A.

2.      I obtained a B.A. with honors from Yale University in 1985 and a M.A. in Philosophy from the University of Texas at Austin in 1988.  I then attended the University of Virginia School of Law, where I was a member of the Virginia Law Review.  I graduated with my J.D. in 1991 with Order of the Coif honors.

3.      I began my legal career in 1991 at Hogan & Hartson LLP, focusing on FDA regulatory law.  I continued as an associate at Kleinfeld, Kaplan and Becker LLP (KKB) in 1994, again focusing on contentious and non-contentious FDA law. I became a partner at KKB in 1999 and remained there until 2003.

4.      In 2003 I became Assistant General Counsel at the trade association Pharmaceutical Research and Manufacturers of America (PhRMA), which represents the research-based pharmaceutical and biotechnology industry in the United States. I was promoted to Senior Assistant General Counsel in 2005.  At PhRMA I handled FDA regulatory and legislative issues, including *inter alia* industry initiatives regarding the approval requirements for drugs and biological products.  During my time at PhRMA, I also worked on legislative changes to the approval requirements for drugs and biological products, which were enacted as the *Food and Drug Administration Amendments Act of 2007* (FDAAA).  I received the PhRMA Board of Directors Exceptional Service Award in 2007 for my work on FDAAA.

5.      I left PhRMA in 2007 to become a partner and the Co-Chair of the FDA Practice Group at Wilmer, Cutler, Pickering, Hale & Dorr LLP.  I then returned to KKB as a partner in 2009, where

thus may entail a reduced risk of disease transmission. RUCONEST was designated as an orphan drug on February 23, 1999 for treatment of (acute attacks of) angioedema caused by hereditary or acquired C1-INH deficiency. FDA Orphan Drug Database (last accessed Dec. 7, 2019). It received seven years of ODE upon its approval for treatment of acute attacks of HAE in adult and adolescent patients, which will expire on July 16, 2021. *Id.*

34.     Finally, in 2017, FDA approved HAEGARDA® (C1 Esterase Inhibitor Subcutaneous [Human]) for routine prophylaxis to prevent HAE attacks in adolescent and adult patients.[13] HAEGARDA is the first C1-INH formulation intended for subcutaneous injection rather than IV injection. Because it is not indicated for treatment of acute attacks, HAEGARDA's approval could not be blocked by RUCONEST's unexpired ODE. HAEGARDA was designated as an orphan drug on October 16, 1992 for the prevention and/or treatment of acute attacks of HAE (FDA determined that the original ODD granted to BERINERT also applied to HAEGARDA). FDA Orphan Drug Database (last accessed Dec. 7, 2019). HAEGARDA received ODE upon its approval on June 22, 2017 for its labeled indication of routine prophylaxis to prevent HAE attacks in adolescent and adult patients, which is scheduled to expire on June 22, 2024. *Id.*

35.     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
in fact, in my experience and as discussed above, it is the FDA's practice not to routinely provide comments to the sponsor of the precise basis for awarding ODE, particularly if it involves a finding of clinical superiority. Because HAEGARDA has the same active ingredient (C1-INH [human]) and "prophylaxis" indication as CINRYZE, it would not typically be eligible for ODE unless it were "clinically superior" to CINRYZE. Accordingly, in my opinion, it is likely that FDA granted ODE to HAEGARDA based upon a determination that HAEGARDA is clinically superior to CINRYZE. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

## REASONS FOR DISCONTINUATION OF CINRYZE SUBCUTANEOUS PROGRAM

36.     It is my understanding that both before and after approval of HAEGARDA, Shire was developing a subcutaneous formulation of CINRYZE for long-term prophylaxis of HAE, *i.e.*, CINRYZE SC. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
Shire_0806652-Shire0806653.

37.     In her expert report, Suzanne M. Sensabaugh suggests that, as of July 25, 2017, a company in Shire's position "would have had a reasonable expectation of filing the BLA for [CINRYZE SC] by June 27, 2018 and receiving FDA approval 12 months later, without delay, in June 2019." Sensabaugh Rep., p. 4. Ms. Sensabaugh's opinion is based almost exclusively on Shire's regulatory preparations up to that point and Ms. Sensabaugh's experience with FDA regulatory procedures. While these regulatory considerations are certainly important factors, they are only one piece of the puzzle. Ms. Sensabaugh does not acknowledge or address other factors that likely had an even more significant effect on Shire's willingness to seek approval of or launch CINRYZE SC in the United States.

