IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHIRE VIROPHARMA LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-414 (MSG) |
| | ) | CONSOLIDATED |
| CSL BEHRING LLC and | ) | |
| CSL BEHRING GmbH, | ) | ██████████████████████ |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF SHIRE VIROPHARMA LLC'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF
DR. GREGORY BELL, MR. ROBERT STOLL, AND DR. BERNHARDT TROUT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs (#2881)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
OF COUNSEL:
Wilmington, DE  19899-1347
(302) 658-9200
Eric J. Marandett
kjacobs@mnat.com
Daniel C. Winston
dfahnestock@mnat.com
G. Mark Edgarton
Anita M. C. Spieth
Bryana T. McGillycuddy          *Attorneys for Plaintiff Shire ViroPharma LLC*
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
(617) 248-5000

Edgar H. Haug
HAUG PARTNERS LLP
745 Fifth Avenue, 10th Floor
New York, NY 10105
(212) 588-0800

Original Filing Date:  April 29, 2020
Redacted Filing Date:  May 4, 2020

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ................................................................................ 1

II.   LEGAL STANDARD....................................................................... 1

III.  ARGUMENT ................................................................................... 2

    A.     DR. BELL: SHIRE'S DAMAGES EXPERT ....................................... 2

        1.   Dr. Bell's Lost Profits and Reasonable Royalty Opinions Are Proper. ........................................................................ 2

        2.   Dr. Bell Does Not Offer Regulatory Opinions or Opine on the Intent or Knowledge of Others. ................................ 11

    B.     MR. STOLL: SHIRE'S PATENT OFFICE EXPERT ..................................... 12

        1.   Mr. Stoll Does Not Improperly Opine on Technical Issues..................... 13

        2.   Mr. Stoll Does Not Provide Impermissible "Intent" Opinions. ................ 17

    C.     DR. TROUT: SHIRE'S PHARMACEUTICAL FORMULATION EXPERT ................................................................................ 19

        1.   Dr. Trout Is Well Qualified to Opine on Bioavailability and Tolerability of the Claimed Protein Formulations. .................................... 19

        2.   Dr. Trout's Opinions Concerning Unexpected Results Are Well Supported by Scientific Evidence and Sufficiently Reliable. ................... 21

IV.  CONCLUSION............................................................................... 25

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*,
 903 F.3d 1310 (Fed. Cir. 2018)...............................................................................25

*Aevoe Corp. v. AE Tech Co.*,
 2014 U.S. Dist. LEXIS 117197 (D. Nev. Aug. 20, 2014) ................................15, 17

*Alcon Research, Ltd. v. Watson Labs.*,
 2018 U.S. Dist. LEXIS 33057 (D. Del. Mar. 1, 2018) .........................19, 21, 23, 25

*Allergan, Inc. v. Sandoz Inc.*,
 796 F.3d 1293 (Fed. Cir. 2015)...............................................................................25

*Apotex, Inc. v. Cephalon, Inc.*,
 2016 U.S. Dist. LEXIS 200127 (E.D. Pa. Jan. 6, 2016) ....................................12, 14

*AstraZeneca AB v. Apotex Corp.*,
 782 F.3d 1324 (Fed. Cir. 2015)........................................................................ *passim*

*AstraZeneca UK Ltd., IPR v. Watson Labs., Inc.*,
 2012 WL 6043266 (D. Del. Nov. 14, 2012) ............................................................13

*Berkeley Inv. Grp. v. Colkitt*,
 455 F.3d 195 (3d Cir. 2006).....................................................................................18

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
 2018 U.S. Dist. LEXIS 167104 (D. Del. Sep. 28, 2018) ...........................................6

*Cadence Pharms., Inc. v. Exela Pharma Scis., LLC*,
 2013 U.S. Dist. LEXIS 166097 (D. Del. Nov. 14, 2013), *aff'd*, 780 F.3d 1364
 (Fed. Cir. 2015).......................................................................................................21

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
 350 F.3d 316 (Fed. Cir. 2003)...................................................................................2

*CardioNet, LLC v. ScottCare Corp.*,
 2017 U.S. Dist. LEXIS 173622 (E.D. Pa. Oct. 19, 2017)............................... *passim*

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys.*,
 809 F.3d 1295 (Fed. Cir. 2015)............................................................................3, 5

*Daubert v. Merrell Dow Pharms. Inc.*,
 509 U.S. 579 (1993).................................................................................... *passim*

*Elcock v. Kmart Corp.*,
  233 F.3d 734 (3d Cir. 2000).............................................................................2, 19

*Eli Lily & Co. v. Actavis Elizabeth LLC*,
  2010 U.S. Dist. LEXIS 47061 (D.N.J. May 13, 2010) .......................................17

*In re Ethicon Inc.*,
  2020 U.S. Dist. LEXIS 25091 (D. Colo. Feb. 13, 2020) .....................................13

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018)...........................................................................10

*F'real Foods v. Hamilton Beach Brands*,
  2019 U.S. Dist. LEXIS 62202 (D. Del. Apr. 11, 2019)........................................10

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970)..........................................................3, 5, 9, 10

*Greatbatch Ltd. v. AVX Corp.*,
  2015 U.S. Dist. LEXIS 182055 (D. Del. Dec. 11, 2015)...............................*passim*

*Holmes Grp. v. RPS Prods.*,
  2010 U.S. Dist. LEXIS 102727 (D. Mass. June 25, 2010) .............................17, 19

*Idenix Pharms. LLC v. Gilead Scis., Inc.*,
  2018 U.S. Dist. LEXIS 25663 (D. Del. Feb. 16, 2018) .................................4, 5, 8, 9

*Immunex Corp. v. Sandoz Inc.*,
  395 F. Supp. 3d 366 (D.N.J. 2019) ......................................................................25

*Integra Lifesciences Corp. v. HyperBranch Med. Tech.*,
  2018 U.S. Dist. LEXIS 234624 (D. Del. May 8, 2018).....................................7, 11

*Integra LifeSciences Corp. v. HyperBranch Medical Tech.., Inc.*,
  2018 U.S. Dist. LEXIS 236159 (D. Del. Mar. 20, 2018) ....................................11

*Intellectual Ventures I LLC v. Check Point Software Techs.*,
  215 F. Supp. 3d 314 (D. Del. Apr. 14, 2014)................................................10, 11

*Karlo v. Pittsburgh Glass Works, LLC*,
  849 F.3d 61 (3d Cir. 2017).................................................................................1, 2

*Knoll Pharm. Co. v. Teva Pharm. USA, Inc.*,
  367 F.3d 1381 (Fed. Cir. 2004).............................................................................22

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)..................................................................................5

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)..............................................................................5

*Mentor Graphics Corp. v. Eve-USA, Inc.*,
    851 F.3d 1275 (Fed. Cir. 2017)..........................................................................4, 6

*MiiCS & Partners, Inc. v. Funai Elec. Co.*,
    2017 U.S. Dist. LEXIS 201511 (D. Del. Dec. 7, 2017)..........................................10

*Network-1 Techs. v. Alcatel-Lucent USA*,
    2017 U.S. Dist. LEXIS 154434 (E.D. Tex. Sept. 21, 2017) ....................................16, 17, 18

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) .............................................................................3, 5, 6, 7

*In re Paoli R.R. Yard Pcb Litig.*,
    35 F.3d 717 (3d Cir. 1994).....................................................................................2

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*,
    161 F.3d 77 (1st Cir. 1998)....................................................................................2

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms., Inc.*,
    748 F.3d 1354 (Fed. Cir. 2014).............................................................................22

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., USA*,
    2010 U.S. Dist. LEXIS 56019 (D.N.J. June 7, 2010) ............................................23