---

[13] HAEGARDA Approval Letter (June 22, 2017), CSLHAE00347705-CSLHAE00347710..

Exhibit 11
to
Exhibit 15

Redacted In Their Entirety

Exhibit 16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHIRE VIROPHARMA INCORPORATED, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 17-00414-MSG |
| v. | ) | CONSOLIDATED |
| | ) | |
| CSL BEHRING LLC and | ) | **HIGHLY CONFIDENTIAL -** |
| CSL BEHRING GmbH, | ) | **SUBJECT TO PROTECTIVE ORDER** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**OPENING EXPERT REPORT OF LISBETH ILLUM, PH.D.
ON THE ISSUE OF INVALIDITY**

I, Lisbeth Illum, Ph.D., D.Sc., declare as follows.  I submit this expert report on behalf of CSL Behring LLC and CSL Behring GmbH (collectively, "CSL Behring").

## I.        BACKGROUND AND QUALIFICATIONS

1.        I am a Danish citizen.  I moved to the United Kingdom in 1987, where I was a resident until 2017.  I am now a resident of Guernsey, The Channel Islands.  I gained my Danish A levels at Horsens Statsskole in 1966, my MPharm First Class Honors Degree, my Ph.D. and my D.Sc. in Pharmaceutical Sciences in 1972, 1978, and 1987, respectively, from the Royal Danish School of Pharmacy.  The syllabus for the MPharm degree in Denmark comprises organic and inorganic chemistry, natural chemistry, physics, mathematics, biology, microbiology, pharmacology, physiology and pharmaceutical sciences.  I worked as a lecturer and senior lecturer in the Royal Danish School of Pharmacy between 1972 and 1990.  I was made a Docent (professor equivalent) in the Department of Pharmaceutical Sciences, Royal Danish School of Pharmacy in 1989.  In 1990, I was made a Special Professor in the Department of Pharmaceutical Sciences, University of Nottingham, UK, and in 2007, also a Special Professor in the Department of Chemistry, University of Nottingham, UK.

2.        I was a founder and, for nine years (1989-1998), the Managing Director and the Chief Scientific Officer of DanBioSyst UK Ltd. (later West Pharmaceutical Services, USA then Archimedes Ltd. and now ProStrakan), a company that specialized in the development of drug delivery systems.  From 2003-2005, I was founder and Managing Director of Phaeton Research Ltd., UK, a company specializing in the development of drug delivery systems.  Between 2007 and 2012, I was the CEO of Critical Pharmaceuticals Ltd., a company based in BioCity in Nottingham, UK, specializing in developing injectable sustained release products using technology based on supercritical fluids and nasal products for biological drugs.  Since 1998, I am also a Director of Identity, now Eurocage Ltd., a consultancy company, whose services

5

problems encountered in the field, previous solutions to those problems, the speed with which innovations are made in the field, and the sophistication of the field.

103.    In my opinion, the claims of the Asserted Patents cover several different disciplines, including drug formulation development and medicinal application of a drug formulation to treat (acutely or prophylactically) HAE.  With respect to drug formulation and drug product development in the context of the Asserted Patents, a person having ordinary skill in the art would be a formulator with experience relating to protein drugs.  Specifically, the formulator would have either (a) a BS or MS degree in chemistry, chemical engineering, biochemistry, pharmacy or pharmaceutical sciences, or a related discipline, and five (for BS, three for MS) or more years of experience formulating proteins in the biopharmaceutical industry; or (b) a Ph.D. in chemistry, chemical engineering, biochemistry, pharmacy or pharmaceutical sciences, or a related discipline, and two or more years of relevant experience.

104.    I understand that the patent application leading to the '111, '788, '423, '690, and '595 patents has an effective filing date of March 15, 2013, and the claims should be interpreted from the perspective of one skilled in the art as of that date.

### B.    Prior Invention

105.    I understand from CSL Behring's attorneys that in order to be entitled to a patent, the claimed invention must not have been made in the United States by a prior inventor before the patent's priority date.  I also understand that to be considered a prior inventor a party must either be the first to reduce the claimed invention to practice or be the first to conceive of the invention and then diligently reduce the invention to practice.  In either instance, I understand that the prior inventor must not abandon, suppress, or conceal the invention before it is made public.