*Se-Kure Controls, Inc. v. Vanguard Prods. Grp.*,
    2008 U.S. Dist. LEXIS 3993 (N.D. Ill. Jan. 17, 2008) ..........................................17

*SmithKline Beecham Corp. v. Apotex Corp.*,
    2005 U.S. Dist. LEXIS 5999 (E.D. Pa. Mar. 31, 2005)..........................................24

*In re Soni*,
    54 F.3d 746 (Fed. Cir. 1995).................................................................................22

*Sonos, Inc. v. D&M Holdings Inc.*,
    297 F. Supp. 3d 501 (D. Del. 2017)......................................................................21

*Specialty Composites v. Cabot Corp.*,
    845 F.2d 981 (Fed. Cir. 1988)...............................................................................24

*Sud-Chemie, Inc. v. Multisorb Techs.*,
    554 F.3d 1001 (Fed. Cir. 2009).............................................................................22

*Sundance, Inc. v. Demonte Fabricating Ltd.*,
    550 F.3d 1356 (Fed. Cir. 2008).............................................................................15, 16, 17

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) (en banc).............................................................16

*Tris Pharma, Inc. v. Actavis Labs. Fl, Inc.*,
    755 Fed. App'x 983 (Fed. Cir. 2018).....................................................................23

*W.L. Gore & Assocs. v. C.R. Bard, Inc.*,
  2015 U.S. Dist. LEXIS 197368 (D. Del. Nov. 20, 2015) ........................................................18

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
  913 F.3d 1067 (Fed. Cir. 2019) .......................................................................................................6

*Worldwide Home Prods. v. Time Inc.*,
  2013 U.S. Dist. LEXIS 142095 (S.D.N.Y. Sept. 30, 2013) ...................................................17

**Statutes**

21 U.S.C. § 360cc ..........................................................................................................................12

35 U.S.C. § 103 ..............................................................................................................................23

35 U.S.C. § 284 ................................................................................................................................3

**Other Authorities**

21 C.F.R. § 316 ..............................................................................................................................12

Federal Rule of Evidence 702 ...................................................................................................1, 19

## I.     INTRODUCTION

Plaintiff Shire ViroPharma, LLC ("Shire") opposes the *Daubert* Motion of defendants CSL Behring LLC and CSL Behring GbmH (collectively, "CSL").  *See* D.I. 287 (CSL Mem.). The testimony of Shire's experts Dr. Gregory Bell, Mr. Robert Stoll, and Dr. Bernhardt Trout meets the *Daubert* requirements of qualifications, reliability, and fit, and should not be excluded.

**Dr. Bell**: CSL's attempt to exclude the opinions of Dr. Bell is based on an erroneous application of the law of apportionment, and turns on asserted factual disputes that are matters for cross-examination, not exclusion.

**Mr. Stoll**: Contrary to CSL's argument, Mr. Stoll has not offered any improper "technical opinions."  Mr. Stoll is offered as an expert on U.S. Patent and Trademark ("PTO") practice and procedure, not as a technical expert, and he does not offer any technical opinions that require the perspective of a person of ordinary skill in a technical art ("POSA" or "POSITA").  In addition, Shire offers Mr. Stoll only to rebut the improper opinions of CSL's proffered PTO expert, Mr. Nicholas Godici, which Shire seeks to exclude entirely.  *See* D.I. 285; D.I. 286.  If Mr. Godici's opinions are excluded, then Mr. Stoll's responsive opinions will not be offered and this challenge becomes moot.  To the extent, however, that Mr. Godici's opinions are permitted, then Mr. Stoll should have an opportunity to respond.

**Dr. Trout**:  Shire's formulation expert is well qualified to opine on the bioavailability and tolerability concerns of a skilled formulator, and provides sufficient scientific support for his opinions regarding "unexpected results."  CSL's disagreement is no grounds for exclusion.

## II.     LEGAL STANDARD

"[D]istrict courts perform a gatekeeping function to ensure that expert testimony meets the requirements of Federal Rule of Evidence 702."  *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017).  "Rule 702 embodies three distinct substantive restrictions on the

admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). To satisfy the "qualifications" prong, the expert must "possess specialized expertise" on the subject of the expert opinion. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (Fed. Cir. 2003). The "reliability" prong requires the expert's opinion to "be based on the method and procedures of science, not on subjective belief and unsupported speculation." *Karlo*, 849 F.3d at 80-81. The test "is not whether a particular scientific opinion has the best foundation," but whether it "is supported by good grounds." *Id.* at 81 (quotations omitted). The "fit" prong "ensures that the evidence or testimony [helps] the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quotations omitted) (alteration in original).

"*Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's [] testimony rests upon 'good grounds,' . . . it should be tested by the adversary process . . . rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998); *see In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 743-46 (3d Cir. 1994). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the "appropriate" methods for challenging expert opinions with which a party disagrees. *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 596 (1993).

## III.   ARGUMENT

### A.   DR. BELL: SHIRE'S DAMAGES EXPERT

#### 1.   Dr. Bell's Lost Profits and Reasonable Royalty Opinions Are Proper.

CSL asserts that Dr. Bell's lost profits and reasonable royalty opinions are inadmissible "for failure to properly apportion damages," allegedly because Dr. Bell "failed to separately

account for profits and royalties generated by demand for the patented features of the accused infringing product—Haegarda®—and those profits and royalties attributable to the other, non-patented features of the product that have [allegedly] driven its demand." CSL Mem. at 3.  CSL fundamentally misstates the law of apportionment, misconstrues the claimed inventions (which do not have any non-patented features driving their demand), and at best points only to factual disputes that are for cross examination, not exclusion.

Pursuant to 35 U.S.C. § 284, a patent holder is entitled to two categories of damages: "the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1330 (Fed. Cir. 2015).  In determining whether a patentee is entitled to lost profits, courts often apply the *Panduit* factors as set forth in the seminal case of *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).  Separately, a reasonable royalty is calculated based on a hypothetical negotiation between a willing licensor and willing licensee.  *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120-21 (S.D.N.Y. 1970) (providing fifteen factors to consider in calculating reasonable royalty).

Contrary to CSL's contention, the apportionment doctrine has no application here. Apportionment is required "*where an infringing product is a multi-component product* with patented and unpatented components." *CardioNet, LLC v. ScottCare Corp.*, 2017 U.S. Dist. LEXIS 173622, at *13-17 (E.D. Pa. Oct. 19, 2017) (emphasis added); *see Commonwealth Sci. & Indus. Research Org. v. Cisco Sys.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) ("This principle— apportionment—is the governing rule where multi-component products are involved.") (quotations omitted).  Apportionment is *not* required, however, where (as here) the asserted claims cover the entire pharmaceutical composition and treatment methods.  *See AstraZeneca*, 782 F.3d at 1337-38; *infra* at 4-7.  Further, it is well-established that a proper analysis of the

- 3 -

*Panduit* factors satisfies and obviates the need for apportionment of lost profits.  *See Mentor Graphics Corp. v. Eve-USA, Inc*., 851 F.3d 1275, 1288 (Fed. Cir. 2017); *CardioNet,* 2017 U.S. Dist. Lexis 173622, at *14-15; *infra* at 6.  Lastly, where a reasonable royalty is already based on the smallest salable unit of an infringing product, further apportionment of reasonable royalty damages is not required.  *See Idenix Pharms. LLC v. Gilead Scis., Inc.*, 2018 U.S. Dist. LEXIS 25663, at *17-20 (D. Del. Feb. 16, 2018), *rev'd in part on other grounds*, 941 F.3d 1149 (Fed. Cir. 2019); *infra* at 7-10.