106.    I have also been informed by CSL Behring's attorneys that a prior inventor need not be aware of each and every property possessed by the claimed invention as the subject matter

Exhibit 17

SANQUIN PLASMA PRODUCTS

## Research Report Department of Product Development

| | |
|---|---|
| ● Confidential | Product: Cinryze |
| 0 For internal use | No.: 036 - 152 |
| ● Limited distribution for: | Page: 1 - 8 |
|   0 Product registration | Date: 15 May 2009 |
|   0 Publication | |
|   ● Third parties | |

Subject:    Stability of Cinryze (≥ 100 U/ml) in solution

Researcher:  J. Bloem

Summary:

This report describes the investigation into the solubility and stability of reconstituted Cinryze containing ≥ 100 U/ml stored for up to 24 hours at 20 ± 2 °C. It can be concluded that Cinryze containing the excipients as described in the BLA, can be solved in 1 - 5 ml of w.f.i within 10 min. No loss of activity, degradation or aggregation was detected after storage at room temperature for up to 24 hr in concentrations of up to 500 U/ml.

| Approved by: | | |
|---|---|---|
| Author: J. Bloem | Manager Product Development:<br>A.H.L. Koenderman | |
| Dated: 15 May 2009 | Dated: 15 May 2009 | Dated: |

Restricted – Outside Counsel Only

LBD_0000978

**SANQUIN PLASMA PRODUCTS**

**Research Report Department of Product Development**

036 – 152                                                                                                          2 - 8

Contents:                                                                                                           Page

1.  Introduction                                                                                                    2
2.  Material and Methods                                                                                            2
3.  Results                                                                                                         2
4.  Conclusions                                                                                                     3

1.    Introduction

For the development of a C1-inhibitor product for subcutaneous administration a more concentrated
product is preferred. As a first experiment it was tried to dissolve the current registered Cinryze
product in a smaller volume to obtain a product with a higher C1-inhibitor concentration but also
higher excipient concentrations. It was tested if the current product can be dissolved in 2.5, 2, 1.5
or 1 ml to obtain product containing 200, 250, 333 or 500 U/ml and higher concentrations of
excipients (Table 1). Also, the stability of this concentrated product at room temperature for up to
24 hrs was tested.

2.    Material and Methods

2.1.   Material

For the experiments vials of Cinryze batch 06C02L370A were used.
Specifications of batch 06C02L370A at release were: C1-inhibitor activity 96 U/ml; protein 14.1 g/l;
pH 7.0; sodium 106 mmol/L; citrate 10 mmol/L; sucrose 62 mmol/L; osmolality 302 mosmol/kg;
valine 17 mmol/L; alanine 13 mmol/L; threonine 38 mmol/l.

2.2.   Methods

The solubility and stability at C1-inhibitor concentrations of 200, 250, 333 and 500 U/ml were
tested. As a reference the product in a concentration of 100 U/ml was used. Per experiment several
vials were used to have enough material to analyse the product at 0, 1, 3, 6 and 24 hr after
dissolution and storage at $20 \pm 2$ °C.
   The solubility of the C1-inhibitor protein was determined using SOP M066 (QC protocol).
Subsequently, the vials were sampled at 5 time points, i.e. t=0, t=1h, t=3h, t=6h and t=24h. The
samples were transferred to Sarstedt tubes, frozen at -30 ºC and despatched for the following
determinations: C1-inhibitor activity (SOP @0398), C1-inhibitor antigen (SOP @2587) and HPSEC
(SOP M916). It must be noted that the C1-inhibitor activity assay is not validated for products with
high concentrations of C1-inhibitor and excipients (a.o. dilution effects).

3.    Results

3.1    Stability of C1-inhibitor in solution

Cinryze can be dissolved in 1 - 5 ml within 10 min. (Table 2). Only if 1 ml of w.f.i. is used, some
material is sticking to the wall due to the small volume.

**SANQUIN PLASMA PRODUCTS**

**Research Report Department of Product Development**

036 – 152 <span style="float:right">3 - 8</span>

Table 1: *Theoretical concentrations of excipients in Cinryze in a smaller dissolution volume than described in the BLA*

| Volume | C1-inhibitor activity | Sodium | citrate | L-valine | L-alanine | L-threonine | Sucrose | |
|--------|------|--------|---------|----------|-----------|-------------|--------|----|
| ml | (U/ml) | mmol/L | mmol/L | mmol/L | mmol/L | mmol/L | mmol/L | % |
| 5.0 | 100 | 100 | 10 | 17 | 13 | 38 | 60 | 2 |
| 2.5 | 200 | 200 | 20 | 34 | 26 | 76 | 120 | 4 |
| 2.0 | 250 | 250 | 25 | 43 | 33 | 95 | 150 | 5 |
| 1.5 | 333 | 333 | 33 | 57 | 43 | 127 | 200 | 7 |
| 1.0 | 500 | 500 | 50 | 85 | 65 | 190 | 300 | 10 |