The apportionment doctrine is inapplicable in this case because the claimed inventions cover the entirety of the accused product: (i) a method for treating hereditary angioedema ("HAE") by administrating a pharmaceutical composition (Haegarda), and (ii) the pharmaceutical composition itself (Haegarda).[1]  As described further below, this case does not involve a "multi-component" product that necessitates a separate apportionment analysis because the accused product is the pharmaceutical product itself.  For that same reason, courts generally have not applied apportionment in the pharmaceutical context.  Indeed, although the Federal Circuit in *AstraZeneca* declined to hold apportionment principles "per se inapplicable," it observed that "there is little reason to import" principles for multi-component products like machines into the pharmaceutical context.  782 F.3d at 1337-38 (quotations omitted) (declining to require apportionment where patent covered pharmaceutical product in its entirety, even where API was in the prior art).  Here, as in *AstraZeneca*, the pharmaceutical product as a whole

---

[1]     The patents-in-suit cover methods for treating HAE, which involve subcutaneously administering a composition comprising a high concentration of the protein C1 esterase inhibitor ("C1-INH"), a citrate buffer, a pH of 6.5-8.0, and a dose of at least about 1000 U.  *See, e.g.*, Ex. N ('111 Patent), Claim 1; Ex. O ('788 Patent), Claim 1.  The patents-in-suit also cover the compositions themselves, which possess improved stability and viscosity.  *See, e.g.*, Ex. P ('423 Patent), Claims 18 and 23.  As described in the shared specification, the claimed subcutaneous treatment methods and compositions were designed to provide better efficacy, safety, patient convenience and access, and dosing regimens for the prophylactic treatment of HAE.  *See, e.g. id.* at 2:19-43.

is at issue, not just some portion of it.  *See id.*; *Idenix*, 2018 U.S. Dist. LEXIS 25663, at *19-20 (D. Del. Feb. 16, 2018) (holding an expert's testimony was reliable without apportioning damages because the "smallest saleable unit may be the pill with the patented active ingredient").[2]   In addition, CSL does not dispute that Dr. Bell applied the accepted methodologies set forth in *Panduit* and *Georgia-Pacific* for analyzing lost profits and reasonable royalties, respectively.  CSL merely disagrees with Dr. Bell's assessment of the underlying facts, which goes to the weight, not the admissibility, of his testimony.

> a.  *Lost Profits:  Where the Panduit Factors Are Applied, Lost Profits Calculations Do Not Require Apportionment.*

As explained above, apportionment of lost profits is only required where the infringing product includes multiple components.  *See Commonwealth Sci.*, 809 F.3d at 1301; *CardioNet*, 2017 U.S. Dist. LEXIS 173622, at *13-17.  CSL does not dispute that Haegarda is *not* a multi-component product.  Nonetheless, CSL argues that Dr. Bell should have apportioned damages to account for Haegarda's alleged "benefits" of (a) "efficacy, safety, patient convenience, and access," (b) weight-based dosing, and (c) price.  *See* CSL Mem. at 6-7, 10.  These "benefits" are not unpatented components of Haegarda under any conceivable application of apportionment but, rather, (i) inherent properties of Haegarda directly attributable to the claimed inventions; and/or (ii) not separately salable components of Haegarda.  In fact (and unsurprisingly), CSL's own damages expert has not even tried to apportion damages nor offered any possible apportionment methodology for reasonable royalties or lost profits.  CSL's Motion should be denied on that basis alone.  *See Greatbatch Ltd. v. AVX Corp.*, 2015 U.S. Dist. LEXIS 182055, at

---

[2]     Indeed, CSL's cited cases are distinguishable in that they *all* involve multi-component technology products.  *See, e.g.*, *Lucent Techs.*, *Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336-40 (Fed. Cir. 2009) (rejecting royalty on Microsoft Outlook as a whole where patent related only to "date-picker tool"); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66-71 (Fed. Cir. 2012) (rejecting royalty on price of laptop computers where patent related only to software detecting different optical discs).

*21-23 (D. Del. Dec. 11, 2015) (denying motion to exclude plaintiff's expert testimony where defendant did not offer apportionment methodology).

But even if the principles of apportionment did apply (which they do not), Dr. Bell's lost profits analysis satisfies these principles by applying the *Panduit* factors. *See Mentor Graphics*, 851 F.3d at 1288; *CardioNet*, 2017 U.S. Dist. LEXIS 173622, at *14-15 ("[T]he apportionment requirement may be satisfied using the *Panduit* factors."). In *Mentor Graphics* (a multi-component product case, unlike the present case), the Federal Circuit explained that "when the *Panduit* factors are met, they incorporate into their very analysis the value properly attributed to the patented feature." 851 F.3d at 1290. CSL cites no case to the contrary.[3]

In an effort to avoid this law, CSL argues that "Dr. Bell attempted to satisfy the *Panduit* factors by performing a regression analysis . . . [that] does not result in apportionment." CSL Mem. at 8. CSL misstates the law as well as Dr. Bell's opinions. First, Dr. Bell's analysis of the demand for the patented product – the first *Panduit* factor, which, along with the second factor, accounts for apportionment – does not rely on his regression analysis. *See* Ex. A (Bell Opening Report) ¶¶ 41-47; *CardioNet*, 2017 U.S. Dist. LEXIS 173622, at *15. Instead, Dr. Bell relies on, among other things: (i) the expert opinions of treating physician Dr. Andrew MacGinnitie stating that patients were drawn to Haegarda because of its subcutaneous attribute (*see* Ex. B (MacGinnitie Opening Report ¶ 96; *see also* Ex. A (Bell Opening Report) ¶ 42-43; *supra* at 4 n.1)); (ii) CSL's own market research, which ████████████████████████████████████

████████████████████████████████████████████████████████

---

[3]       The cases CSL cites to support its contention that apportionment of lost profits is required are inapposite. In *WesternGeco L.L.C. v. ION Geophysical Corp.*, 913 F.3d 1067, 1073 (Fed. Cir. 2019), the court held that the defendants waived apportionment. In *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 2018 U.S. Dist. LEXIS 167104, at *23-24 (D. Del. Sep. 28, 2018), the court did not reach the issue of apportionment but instead excluded the expert's lost profits testimony for failure to provide any economic analysis to support the expert's finding of a "two-supplier market," a finding that was key to his lost profits opinions.

████████████████████████████████████████ (Ex. A (Bell Opening Report)

¶ 43); and (iii) ████████████████████████████████████████████

████████████████████████████ (*see* Ex. A (Bell Opening Report) ¶¶ 42-46).

Thus, Dr. Bell provides ample evidence to support his application of the first *Panduit* factor.

CSL's disagreement with his conclusions is a topic for cross-examination, not exclusion.

Nor is it of any consequence to the apportionment analysis that the asserted claims are of

differing scope. *See* CSL Mem. at 6. As an initial matter, Dr. Bell is not a technical expert and

does not purport to opine on the scope of the asserted claims. Rather, he relies on Dr.

MacGinnitie, Dr. Klibanov (Shire's technical expert on infringement), and other facts in the

record. More importantly, CSL completely ignores what the facts actually show: the claimed

elements of the claimed compositions provide for the subcutaneous treatment attribute of

Haegarda, which, in turn, drives demand for the inventions claimed in all three patents. *See*

*supra* at 4 n.1. Finally, CSL misstates the law. There is no requirement that a damages expert

apportion damages on a claim-by-claim basis. *See Integra Lifesciences Corp. v. HyperBranch*

*Med. Tech.*, 2018 U.S. Dist. LEXIS 234624, at *7-10 (D. Del. May 8, 2018) (rejecting a *Daubert*

challenge because expert did not apportion damages on a claim-by-claim basis); *Greatbatch*,

2015 U.S. Dist. LEXIS 182055, at *20-21 (denying motion to exclude expert's testimony for

failure to apportion damages on a patent-by-patent basis).[4]

       b.  *Reasonable Royalty: Dr. Bell's Reasonable Royalty Opinions Do Not*
          *Require Apportionment, as Haegarda Is Already the Smallest Salable*
          *Unit.*

CSL's attempt to require apportionment in the reasonable royalty analysis also is flawed.