Table 2 : *Solubility and appearance of the solution after storage for up to 24 hrs at room temperature; conform release: no precipitate, no "flakes"*

| Volume | Solubility | Appearance | |
|--------|-----------|---------|---------|
| ml | | at 3hrs | at 24 hrs |
| 5.0 | ++ | conform | conform |
| 2.5 | ++ | conform | conform |
| 2.0 | ++ | conform | conform |
| 1.5 | +(+) | conform | conform |
| 1.0 | - | conform | conform |

++: within 1 min.

+  : 5 min.

-  : within 10 min., but some material sticked to the wall and did not dissolve completely due to the small volume.

The stability of C1-inhibitor activity after reconstitution was determined at t=0 h, t=1 h, t=3 h t=6 h and t= 24 h (Table 2) and no loss of C1-inhibitor activity was observed after storage at room temperature for up to 24 hrs (Table 3; Figure 1). For the 200 U/ml experiments the measured C1-inhibitor concentration was lower than calculated, but the C1-inhibitor activity did not change after storage. It was decided to repeat the experiment with the 100, 200 and 500 U/ml formulations and the results are presented in Table 4. For the 200 U/ml experiments the measured C1-inhibitor concentration was as expected and thus higher than in the first experiment . However, in this experiment the C1inhibitor concentration in the 500 U/ml formulation was lower than calculated. The osmolality and pH of the samples were determined (Table 5).

Also, HPSEC analysis was performed showing that there was no aggregation or degradation after storage for up to 24 hrs, even for the highest concentration, 500 U/ml, tested (Figure 2 to 6).

4    Conclusions

It can be concluded that dissolving the regular product in less w.f.i. to obtain a presentation containing up to 500 U/ml does not affect the stability of the product after reconstitution. However, due to the high concentration of the excipients more experiments are needed to find a formulation containing a high concentration of C1-inhibitor at lower concentrations of excipients.

Restricted – Outside Counsel Only

**SANQUIN PLASMA PRODUCTS**

**Research Report Department of Product Development**

036 – 152                                                                                                      4 - 8

Table 3: *C1-inhibitor activity after dissolution and storage for up to 24 hrs at room temperature*

| Cinryze | Activity | Yield (%) | | Antigen | Ratio Activity/antigen |
|---|---|---|---|---|---|
| | U/ml | T = 0 | theoretical | g/L | U/mg |
| *5 ml; 100 U/ml* | | | | | |
| T = 0 | 89 | 100 | 89 | 20 | 4.5 |
| T = 1 | 91 | 102 | 91 | 20 | 4.6 |
| T = 3 | 80 | 90 | 80 | 20 | 4.0 |
| T = 6 | 84 | 94 | 84 | 21 | 4.0 |
| T = 24 | 86 | 97 | 86 | 21 | 4.1 |
| *2.5 ml; 200 U/ml* | | | | | |
| T = 0 | 127 | 100 | 64 | 29 | 4.4 |
| T = 1 | 120 | 94 | 60 | 30 | 4.0 |
| T = 3 | 114 | 90 | 57 | 29 | 3.9 |
| T = 6 | 105 | 83 | 53 | 30 | 3.5 |
| T = 24 | 121 | 95 | 61 | 29 | 4.2 |
| *2 ml; 250 U/ml* | | | | | |
| T = 0 | 220 | 100 | 88 | 51 | 4.3 |
| T = 1 | 210 | 95 | 84 | 51 | 4.1 |
| T = 3 | 220 | 100 | 88 | 52 | 4.2 |
| T = 6 | 210 | 95 | 84 | 52 | 4.0 |
| T = 24 | 220 | 100 | 88 | 52 | 4.2 |
| *1.5 ml; 333 U/ml* | | | | | |
| T = 0 | 280 | 100 | 85 | 70 | 4.0 |
| T = 1 | 280 | 100 | 85 | 68 | 4.1 |
| T = 3 | 290 | 104 | 88 | 69 | 4.2 |
| T = 6 | 290 | 104 | 88 | 70 | 4.1 |
| T = 24 | 280 | 100 | 85 | 68 | 4.1 |
| *1 ml; 500 U/ml* | | | | | |
| T = 0 | 410 | 100 | 82 | 99 | 4.1 |
| T = 1 | 410 | 100 | 82 | 99 | 4.1 |
| T = 3 | 410 | 100 | 82 | 101 | 4.1 |
| T = 6 | 430 | 105 | 86 | 101 | 4.3 |
| T = 24 | 430 | 105 | 86 | 97 | 4.4 |