*See* CSL Mem. at 3. The patents-in-suit already are directed to the smallest salable unit: the

---

[4]     CSL's arguments regarding Dr. Bell's technical understanding of SHP616, Shire's subcutaneous C1-INH product (*see* CSL Mem. at 6, 14), are irrelevant for the same reasons.

method of treatment using the pharmaceutical composition (i.e., Haegarda), and the pharmaceutical composition itself (which includes its concentration, pH, excipients and other qualities). *See supra* at 4 n.1. This is exactly why apportionment has not been applied in the pharmaceutical context. Where, as here, the patented product is the smallest salable patent-practicing unit, and not a multi-component product, apportionment of royalties is not required. *See Idenix*, 2018 U.S. Dist. LEXIS 25663, at *17-20 ("[R]easonable royalties must generally be based not on the entire product, but instead on the smallest salable patent-practicing unit.") (quotations omitted); *Greatbatch*, 2015 U.S. Dist. LEXIS 182055, at *19-21 (denying motion to exclude reasonable royalty opinions where plaintiff argued the accused product was the smallest salable unit). As explained above, Haegarda's alleged "benefits" are not separate, non-patented components of Haegarda. *See supra* at 5-6.

Both the Federal Circuit and the District of Delaware recently have found that apportionment of a royalty is not required where the patents cover the pharmaceutical product itself (even where the product had multiple components), making the patented product the smallest salable unit. In *AstraZeneca,* the Federal Circuit rejected the argument that the plaintiff should have apportioned the relative value between the prior art active and the inactive elements of the claimed omeprazole product. *See* 782 F.3d at 1337-38. The Federal Circuit held that the rules of apportionment did not apply because the patented elements – the active ingredient, coating, and subcoating – "cover[ed] the infringing product as a whole, not a single component of a multi-component product." *Id.* at 1338. In reaching this conclusion, the Federal Circuit noted that "[t]here is no unpatented or non-infringing feature in the product." *AstraZeneca*, 782 F.3d at 1338. Here, the only purported "unpatented or non-infringing feature" that CSL points to in the reasonable royalty section of its *Daubert* Motion is Haegarda's comparatively lower price. *See* CSL Mem. at 10. Unsurprisingly, CSL does not cite a single case in which a lower product

price is a "non-patented feature."[5]    Likewise,   weight-based dosing, efficacy, patient

convenience, and/or safety are not "non-patented features."  They are inherent properties and

indeed the purpose of the claimed compositions and methods.  Any value attributable to those

properties necessarily relates to Haegarda's claimed subcutaneous administration enabled by the

claimed composition.  *See, e.g.*, Ex. C (Request for Orphan Drug Marketing Exclusivity,

CSLHAE01241918) at 6, 21, 41; Ex. D (Type B Pre-BLA Meeting Package,

CSLHAE00001406), at 35-36; Ex. E (MacGinnitie Reply Report) ¶¶ 37-39; *supra* at 4 n.1.

Regardless, as explained below, this issue merely goes to the weight, not admissibility, of Dr.

Bell's testimony.

Similarly, in *Idenix*, the defendant argued that the expert's use of an unapportioned

royalty base failed to account for defendant's non-patented contribution to the infringing

product.  *See* 2018 U.S. Dist. LEXIS 25663, at *19-21.  The Court rejected this argument,

explaining that the expert gave "a reasonable reliable opinion that fits and is consistent with the

law, including that for use of the medication to treat an ailment, the smallest saleable unit may be

the pill with the patented active ingredient.  The patented feature may not, under the

circumstances, be segregated out and that the patented feature may be found to drive demand."

*Id.* at *19-20 (quotations omitted).  Here, Haegarda (the accused product) is the smallest salable

unit, and no apportionment is required.  *See Greatbatch*, 2015 U.S. Dist. LEXIS 182055, at *19-

21.

In any event, Dr. Bell's *Georgia-Pacific* analysis already sufficiently accounts for any

alleged non-patented "features" of Haegarda, because "the standard *Georgia-Pacific* reasonable

royalty analysis takes account of the importance of the inventive contribution in determining the

---

[5]    Moreover, Dr. Bell's regression analysis establishes that price did not affect Haegarda's
demand, as its launch did not have a material market expanding effect.  *See* Ex. A (Bell Opening
Report) ¶¶ 41-47 & Bell Ex. E attached thereto.

royalty rate that would have emerged from the hypothetical negotiation." *AstraZeneca*, 782 F.3d at 1338. CSL's only specific objection to Dr. Bell's *Georgia-Pacific* analysis relates to the thirteenth factor: the "portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." CSL Mem. at 10. Dr. Bell conducted a fulsome analysis of this factor and incorporated his evaluation into his reasonable royalty rate.[6] *See* Ex. A (Bell Opening Report ¶ 92). To the extent CSL objects to Dr. Bell's analysis, the dispute is only appropriate for cross examination, as explained below.

> ### c.  *CSL's Objections Go to the Weight, Not Admissibility, of Dr. Bell's Testimony.*

At best for CSL, it disagrees with the facts: namely, Dr. Bell's reference to the claimed features of the inventions and his assumptions about the importance of the subcutaneous nature of Haegarda and the demand-driving features of Haegarda. *See* CSL Mem. at 5-7. These purported factual disputes, however, all "go to the weight, not the admissibility" of Dr. Bell's testimony. *F'real Foods v. Hamilton Beach Brands*, 2019 U.S. Dist. LEXIS 62202, at *2 (D. Del. Apr. 11, 2019) (rejecting Defendants' argument that expert opinion was unreliable for failure to apportion damages based on factual disputes); *Intellectual Ventures I LLC v. Check Point Software Techs.*, 215 F. Supp. 3d 314, 326 (D. Del. Apr. 14, 2014) (disagreements as to underlying facts "go to the weight of [expert]'s testimony, not its admissibility").

At most, the parties dispute whether Haegarda has non-patented components. That

---

[6]      The cases cited by CSL, *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018), and *MiiCS & Partners, Inc. v. Funai Elec. Co.*, 2017 U.S. Dist. LEXIS 201511, at *7-8 (D. Del. Dec. 7, 2017) (*see* CSL Mem. at 10-11), are inapposite, as both involved multi-component high technology products where apportionment undisputedly was required. Moreover, in *Exmark*, the Court excluded plaintiff's damages expert's opinions because they failed to tie the proposed reasonable royalty to the facts of the case. *See* 879 F.3d at 1349. Here, Dr. Bell ties each *Georgia-Pacific* factor to the reasonable royalty rate and the facts of the case. *See* Ex. A (Bell Opening Report) ¶¶ 78-96.

dispute is not a *Daubert* issue.   *See CardioNet*, 2017 U.S. Dist. LEXIS 173622, at *15-16 (holding that "failure to apportion damages is not a valid basis for excluding [expert] testimony because if the trier of fact concludes that the [infringing product] is not a multi-component device, apportionment is not necessary").   Even where apportionment applies, whether it is the patented feature that drives demand for a product is a question of fact for the factfinder.   *See Integra LifeSciences Corp. v. HyperBranch Medical Tech.., Inc.*, 2018 U.S. Dist. LEXIS 236159, at *10 (D. Del. Mar. 20, 2018), *adopted by* 2018 U.S. Dist. LEXIS 234624; *Intellectual Ventures I*, 215 F. Supp. 3d at 326 (expert testimony about the patented feature driving demand for the accused product went to the weight of the testimony).   CSL may disagree with the facts relied upon by Dr. Bell, but CSL has not established that the principles and methodology supporting his opinions are unreliable.