Restricted – Outside Counsel Only

**SANQUIN PLASMA PRODUCTS**

**Research Report Department of Product Development**

036 – 152                                                                                                     5 - 8

Table 4: *C1-inhibitor activity after dissolution and storage for up to 24 hrs at room temperature; second experiment*

| Cinryze | Activity | Yield (%) | | Antigen | Ratio Activity/antigen |
|---|---|---|---|---|---|
| | U/ml | T = 0 | theoretical | g/L | U/mg |
| 5 ml; 100 U/ml | | | | | |
| T = 0 | 83 | 100 | 86 | 22 | 3.8 |
| T = 1 | 79 | 95 | 82 | 22 | 3.6 |
| T = 3 | 85 | 102 | 89 | 22 | 3.9 |
| T = 24 | 80 | 96 | 83 | 21 | 3.8 |
| 2.5 ml; 200 U/ml | | | | | |
| T = 0 | 185 | 100 | 96 | 44 | 4.2 |
| T = 1 | 165 | 89 | 86 | 45 | 3.7 |
| T = 3 | 165 | 89 | 86 | 45 | 3.7 |
| T = 24 | 180 | 97 | 94 | 46 | 3.9 |
| 1 ml; 500 U/ml | | | | | |
| T = 0 | 330 | 100 | 69 | 90 | 3.7 |
| T = 1 | 370 | 112 | 77 | 89 | 4.2 |
| T = 3 | 340 | 103 | 71 | 90 | 3.8 |
| T = 24 | 390 | 118 | 81 | 102 | 3.8 |

Table 5: *Osmolality and pH at t=0*

| Cinryze | Osmolality mosmol/kg | pH* |
|---|---|---|
| 5 ml; 100 U/ml | 312 | 7.0 - 7.5 |
| 2.5 ml; 200 U/ml | 440 | 7.0 - 7.5 |
| 2 ml; 250 U/ml | 781 | 7.0 - 7.5 |
| 1.5 ml; 333 U/ml | 1102 | 7.0 - 7.5 |
| 1 ml; 500 U/ml | 1759 | 7.0 - 7.5 |

*pH is determined with pH paper due to small volume left

Restricted – Outside Counsel Only

**SANQUIN PLASMA PRODUCTS**

**Research Report Department of Product Development**

036 – 152                                                                                                 6 - 8



Figure 1: *Stability of Cinryze after dissolution at high concentrations.*



Figure 2: *HPSEC analysis of Cinryze after dissolution in 5 ml and storage for up to 24 h at room temperature.*
Samples were taken after storage for 10 min, 1 h, 3 h, 6 h and 24 h.

Restricted – Outside Counsel Only                                                                         LBD_0000983

**SANQUIN PLASMA PRODUCTS**

**Research Report Department of Product Development**

036 – 152



Figure 3: *HPSEC analysis of Cinryze after dissolution in 2.5 ml and storage for up to 24 h at room temperature.*
Samples were taken after storage for 10 min, 3 h, 6 h and 24 h. The highest peaks (black) are the t=0 sample where accidentally a double concentration was analysed.



Figure 4: *HPSEC analysis of Cinryze after dissolution in 2 ml and storage for up to 24 h at room temperature.*
Samples were taken after storage for 10 min, 1 h, 3 h, 6 h and 24 h.

Restricted – Outside Counsel Only

**SANQUIN PLASMA PRODUCTS**

**Research Report Department of Product Development**

036 – 152 _____ 8 - 8



Figure 5: *HPSEC analysis of Cinryze after dissolution in 1.5 ml and storage for up to 24 h at room temperature.*
Samples were taken after storage for 10 min, 1 h, 3 h, 6 h and 24 h.



Figure 6: *HPSEC analysis of Cinryze after dissolution in 1 ml and storage for up to 24 h at room temperature.*
Samples were taken after storage for 10 min, 1 h, 3 h, 6 h and 24 h.