### 2.   Dr. Bell Does Not Offer Regulatory Opinions or Opine on the Intent or Knowledge of Others.

CSL next seeks to exclude Dr. Bell's lost profits and reasonable royalty opinions "to the extent they rely on Dr. Bell's [alleged] regulatory opinions."  CSL Mem. at 11.  CSL admits that Dr. Bell does not purport to be a regulatory expert, but nevertheless asserts that Dr. Bell "offers a number of independent opinions that are unsupported by regulatory expert opinion," including the reasons why the FDA granted Orphan Drug Exclusivity ("ODE") to Haegarda.  *Id.* at 12-13. Dr. Bell did not offer any "independent opinions" on this topic, but rather relied on Shire's FDA expert Suzanne Sensabaugh for his understanding that subcutaneous administration was key to Haegarda's receipt of ODE.  *See* Ex. F (Bell Reply Report) ¶ 7(a).[7]  CSL's objection to Dr. Bell's testimony as it relates to FDA issues should therefore be rejected.  *See Greatbatch*, 2015

---

[7]      Dr. Bell's deposition testimony was not to the contrary.  *See* CSL Mem. at 13.  When read in context, it is clear that Dr. Bell was testifying not generally but only to the contents of a specific document before him.  *See id.*  In any event, alleged inconsistencies are matters for cross-examination, not exclusion.

U.S. Dist. LEXIS 182055, at *21 (expert "is allowed to rely on his understanding, as informed by the opinions of" other experts).

Nor did Dr. Bell rely "on intent or mental states of Shire employees" in assessing losses attributable to Haegarda's ODE, as CSL contends.  CSL Mem. at 14.  ████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████  Dr. Bell had no need to, and therefore did not, rely on the intent or mental state of any Shire witness in calculating lost revenue.  ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████  CSL Mem. at 14.  ████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████  Again, CSL's disagreement with Dr. Bell's understanding of the facts goes to the weight, not admissibility, of his testimony.  *See Apotex, Inc. v. Cephalon, Inc.*, 2016 U.S. Dist. LEXIS 200127, at *28 & n.1 (E.D. Pa. Jan. 6, 2016).

### B.   MR. STOLL: SHIRE'S PATENT OFFICE EXPERT

Mr. Stoll, a former PTO Commissioner, is Shire's expert on PTO practices and procedures related to CSL's counterclaim of inequitable conduct.  He was retained to respond to CSL's expert Mr. Nicholas Godici, also a former PTO Commissioner.  Ironically, CSL seeks to exclude Mr. Stoll, while Mr. Godici offers the very types of opinions that CSL challenges.  To the extent the Court permits Mr. Godici's opinions, then those that Mr. Stoll seeks to offer in

response are undoubtedly proper.[8]  CSL's challenges also are ill-founded.  CSL accuses Mr. Stoll of improperly opining on (a) technical issues related to pharmaceutical formulation for which he is not a POSA; and (b) Shire's intent in terms of certain materials allegedly withheld from the PTO during prosecution of the patents-in-suit.  CSL presents a classic straw man argument in seeking to exclude opinions that Mr. Stoll has not advanced.  Mr. Stoll has not offered technical opinions and does not claim to be a technical POSA.  Further, Shire agrees that experts should not be permitted to testify as to intent, motive, or state of mind, or draw legal conclusions.  Mr. Stoll has not done so, and as such, CSL's Motion should be denied.[9]

### 1.    Mr. Stoll Does Not Improperly Opine on Technical Issues.

Mr. Stoll worked for the PTO for 34 years, rising from patent examiner to Commissioner for Patents, where he oversaw the PTO from 2009 to 2011.  Ex. H (Stoll Report) at 59-60 (Stoll CV attached thereto as Ex. A).  CSL does not dispute that he is an expert on PTO practices and procedures.  Mr. Stoll also happens to have a background (including an undergraduate degree) in chemical engineering.  *See id.*  That does not mean, however, that he offered opinions on technical issues; nor does he purport to be a technical expert.  Rather, Mr. Stoll was retained to respond to Mr. Godici's opinions and therefore discuss "the process before the Patent and Trademark Office" and opine on CSL's allegation (as does Mr. Godici) of "whether or not there was evidence of inequitable conduct."  Ex. I (Stoll Depo.) at 12:21-13:7.

---

[8]    Contrary to CSL's assertions, Shire does not concede that expert testimony on PTO practices and procedures is always proper.  *See AstraZeneca UK Ltd., IPR v. Watson Labs., Inc.*, 2012 WL 6043266, at *3 (D. Del. Nov. 14, 2012).  Mr. Stoll's Report explicitly states his testimony is proffered only to respond to Mr. Godici in the event the Court is inclined to accept such testimony.

[9]    It is not clear exactly which sections of Mr. Stoll's Report CSL challenges.  Thus, even if the Court grants any portion of CSL's Motion with respect to Mr. Stoll, the parties will likely dispute which specific portions are actually barred.  For this reason alone, CSL's Motion should be denied.  *See In re Ethicon Inc.*, 2020 U.S. Dist. LEXIS 25091, at *23 (D. Colo. Feb. 13, 2020) (declining to "make speculative or advisory rulings . . . where the party seeking exclusion [did] not provide specific content" to be excluded).

a.   *Mr. Stoll Does Not Claim to Be a POSA.*

CSL charges Mr. Stoll with "believ[ing] himself to be a person of ordinary skill in the art for portions of the [pharmaceutical formulation] technology at issue."  CSL Mem. at 16.  This is a vast mischaracterization of Mr. Stoll's testimony.   Mr. Stoll states the opposite: "I do not profess to have special technical expertise in the patents-in-suit."  Ex. H (Stoll Report) ¶ 15.  He also expressly confirmed at his deposition that he is not testifying as a technical expert or POSA, but does have some understanding of the language in the patent claims due to his background:

> I am a chemical engineer, so I do understand a lot of what's going on.  And I can also read terms and I know what they are.  So I have some skills in this particular area, but **I would not hold myself out as a technical expert in this particular subject matter[.]**

Ex. I (Stoll Depo.) at 48:18-23 (emphasis added); *id.* at 128:15-17.   Mr. Stoll repeatedly explained, in both his Report and deposition, that he relied on Shire's technical expert, Dr. Trout, to understand the full details of the pharmaceutical formulation science at issue.  *See id.* at 49:14-21 ("For the technical expertise, I reviewed Dr. Trout . . . .").[10]

While CSL criticizes Mr. Stoll for stating "I intend to testify [] as a chemical engineer" (CSL Mem. at 17), that quote is taken out of context.   Mr. Stoll explained that he intends to "testify not only as a chemical engineer, but as a reader of English as to what [a] document says."   Ex. I (Stoll Depo.) at 128:18-24.   He does not claim to be an *expert* in chemical engineering or any technical area.   He simply stated he is an expert in PTO practices and procedures who happens to have a background in chemical engineering.   He explained that his understanding of "basic chemistry, basic understanding of language, those types of things," allowed him to read and understand parts of the claims of the patents-in-suit.  *See id.* at 49:11-13.

---

[10]   CSL can hardly claim ignorance of Mr. Stoll's reliance on a separate technical expert.   Mr. Stoll stated at least 29 separate times his Report and deposition that he relied on Dr. Trout for technical expertise.  *See* Ex. H (Stoll Report) ¶¶ 21, 125-27, 141, 147, 161, 167; Ex. I (Stoll Depo.) at 49:18-21, 50:213, 124:23-125:11, 126:1-6, 127:3-6, 133:22-24, 135:10-12, 139:10-12, 149:21-24, 211:23-25, 227:24-229:4, 230:20-24, 232:10-14, 244:12-16, 245:14-246:2.