Restricted – Outside Counsel Only

Exhibit 18
to
Exhibit 22

Redacted In Its Entirety

Exhibit 23

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SHIRE VIROPHARMA INCORPORATED, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 17-00414-MSG |
| v. | ) | CONSOLIDATED |
| | ) | |
| CSL BEHRING LLC and | ) | **RESTRICTED—OUTSIDE COUNSEL** |
| CSL BEHRING GmbH, | ) | **ONLY** |
| | ) | |
| Defendants. | ) | |
| ————————————————— | ) | |

**REPLY EXPERT REPORT OF LISBETH ILLUM, PH.D.**
**ON THE ISSUE OF INVALIDITY**

HAE therapies contain sodium citrate, and the SC administration of two therapies, Berinert® and Cinryze®, was known prior to March 2013. Dr. Trout's attempt to dismiss this fact by relying on Ex. 252, Torben Laursen, *Pain Perception after Subcutaneous Injections of Media Containing Different Buffers*, 98 BASIC CLIN. PHARMACOL. TOXICOL. 218-221 (2008) misses the mark. Trout Report at ¶ 80. There, *Laursen* studied the effect on pain after SC injection of two human growth hormone formulations containing either sodium citrate or histidine. Ex. 252 [*Laursen*] at page 218. *Laursen* makes no specific reference to C1-INH and concludes that "it seems advisable to employ histidine-buffered solution rather than citrate-buffered solution for dispensing recombinant human growth hormone by daily subcutaneous injections." *Id.* But according to Dr. Trout's own report, it is inappropriate to draw parallels to other protein formulations involving the same excipients because "POSITAs would have understood that any given excipient might fail to perform its intended or desired function, and could instead behave in a completely contrary manner." Trout Report at ¶ 74. Thus, Dr. Trout disregards his own opinion by relying upon *Laursen* in an attempt to analogize it to C1-INH.

39.     Dr. Trout also ignores his own statements regarding *Schranz* and the alleged tolerability issues observed in the Prior 200 Study and the Current 204 Study. *Compare id.* at ¶ 126, *with id.* at ¶ 143. Despite the use of Cinryze® in both studies, which contains citrate (Ex. 51, Shire, Cinryze®, US Package Insert, Revised: Dec. 2016 at "Description"), Schranz *did not report any tolerability issues with either the 333 U/mL formulation or the 100 U/mL coformulation.* Trout Report at ¶ 143. Indeed, *Schranz* concluded that the coformulation was "well tolerated." Ex. 25, Schranz et al., *Safety, Pharmacokinetics (PK), and Pharmacodynamics (PD) of Subcutaneous (SC) CINRYZE® (C1 Esterase Inhibitor [Human]) with Recombinant Human Hyaluronidase (rHuPH20) in Subjects with Hereditary Angioedema (HAE),*

VIROPHARMA INC., Poster L21 presented at the 2012 Annual Meeting of the American Academy of Allergy, Asthma & Immunology ("*Schranz*") at Discussion, Conclusion. ███████ ███████████████████████████████████████████████████████ ██████████████████████████ Ex. 253, Shire 0624-200 Clinical Study Report (Aug. 8, 2011) at page 114.  Accordingly, it is my opinion that persons having ordinary skill in the art would not be deterred from using citrate in novel C1-INH formulations.

40.     It is also my opinion that a person having ordinary skill in the art would recognize that Cinryze®, Berinert®, and Ruconest® are all formulated within a common pH range that mirrors the physiological pH desirable for subcutaneous administration.  *See* Ex. 51 [Cinryze® Label] at "Description" (listing a pH of 6.6-7.4); Ex. 84, Berinert® Material Safety Data Sheet, CSL Behring, Sept. 23, 2009 at "Physical and Chemical Properties" (listing a pH of 6.5-7.5); Ex. 55, Pharming Healthcare, Ruconest®, Draft US Package Insert, at "Description" (listing a pH of 6.8).  Contrary to Dr. Trout's opinions, this information would not be ignored or disregarded as an unreasonable expectation for success in developing an SC C1-INH formulation.

41.     It is my opinion then that these commonalities among existing formulations containing the same API would cause a skilled formulator to proceed in a linear, predictable manner.  *See, e.g.*, Opening Report at ¶¶ 136, 140-141, 153.  CSL Behring, Sanquin, Shire, and Legacy BioDesign did just that.  CSL Behring's development of Haegarda® began by creating a formulation that contained the same excipients in the same concentration ranges as commercial Berinert®.  *See id.* at Table 4.  Sanquin simply concentrated the commercial IV Cinryze® formulation up to 500 U/mL by using less water to reconstitute the lyophilizate (Ex. 145, May 15, 2009, Sanquin Report titled *Stability of Cinryze (≥ 100 U/ml) in solution* at page 1) and ████ ████████████████████████████████████████████████████████████