At no point did Mr. Stoll attempt to opine as a POSA.

> b. *Non-Technical Patent Law Experts May Assess Materiality of a Reference for an Inequitable Conduct Analysis.*

Certain issues in patent litigation, including infringement and validity, require the perspective of a technical POSA. *See Sundance, Inc. v. Demonte Fabricating Ltd.*, 550 F.3d 1356, 1361 (Fed. Cir. 2008). For infringement, "patent claims are construed from the perspective of one of ordinary skill in the art"; and for validity, "whether a patent claim would have been obvious in light of prior art references is determined from the perspective or one of ordinary skill in the art." *Id.* at 1361 n.3. But Mr. Stoll does not opine on infringement or validity. At his deposition, he stated in no uncertain terms that he does not intend to opine on "validity," "obviousness," "anticipation," or "issues under Section 112 of the [P]atent [A]ct." Ex. I (Stoll Depo.) at 54:2-55:5. Mr. Stoll is offered as a PTO expert on the issue of inequitable conduct to rebut the opinions of CSL's PTO expert Mr. Godici. This role does not require the perspective of a POSA. *See Aevoe Corp. v. AE Tech Co.*, 2014 U.S. Dist. LEXIS 117197, at *6-7 (D. Nev. Aug. 20, 2014).

CSL relies on *Sundance* to argue that when a patent law expert is "also opining as [a] technical expert[]," his "qualification must derive from [his] technical qualifications in the pertinent art." CSL Mem. at 19. In *Sundance*, however, the patent law expert impermissibly offered opinions on "infringement and validity," which required that the expert be a POSA. 550 F.3d at 1364. But, as *Sundance* specifically explained, patent law experts *may* "offer testimony in contexts *other than* noninfringement and invalidity, such as patent office practice and procedure," as Mr. Stoll does. *Id.* at 1363 n.5 (emphasis added).

 Mr. Stoll's opinions "do not

derive from technical knowledge" about the "technology or scope of the claims, but rather, from

[his] familiarity with patent office rules and practice." *Network-1 Techs. v. Alcatel-Lucent USA*,

2017 U.S. Dist. LEXIS 154434, at *10 (E.D. Tex. Sept. 21, 2017).

Courts that have considered the issue of materiality of a reference submitted or withheld

from the PTO have found that patent law experts (i.e. non-POSAs) may opine on materiality.

For example, in *Network-1*, the challenged expert was a patent law expert opining on the

materiality of a technical reference submitted to the PTO. *See* 2017 U.S. Dist. LEXIS 154434, at

*10-16.  Like Mr. Stoll, the expert had decades of experience in various roles at the PTO and a

bachelor's degree in chemistry.  Defendants challenged the expert's opinion on materiality of

references submitted to the PTO, arguing that he was "a non-technical expert," "not one of

---

[11]     "To prevail on the defense of inequitable conduct, [CSL] must prove that [Shire]
misrepresented or omitted material information with the specific intent to deceive the PTO."
*Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc).
Thus, CSL must prove the allegedly withheld reference was but-for material.

ordinary skill in the art," and "therefore not qualified to opine on the materiality of" the references.  *Id.* at *10.  In considering the same argument that CSL now raises, the court found the expert opinions permissible, and expressly distinguished *Sundance*:

> In contrast to inquiries into infringement and validity, the materiality prong of the inequitable conduct inquiry is analyzed from the perspective of the PTO . . . . Accordingly, an appropriate expert on this topic could be an individual who had knowledge of and experience with the procedures of the PTO.

*Id.* at *12 (quotations omitted).  Other courts have reached similar conclusions on patent law experts opining on materiality and inequitable conduct.  *See Aevoe*, 2014 U.S. Dist. LEXIS 117197, at *6-7; *Eli Lily & Co. v. Actavis Elizabeth LLC*, 2010 U.S. Dist. LEXIS 47061, at *35 (D.N.J. May 13, 2010) (expert was "sufficiently qualified to offer his opinion as to materiality" when expert had "extensive experience working at the PTO as an examiner"); *Holmes Grp. v. RPS Prods.*, 2010 U.S. Dist. LEXIS 102727, at *16 (D. Mass. June 25, 2010) (permitting former PTO examiner to testify on "whether a reasonable examiner "would have considered the information to be material"); *see also Se-Kure Controls, Inc. v. Vanguard Prods. Grp.*, 2008 U.S. Dist. LEXIS 3993, at *11-12 (N.D. Ill. Jan. 17, 2008); *Worldwide Home Prods. v. Time Inc.*, 2013 U.S. Dist. LEXIS 142095, at *15 (S.D.N.Y. Sept. 30, 2013).[12]

### 2.    Mr. Stoll Does Not Provide Impermissible "Intent" Opinions.

CSL charges Mr. Stoll with opining on "intents, motives, and states of mind of various witnesses" and drawing "legal conclusions."  CSL Mem. at 15, 20.  Indeed, an expert cannot "render[] a legal opinion."  *Berkeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006).

---

[12]    Ironically, CSL's own PTO expert, Mr. Godici, also opines on materiality of the allegedly "withheld" reference; therefore, Mr. Stoll necessarily opines on the materiality in rebuttal.  *See, e.g.*, Ex. J (Godici Opening Report) ¶ 151 ("[I]t is likely the examiner would have found the . . . Sanquin Report . . . material information by rejecting claims of the '168 application [for the patents-in-suit]."); *id.* ¶¶ 149-58 (section titled "Failure to Submit Material Information to the PTO").  Yet Mr. Godici has no background in chemistry and is not a POSA.  To the extent Mr. Stoll's opinions on materiality are improper, Mr. Godici's opinions are also inadmissible.

Moreover, this Court holds the "strong and consistent view" that "the testimony of patent law experts" is "routinely exclude[d]." *W.L. Gore & Assocs. v. C.R. Bard, Inc.*, 2015 U.S. Dist. LEXIS 197368, at *7-8 (D. Del. Nov. 20, 2015) (collecting cases).  For this very reason Shire seeks to exclude the opinions of CSL's patent law expert Mr. Godici.  If Mr. Godici's opinions are excluded, then the portions of Mr. Stoll's Report that respond to Mr. Godici on this point (i.e., paragraphs 133, 152, 158, 175 and 178) are not necessary.

Mr. Stoll's opinions differ from those of Mr. Godici, however, in an important way.  Mr. Stoll does not, as CSL claims, "usurp[] the role of the judge and jury by opining on the intent[], motive, and state of mind."  CSL Mem. at 20.  Rather, he reviewed the file histories of the patents-in-suit based on his decades of expertise in PTO practice to offer opinions about *the specific evidence in this case* relevant to a finding of intent to deceive the PTO.  "[T]he case law establishes that [] an expert may point to and even testify about evidence relevant to intent," so long as he does not opine as to the ultimate issue.  *Network 1*, 2017 U.S. Dist. LEXIS 154434, at *17.

For example, Mr. Stoll summarizes the information he reviewed, including the file histories of the patents-in-suit and the information that CSL and Mr. Godici allege was withheld from the PTO during prosecution.  *See* Ex. H (Stoll Report) ¶¶ 21, 125, 141.  He then permissibly draws from to his expertise to opine on whether such evidence would typically be disclosed to the PTO:

- 

-

As Mr. Stoll demonstrates, he has personal experience with the types of information that applicants submit (and are obligated to submit) during patent prosecution.  His opinions do not go to Shire's state of mind, but rather assist the Court in determining what is an "ordinary" practice before the PTO, and which "therefore could not have been inequitable."  *Holmes Grp.*, 2010 U.S. Dist. LEXIS 102727, at *15-16 (allowing PTO expert to testify regarding "whether plaintiff's conduct was out-of-the-ordinary or contrary to the expectations of a reasonable patent examiner").  Accordingly, Mr. Stoll's opinions regarding usual submissions to the PTO meet the requirements of Rule 702.

### C.    DR. TROUT: SHIRE'S PHARMACEUTICAL FORMULATION EXPERT

"Unexpected results" is one of the secondary considerations of non-obviousness put forth by Shire that must be weighed in the obviousness analysis.  *See, e.g.*, *Alcon Research, Ltd. v. Watson Labs.*, 2018 U.S. Dist. LEXIS 33057, at *67-68 (D. Del. Mar. 1, 2018).  In particular, Dr. Trout opines that the inventors "surprisingly and unexpectedly provided a high concentration C1-INH formulation for subcutaneous administration with acceptable stability, viscosity, solubility, tolerability, and bioavailability."  Ex. K (Trout Report) ¶¶ 351-54.  CSL seeks to preclude Dr. Trout from testifying to the unexpected results of the inventions generally, arguing essentially that his opinions lack sufficient evidentiary basis.  CSL further argues that, as a formulator, Dr. Trout is unqualified to opine on bioavailability and tolerability.  As explained below, however, Dr. Trout's opinions are within his expertise and well supported by his experience and scientific evidence.  At best, CSL's objections go to the weight, not admissibility, of his testimony.

#### 1.    Dr. Trout Is Well Qualified to Opine on Bioavailability and Tolerability of the Claimed Protein Formulations.

Dr. Trout is a Professor of Chemical Engineering at MIT with over 20 years of experience in protein formulation.  CSL does not dispute that Dr. Trout is well qualified to testify

about formulation issues such as stability, viscosity, and solubility, and the scope and content of prior art, including challenges faced by those formulating proteins for subcutaneous administration.  CSL only argues that Dr. Trout cannot opine on bioavailability (the amount of active ingredient available in the body after administration of a formulation) and tolerability (which includes injection pain caused by a formulation) because he is not a physician.  *See* CSL Mem. at 25.

CSL mistakenly attempts to draw a bright line rule defining the appropriate scope of formulator versus physician expertise.  Contrary to CSL's suggestion, formulator and physician areas of expertise overlap, as both take into account bioavailability and tolerability.  Dr. Trout opines on bioavailability and tolerability, but only from the formulator's perspective.  *See, e.g.*, Ex. K (Trout Report) ¶¶ 32-33 ("I am not a 'physician' POSITA.  Instead, I have conducted my analysis in this report though the eyes of a 'formulator' POSITA."), 64 & n.1.  As Dr. Trout explains (with citations to supporting references), a skilled formulator in fact *must* take into account bioavailability and tolerability when developing a high concentration subcutaneous protein formulation, as these parameters contribute to its ultimate viability.  *See, e.g.*, *id.* ¶ 69 ("In developing pharmaceutical formulations, formulators must ensure sufficient 'bioavailability' of the API"), ¶ 84; *see also* Ex. L (Trout Depo.) at 46:5-47:2, 241:19-23, 243:2-14, 246:6-18.  CSL's formulation expert Dr. Illum likewise opines on bioavailability and tolerability, offering opinions on "injection site pain."  *See, e.g.*, Ex. M (Illum Opening Report) ¶¶ 147, 240.[13]  Bioavailability and tolerability are thus irrefutably relevant to the perspective of a skilled formulator.

---

[13]    Indeed, CSL's entire obviousness defense is premised on Dr. Illum's opinion that a formulator would seek to reduce injection pain and, therefore, allegedly combine the *Schranz* Poster with *Gatlin*.  *See* D.I. 283 at 3.  If the Court adopts CSL's argument here, it must exclude Dr. Illum's testimony on bioavailability and tolerability as well.

As such, Dr. Trout is qualified to testify regarding bioavailability, tolerability, and (more broadly) the other unexpected results achieved by the claimed inventions. *See Alcon*, 2018 U.S. Dist. LEXIS 33057, at *60-63 (expert in formulating ophthalmic compositions was qualified to testify about bioavailability); *Sonos, Inc. v. D&M Holdings Inc.*, 297 F. Supp. 3d 501, 508-10 (D. Del. 2017) (rejecting challenge to expert's qualifications, cautioning against "defining the scope of the pertinent art too narrowly").

### 2. Dr. Trout's Opinions Concerning Unexpected Results Are Well Supported by Scientific Evidence and Sufficiently Reliable.

Dr. Trout opines that, in view of the known challenges and unpredictability involved in formulating high concentration protein compositions for subcutaneous administration, the inventors "surprisingly and unexpectedly" developed high concentration subcutaneous C1-INH formulations with "acceptable stability, viscosity, solubility, tolerability, and bioavailability." Ex. K (Trout Report) ¶¶ 351-54.  Notably, CSL does not dispute that the inventions actually possess these characteristics.[14]  Rather, CSL argues that Dr. Trout's opinions on unexpected results lack proper evidentiary foundation because (a) there is insufficient data in the patents; (b) he does not compare the inventions to the closest prior art; and (c) he does not explain what a POSA *would* have expected.  *See* CSL Mem. at 23-24.  As explained below, however, Dr. Trout's opinions are well supported by scientific evidence and the factual record.  CSL's disagreement with those opinions are topics for cross-examination, not exclusion.

First, CSL contends there is insufficient data in the patents from which Dr. Trout could conclude that the claimed formulations possess unexpected "tolerability, bioavailability, [and]

---

[14]    Nor does CSL deny that Haegarda in particular (which Shire contends embodies the inventions) possesses this combination of desirable features.  *See, e.g., id.* ¶ 355.  Shire can thus rely on the characteristics of Haegarda to show unexpected results of the claimed inventions.  *See Cadence Pharms., Inc. v. Exela Pharma Scis., LLC*, 2013 U.S. Dist. LEXIS 166097, at *90-92 (D. Del. Nov. 14, 2013), *aff'd*, 780 F.3d 1364, 1374-75 (Fed. Cir. 2015) (unexpected results can be based on the properties of a commercial embodiment).

lack of injection pain [i.e., tolerability]."  CSL Mem. at 23.  But unexpected results need not

appear in the specification.  *See Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms., Inc.*,

748 F.3d 1354, 1360 (Fed. Cir. 2014) (rejecting argument that "later-discovered benefits cannot

be considered in an obviousness analysis"); *Knoll Pharm. Co. v. Teva Pharm. USA, Inc*., 367

F.3d 1381, 1385 (Fed. Cir. 2004) ("There is no requirement [for unexpected results] . . . that the

patent application contains all of the work done in studying the invention . . . .").  Moreover, the

shared patent specification does, in fact, provide stability, viscosity (which affects tolerability),

solubility, and purity data for the claimed compositions.  *See* Ex. N ('111 Patent) at 7:30-10:49.

It also discloses that the subcutaneous formulations will provide sufficient bioavailability, and

that citrate, despite being associated with pain, is nevertheless tolerable as a buffer.  *See id.* at

2:10-20, 2:62-67, 6:1-25, 10:33-41; Ex. K (Trout Report) ¶¶ 79-80, 165-86, 191-93.  Such

statements are relevant to unexpected results and must be considered in the obviousness analysis.

*See Sud-Chemie, Inc. v. Multisorb Techs.*, 554 F.3d 1001, 1008-09 (Fed. Cir. 2009) (court erred

by not considering information in the patent "pertinent" to purported unexpected results); *In re

Soni*, 54 F.3d 746, 749-50 (Fed. Cir. 1995) (reversing obviousness rejection where specification

"contains specific data indicating improved properties" and "states that the improved properties

provided by the claimed compositions 'are much greater than would have been predicted'").

Second, CSL asserts that Dr. Trout fails to compare the invention to the closest prior art.

*See* CSL Mem. at 23-24.  CSL is wrong about both the law and Dr. Trout's opinions.  First,

unexpected results need not be based on comparative studies or testing.  *See, e.g.*, *Sanofi-Aventis

Deutschland GmbH v. Glenmark Pharms. Inc., USA*, 2010 U.S. Dist. LEXIS 56019, at *41

(D.N.J. June 7, 2010) ("Plaintiffs may demonstrate unexpected results in reliance upon mediums

other than comparative tests."), *aff'd*, 748 F.3d at 1360-61 (upholding non-obviousness verdict

- 22 -

based on expert testimony that POSAs "would not have predicted the longer-lasting hypertension control demonstrated by [the invention]"); *Alcon*, 2018 U.S. Dist. LEXIS 33057, at \*69-72.



Dr. Trout's comparison of the claimed compositions to prior failed attempts to formulate C1-INH for subcutaneous administration (including those in the *Schranz* Poster) supports a finding of unexpected results. *See SmithKline Beecham Corp. v. Apotex Corp.*, 2005 U.S. Dist. LEXIS 5999, at \*60-65 (E.D. Pa. Mar. 31, 2005) (finding unexpected results where patentee

---

15      CSL does not explain what it believes to be the "closest prior art." CSL identified only the *Schranz* Poster and *Gatlin* as prior art under 35 U.S.C. § 103, and so one can assume for purposes of CSL's *Daubert* Motion that the *Schranz* Poster is the closest prior art. But in addition, Dr. Trout compares the claimed compositions to all of: preexisting intravenous C1-INH formulations (Berinert and Cinryze), CSL's confidential subcutaneous C1-INH formulation attempts (including CSL830, which evolved into Haegarda), and other subcutaneous protein formulations. *See* Ex. K (Trout Report) ¶¶ 74, 80, 89, 111-14, 117-18, 157-59, 203-39, 259-76, 352-53. The fact-finder ultimately decides what is the closest prior art. *See Tris Pharma, Inc. v. Actavis Labs. Fl, Inc.*, 755 Fed. App'x 983, 992 (Fed. Cir. 2018) (court erred in rejecting expert testimony on unexpected results where experts "purportedly failed to compare the [] formulation with the prior closest art," because they compared the invention "to all prior art products . . . cited by [defendant]").

"attempt[ed] numerous alterations" of prior art methods and surprisingly discovered a desirable method); *see also Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991 (Fed. Cir. 1988) (patentee "went in a direction different from that of others in the art," and "thus produced unexpected results").

Finally, CSL suggests that Dr. Trout "made no effort to define what *would* be expected." CSL Mem. at 24.  CSL ignores over 45 pages of Dr. Trout's Report explaining (with citations to scientific articles) the many known and potentially insurmountable challenges a formulator POSA would expect would prevent developing a high concentration subcutaneous C1-INH formulation.  *See* Ex. K (Trout Report) ¶¶ 64-159; *see also* Ex. L (Trout Depo.) at 245:2-248:8, 249:7-18.  For instance, Dr. Trout opines:

- "Although subcutaneous bioavailability can sometimes improve with the proper selection of formulation additives/excipients (explained below), adding excipients to the formulation presents additional challenges that may be insurmountable," because "excipients can . . . alter important characteristics of the formulation, such as stability, solubility, and tolerability."  Ex. K (Trout Report) ¶¶ 69, 74.
- "[C]itrate was known to cause injection pain . . . . Thus . . . a POSITA [would not] presume or expect that the use of sodium citrate would lead to acceptable results."  *Id.* ¶ 80.
- "POSITAs as of March 2013 would have understood that a high concentration subcutaneous pharmaceutical formulation would require sufficient stability and acceptable tolerability (including viscosity and syringeability), among other characteristics . . . . But achieving this combination of features (solubility, stability, viscosity/syringeability, high concentration, low volume, etc.) would have been very difficult and potentially impossible."  *Id.* ¶ 113.

Dr. Trout explains that, given these obstacles, a POSA would have expected not to successfully create a high concentration C1-INH formulation with "acceptable stability, viscosity, solubility, tolerability, and bioavailability," and therefore would have pursued formulations with different parameters than those claimed.  *See id.* ¶¶ 65, 74-75, 79-80, 83-84,

102-05, 108-18, 125-27, 283-87, 295-99, 304-10, 313-16, 323-24, 337.[16]   Dr. Trout has more than sufficient grounds to opine that it was unexpected that the inventors would overcome these obstacles and invent the claimed high concentration C1-INH formulations and treatment methods that possess the above-listed properties.  *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1304-07 (Fed. Cir. 2015) (finding unexpected results where "prior art taught away" from low concentrations of bimatoprost, but the claimed low concentration formulation was "unexpectedly . . . effective and safe"); *Alcon*, 2018 U.S. Dist. LEXIS 33057, at *69-72; *Immunex Corp. v. Sandoz Inc.*, 395 F. Supp. 3d 366, 403-04 (D.N.J. 2019).  To the extent CSL disagrees with Dr. Trout's interpretation of the record, his opinions regarding "unexpected results," or his non-obviousness opinions more broadly, CSL can cross-examine Dr. Trout and present conflicting evidence at trial.

## IV.   CONCLUSION

For the foregoing reasons, Shire respectfully requests that the Court deny CSL's Motion.[17]

---

[16]   CSL's argument that Dr. Trout's opinions "run contrary to the scientific evidence" is misguided. CSL Mem. at 24.  First, CSL improperly relies on Dr. MacGinnitie's expert testimony about what a skilled *physician*, not a skilled *formulator*, would have believed.  Second, CSL cannot rely on CSL's and Shire's clinical study data because such confidential results were not available to relevant POSAs.  *See Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1320-21, 1325 (Fed. Cir. 2018).  Third, to the extent that evidence of secondary considerations conflicts, it merely presents a factual dispute to be resolved at trial, if necessary. *See, e.g.*, D.I. 283.

[17]   CSL's purported "Reservation of Rights" (CSL Mem. at 25) cannot substitute for legal argument regarding additional, unidentified grounds for excluding Shire experts.  In its Motion, CSL only seeks to exclude portions of the testimony of Dr. Bell, Mr. Stoll, and Dr. Trout.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs*

_____

Karen Jacobs (#2881)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
kjacobs@mnat.com
dfahnestock@mnat.com

*Attorneys for Plaintiff Shire ViroPharma LLC*

OF COUNSEL:

Eric J. Marandett
Daniel C. Winston
G. Mark Edgarton
Anita M. C. Spieth
Bryana T. McGillycuddy
Jennie D. Wilusz
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
(617) 248-5000

Edgar H. Haug
HAUG PARTNERS LLP
745 Fifth Avenue, 10th Floor
New York, NY 10105
(212) 588-0800

April 29, 2020

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on April 29, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

   I further certify that I caused copies of the foregoing document to be served on April 29, 2020, upon the following in the manner indicated:

John W. Shaw, Esquire            *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
David M. Fry, Esquire
Nathan R. Hoeschen, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801

Amanda K. Murphy, Esquire         *VIA ELECTRONIC MAIL*
Thomas J. Sullivan, Esquire
Candice R. Jones, Esquire
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001

Ryan P. O'Quinn, Esquire          *VIA ELECTRONIC MAIL*
L. Scott Burwell, Esquire
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA  20190

Anthony C. Tridico, Esquire         *VIA ELECTRONIC MAIL*
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
16 Old Bailey
London, EC4M 7EG
United Kingdom

Sanya Sukduang, Esquire                              *VIA ELECTRONIC MAIL*
Jonathan R. Davies, Esquire
COOLEY LLP
1299 Pennsylvania Ave, NW
Suite 700
Washington, DC 20004

/s/ Karen Jacobs
_____
Karen Jacobs (#2881)