IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHIRE VIROPHARMA LLC, ) | |
| ) | Redacted: |
| Plaintiff, ) | Public Version |
| ) | |
| v. ) | C.A. No. 17-414-MSG (CONSOLIDATED) |
| ) | |
| CSL BEHRING LLC and ) | ██████████████████████ |
| CSL BEHRING GmbH, ) | |
| ) | |
| Defendants. ) | ████████████ |

**DEFENDANTS' MEMORANDUM IN RESPONSE TO SHIRE VIROPHARMA LLC'S**
***DAUBERT* MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY**
**AND STRIKE EXPERTS**

OF COUNSEL:
Sanya Sukduang
Jonathan R. Davies
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
(202) 842-7800

Amanda K. Murphy
Thomas J. Sullivan
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
nhoeschen@shawkeller.com

*Attorneys for Defendants*

Anthony C. Tridico
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
1 London Bridge
London SE1 9BG
United Kingdom
011.44.207.864.2888

L. Scott Burwell
Ryan P. O'Quinn
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
11955 Freedom Drive, Suite 800
Reston, VA 20190
(571) 203-2700

April 29, 2020

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................1

II. RESPONSE..........................................................................................................1

   A.  Mr. Lassman's Opinions Concerning ███████████████████
        Are Based on Shire's Own Documents and His Years of Experience
        Working with Pharmaceutical Companies.................................................1

   B.  Dr. Craig's Opinions on Non-Infringement Should Not be Excluded....................4

   C.  Dr. Craig's Obviousness Opinions Are Within His Area of Expertise...................8

   D.  Dr. Craig's Testimony Regarding ███████████████ Should Not
        Be Excluded ...........................................................................................10

   E.  Dr. Craig's Opinions Regarding Patient Treatment Preference are
        Based on His Decades of Experience Treating HAE Patients and
        Assisting Companies in Developing New HAE Treatments ................................12

   F.  Dr. Lisbeth Illum Has Not Offered Legal Opinions Regarding
        Inventorship or Contract Interpretation ...................................................13

   G.  Opinions of Mr. Godici Are Proper and Assist the Finder of Fact ......................15

        1.  Mr. Godici Has Not Opined on "Legal Framework" and
             Intends to Assist the Finder of Fact with Helpful Testimony
             Regarding PTO Practices and Procedures ...................................................15

        2.  Mr. Godici's Opinions Do Not Undermine the Presumption of
             Validity .......................................................................................18

   H.  Dr. Meyer's Rebuttal Damages Opinions Are Reliable and Admissible..............19

        1.  Shire Ignores the Relevant Legal Standards .............................................20

        2.  Adivo Market Data Is Commonly Used and Reliable .............................22

        3.  Shire's Eleventh-Hour Attempt at a Discovery Dispute Is Not
             an Evidentiary Issue...................................................................24

III. CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

## CASES

Page

*Advanced Medical Optics, Inc. v. Alcon Inc.*,
    No. 03-1095-KAJ, 2005 WL 782809 (D. Del. Apr. 7, 2005) ..............................................12

*Alcoa, Inc. v. Alcan Rolled Prods.-Ravenswood LLC*,
    No. 06-451-JFB, 2020 WL 433856 (D. Del. Jan. 28, 2020) .................................................20

*Apotex, Inc. v. Cephalon, Inc.*,
    321 F.R.D. 220 (E.D. Pa. 2017) .................................................................................22, 24

*Barry v. Medtronic, Inc.*,
    No. 1:14-cv-104 (E.D. Tex. Sept. 21, 2016) ....................................................................26

*Bayer Healthcare LLC v. Baxalta Inc.*,
    No. 16-1122-RGA, 2019 WL 330149 (D. Del. Jan. 25, 2019) .............................................23

*Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*,
    No. 08-464, 2010 WL 3907490 (D. Del. Sept. 21, 2010) ...................................................16

*Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank*,
    383 F.3d 110 (3d Cir. 2004) .......................................................................................24

*Comcast Cable Commc'ns v. Sprint Commc'ns Co., LP*,
    203 F. Supp. 3d 499 (E.D. Pa. 2016) ...........................................................................14

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ...............................................................................................6, 18

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) .......................................................................................1

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) .........................................................................................24

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999) .............................................................................22, 23 n.18

*Intellectual Ventures I LLC v. Symantec Corp.*,
    No. 10-1067-LPS, 2015 WL 82052 (D. Del. Jan. 6, 2015) .............................................14, 19

*Int'l Bus. Machs. Corp. v. Groupon, Inc.*,
    No. 16-122-LPS, 2018 WL 3007662 (D. Del. June 15, 2018) .............................................18

*Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*,
    No. 04-940-JJF, 2006 WL 2241018 (D. Del. Aug. 4, 2006) ...............................................16

ii

*Revlon Consumer Prods. Corp. v. L'Oreal S.A.*,
  No. 96-192-MMS, 1997 WL 158281 (D. Del. Mar. 26, 1997) ...............................................16

*Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care*,
  756 F. Supp. 2d 598 (D. Del. 2010) .........................................................................................15

*Sonos, Inc. v. D & M Holdings Inc.*,
  297 F. Supp. 3d 501 (D. Del. 2017) .........................................................................................14

*Touchcom, Inc. v. Berreskin & Parr*,
  No. 1:07cv114, 2010 WL 4393282 (E.D. Va. Oct. 29, 2010) .................................................14

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
  949 F.3d 825 (3d Cir. 2020) .....................................................................................................20

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
  No. 11-515-LPS, 2015 WL 12815314 (D. Del. Nov. 20, 2015) .......................................16-18

*Waldorf v. Shuta*
  142 F.3d 601 (3d Cir. 1998) .......................................................................................................4

*Whitewater W. Indus. v. Pac. Surf Designs, Inc.*,
  No. 3:17-01118-BEN, 2019 WL 2211897 (S.D. Cal. May 22, 2019) ....................................16

## STATUTES & RULES

Fed. R. Evid. 702 ............................................................................................................. *passim*

Fed. R. Evid. 703 ...............................................................................................................23 n.18

## TABLE OF EXHIBITS

| CSL Behring Exhibits | |
|---|---|
| **Exhibit No.** | **Description** |
| 1 | Deposition Transcript of Suzanne Sensabaugh (Jan. 30, 2020) |
| 2 | ███████████████████████████████████████████ |
| 3 | ███████████████████████████████████ |
| 4 | Reply Report of Andrew MacGinnitie (Jan. 23, 2020) |
| 5 | Declaration of Timothy Craig, '111 IPR Petition (Craig Dep. Ex. 6) |
| 6 | Declaration of Timothy Craig, '788 IPR Petition (Craig Dep. Ex. 7) |
| 7 | Jennifer Schranz et al., *Safety, Pharmacokinetics (PK), and Pharmacodynamics (PD) of Subcutaneous (SC) CINRYZE® (C1 Esterase Inhibitor [Human]) with Recombinant Human Hyaluronidase (rHuPH20) in Subjects with Hereditary Angioedema (HAE)*, VIROPHARMA INC., Poster L21 presented at the 2012 Annual Meeting of the American Academy of Allergy, Asthma & Immunology ("the Schranz Poster") (CSLHAE00132475) |
| 8 | Deposition Transcript of Alexander Klibanov (Mar. 12, 2020) |
| 9 | Responsive Report of Bernhardt Trout (Dec. 10, 2019) |
| 10 | Opening Report of Andrew MacGinnitie (Nov. 1, 2019) |
| 11 | Opening Report of Alexander Klibanov (Nov. 1, 2019) |
| 12 | Opening Report of Hartmut Derendorf (Nov. 1, 2019) |
| 13 | ██████████████████████████████████ |
| 14 | ████████████████████████████████████████ |
| 15 | *Expert call alert: HAE specialist; SHP643 preview and more*, DEUTSCHE BANK (Feb. 15, 2017) (Shire_0752460-Shire_0752467) |
| 16 | ████████████████████████████████ |

| 17 | ███████████████████████████████ |
| 18 | Deposition Transcript of John Fudala (Aug. 21, 2019) |
| 19 | ████████████████████████████████████ |
| 20 | Cellular Dynamics International, Inc., Annual Report (Form 10-K) (Dec. 31, 2013) |
| 21 | *Bayer Healthcare LLC v. Baxalta Inc.*, No. 16-1122-RGA, Trial Tr., Jan. 30, 2019 (D.I. 494) |
| 22 | Deposition Transcript of Andrew MacGinnitie (Feb. 5, 2020) |
| 23 | Deposition Transcript of Gregory Bell (Mar. 5, 2020) |
| 24 | Deposition Transcript of Stephen Ruddy (Aug. 6, 2019) |
| 25 | Deposition Transcript of Mark Manning (July 29, 2019) |
| 26 | Deposition Transcript of Ryan Holcomb (July 31, 2019) |
| 27 | *Barry v. Medtronic, Inc.*, No. 1:14-cv-104 (E.D. Tex. Sept. 21, 2016) |
| 28 | ███████████████████████████████ |
| **Shire Exhibits Cited** | |
| D.I. 286-1 Ex. A | Opening Report of Scott Lassman (Nov. 1, 2019) |
| D.I. 286-1 Ex. B | Responsive Report of Timothy Craig (Dec. 10, 2019) |
| D.I. 286-1 Ex. C | Opening Report of Timothy Craig (Nov. 1, 2019) |
| D.I. 286-1 Ex. D | Reply Report of Timothy Craig (Jan. 23, 2020) |
| D.I. 286-1 Ex. E | Supplemental Report of Timothy Craig (Feb. 25, 2020) |
| D.I. 286-1 Ex. F | Opening Report of Lisbeth Illum (Nov. 1, 2019) |

| D.I. 286-2 Ex. J | Responsive Report of Christine Meyer (Dec. 10, 2019) |
|---|---|
| D.I. 286-2 Ex. K | Deposition Transcript of Scott Lassman (Feb. 13, 2020) |
| D.I. 286-2 Ex. L | |
| D.I. 286-2 Ex. M | Deposition Transcript of Timothy Craig (Mar. 6, 2020) |
| D.I. 286-2 Ex. N | HAEGARDA® Website, available at: https://www.haegarda.com/hcp/subcutaneous-C1-INH (last visited Oct. 8, 2019) (Shire_0714416) |
| D.I. 286-2 Ex. O | Dipti Pawaskar et al., *Population pharmacokinetics of subcutaneous C1-inhibitor for prevention of attacks in patients with hereditary angioedema*, 48 CLIN. EXP. ALLERGY 1325 (2018) (Shire_0813829-Shire_0813836) |
| D.I. 286-3 Ex. R | Deposition Transcript of Lisbeth Illum (Jan. 31, 2020) |
| D.I. 286-3 Ex. T | Deposition Transcript of Nicolas Godici (Jan. 30, 2020) |
| D.I. 286-3 Ex. V | Deposition Transcript of Christine Meyer (Mar. 12, 2020) |
| D.I. 286-3 Ex. W | Deposition Transcript of Thomas Groeling (Jul. 31, 2019) |
| D.I. 286-3 Ex. Y | Correspondence Between Counsel for Shire and CSL Behring (Dec. 2019 – Jan. 2020) |

## I.     INTRODUCTION

Shire's motion to exclude some or all of the opinions CSL's experts intend to offer should be denied because CSL's experts are qualified to provide such opinions, which are grounded in reliable methods and procedures, highly relevant to the issues in this case, and will assist the triers of fact. Fed. R. Evid. 702. As explained herein, at most, Shire's arguments go to the weight of the evidence and opinions, which does not warrant their exclusion under *Daubert*. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."). As such, Shire's motion should be denied.

## II.    RESPONSE

### A.     Mr. Lassman's Opinions ▮▮▮▮▮▮▮▮▮▮▮▮ Are Based on Shire's Own Documents and His Years of Experience Working with Pharmaceutical Companies



Shire, however, seeks to exclude the opinions of Scott Lassman, CSL's FDA expert, based on the allegation that he is opining on Shire's "state of mind, intent, and motives." D.I. 286 at 3-6. But Mr. Lassman has merely responded to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. His opinions are based, not on inferences of Shire's intent, but on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1



This is incorrect.

[1] Pages 4-5 of Shire's Motion contain bullet point partial quotes from Mr. Lassman's expert report wherein Shire alleges Mr. Lassman is drawing impermissible inferences. Each of Mr. Lassman's statements, however, are fully supported by the documentary evidence, which he specifically cited. *See* D.I. 286-1: Ex. A at ¶¶ 40, 42, 44, 47-49, 53.

[2] This is incorrect as

██████████████████████████████████████████ ████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████ Mr. Lassman, however, did

take into account Shire's complete "position," and his opinions, based on highly relevant

information that will assist the Court and jury on the issue of damages[3] and validity of the

patents-in-suit, complete the picture surrounding ████████████████████████

████████ .

Shire further argues that Mr. Lassman's opinions should be excluded because he has no

"specialized knowledge to interpret Shire's state of mind or motivations," as he has not worked

at the FDA, a pharmaceutical company, or at Shire. D.I. 286 at 3-4. To begin with, if working for

Shire was a prerequisite to offer an opinion, Ms. Sensabaugh would also be unqualified as she

never worked for Shire. And as discussed above, Mr. Lassman is not "interpreting Shire's state

of mind or motivations." Nonetheless, Shire purposefully overlooks Mr. Lassman's extensive

experience in this area. ████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████

---

[3] Shire's damages expert, Dr. Bell, is not a regulatory expert (Ex. 23 at 18:1-11), and Shire's
FDA expert, Ms. Sensabaugh, is not offering any opinion as to ████████████████████
██████████████████████████████████

3

Additionally, Shire misunderstands the standards for expert admissibility. The Third Circuit "has interpreted the specialized knowledge requirement liberally, and has stated that this policy of liberal admissibility of expert testimony extends to the substantive as well as the formal qualification of experts." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998). Courts have found that "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman." *Id.* Certainly Mr. Lassman's years of regulatory experience and work with pharmaceutical companies on issues similar to those presented here meets this standard. For these reasons, Shire's motion to exclude Mr. Lassman's opinions concerning ███████ ████████████████████ should be denied.

### B.     Dr. Craig's Opinions on Non-Infringement Should Not be Excluded

The claims of the '111 and '788 patents require that "the administration of the composition comprising the Cl-esterase inhibitor increases the level of Cl esterase inhibitor in the blood of the subject to at least about 0.4 U /mL." D.I. 286 at 6. Shire seeks damages from every dose of Haegarda® sold, but has offered no evidence that each administered dose increases the C1-INH blood level of the subject to at least about 0.4 U/mL. Recognizing this deficiency, Shire seeks to exclude relevant testimony by Dr. Craig directly addressing this issue.

Dr. Craig has decades of experience treating HAE patients and with more than 200 HAE patients, he treats one of the largest HAE patient populations in the United States. D.I. 286-1: Ex. B at ¶ 2; D.I. 286-2: Ex. M at 57:14-59:19. Dr. Craig was also a principal clinical investigator in the Phase II and Phase III clinical trials that demonstrated the safety and efficacy of Haegarda®. D.I. 286-1: Ex. C at ¶ 7. In this role, Dr. Craig received and reviewed blood level data from participating subjects. *See, e.g.*, *id.* at ¶¶ 101-10, 118-21; D.I. 286-2: Ex. M at 141:14-19, 145:7-10. Based on his years of accumulated expertise, and the actual clinical data he had previously considered, Dr. Craig offers the opinion that not all administered doses of Haegarda®

result in an increase in the level of C1-INH in the blood of the subject to at least about 0.4 U/mL.

D.I. 286-1: Ex. B at ¶¶ 18-23 █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████ ).

    Additionally, Dr. Craig did not ignore blood level data. *See* D.I. 286 at 6-7. Dr. Craig's

analysis relies on *the same* Phase III data that Shire itself intends to rely on to prove

infringement[4] and demonstrates that not every administered dose of Haegarda® leads to an

increase in C1-INH blood levels to 0.4 U/mL. █████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████ Additionally, the

methodology employed to present and analyze the data is sufficiently described in paragraphs

19-20 of Dr. Craig's Responsive Report. D.I. 286-1: Ex. B at ¶¶ 19-20.

    Shire further criticizes Dr. Craig's analysis because it allegedly "ignores the well-

understood dose response curve for C1-INH blood levels and the Court's claim construction."

*See* D.I. 286 at 8-10. As discussed below, neither of these criticisms are fair. The "scalloped"

response is a result of a simulation based on a pharmacokinetic model that aggregated data from

multiple clinical trials. *See* D.I. 286 at 8-9 (citing D.I. 286-2: Ex. O). ███████████████████



───────────────

[4] ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ That Shire points to a different

type of analysis and disagrees with the type of analysis Dr. Craig conducted should be explored

via cross-examination and is not a basis to exclude that analysis under *Daubert*. *Daubert v.*

*Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

　　　　Shire also contends that ██████████████████████████████████████

█████████████████████████████ ██████████████████████████████████

████████ Shire overlooks the fact that the cited Haegarda® website states that Haegarda®

"builds" C1-INH blood levels and that steady state is "expected within 3-4 doses." *See* D.I. 286-

2: Ex. N at Shire_0714417. This is consistent with Dr. Craig's individual patient analysis,

demonstrating that it takes several doses before an individual patient achieves a C1-INH blood

level of 0.4 U/mL. Moreover, Shire ignores that the Haegarda® website graph includes a shaded

region that is part of the simulated dose-response modeling. D.I. 286 at 8. These shaded regions

demonstrate that even modeling an aggregate of patient data predicts that some patients have C1-

INH blood levels below 0.4 U/mL even after Haegarda® is administered—again, entirely

consistent with Dr. Craig's analysis.

　　　　Dr. Craig's analysis is also consistent with the Court's construction of the claim

limitation "the administration of the composition increases the level of C1 esterase inhibitor in

the blood of the subject to at least about 0.4 U/mL." The Court construed this phrase to mean

"the administration of the composition increases the level of C1 esterase inhibitor in the blood of

the subject to at least about 0.4 U/mL *after administration of the composition*," and Dr. Craig's

analysis evaluates blood levels after administration of Haegarda®. D.I. 237 at 24-25, 28

---

[5] The graph Shire relies on in page 8 of its motion also does not identify when Haegarda® was dosed.

(emphasis added). Shire expands the Court's construction in order to expand infringement by inserting the phrase "***any time***" after administration.[6] *See* D.I. 286 at 10 (emphasis added).

Shire's expert, ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████ █████ .[7] Ex. 4 at ¶ 58. As such, Shire's new interpretation of this claim phrase

is in conflict with the Court's construction, not Dr. Craig's analysis.

Shire criticizes ██████████████████████████████████████████████

██████████████████████████████████████ Shire's criticism is inaccurate.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████ ████████████████

██████████████████████████████████████ █████████████████

██████████████████████████████████



---

[6] Shire did not advocate during claim construction that blood levels can increase at "any time" after administration. *See generally* D.I. 186; D.I. 204. Such an interpretation would result in the claim being indefinite, as a skilled artisan would not know when infringement occurs.

[7] Under Shire's new claim construction, if a patient at "at some point" after administration of Haegarda® achieves a C1-INH blood level of 0.4 U/mL, that patient would continue to infringe the asserted claims even if the patient's C1-INH blood levels drop below 0.4 U/mL after subsequent administered doses of Haegarda®. Ex. 22 at 265:12-21. Shire's interpretation and infringement theory finds no basis in the Court's construction.

Dr. Craig properly included ████████████ in his analysis because they reflect the fact that, as discussed above, it takes time for Haegarda® to "build" C1-INH levels in the blood of the subject from their pre-administration baseline. ████████████



Finally, Shire's allegation that Dr. Craig was unfamiliar with his analysis and methods ignores the fact that Dr. Craig's methodology is clearly spelled out in his Responsive Report. Moreover, as discussed above, Shire disregards Dr. Craig's personal experience outside of the context of this litigation, analyzing these very same data during the course of clinical studies for registration of Haegarda®. For all these reasons, Dr. Craig's opinions are valid and reliable and should not be excluded.

### C.     Dr. Craig's Obviousness Opinions Are Within His Area of Expertise

Shire seeks to strike the entirety of Dr. Craig's obviousness opinions in his expert reports on the basis that he was allegedly unfamiliar with a reference cited to support his obviousness opinions. D.I. 286 at 12-13. Dr. Craig, however, did see and review the *Gatlin* reference as part of forming his opinions in this case and, as a treating physician, was familiar with the concepts presented in *Gatlin* related to the desired volumes for subcutaneous ("SC") injection.

Dr. Craig saw the *Gatlin* reference prior to his deposition as evidenced by his citation to the reference in his Opening, Reply, and Supplemental Expert Reports. D.I. 286-1: Ex. C at ¶¶

196-97, 202; D.I. 286-1: Ex. D at ¶¶ 121-25; D.I. 286-1: Ex. E at ¶¶ 14-16. Dr. Craig also relied

upon the *Gatlin* reference in both his IPR declarations filed in the '111 patent and the '788

patent, which were filed on May 31, 2017, and December 18, 2018, respectively. Ex. 5 at ¶¶ 53-

54, 56; Ex. 6 at ¶¶ 54-55, 57. In fact, ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

 Shire also overstates the significance of the *Gatlin* reference to Dr. Craig's obviousness

opinions. The primary reference relied on by Dr. Craig in the context of his obviousness opinions

is a scientific poster by Shire employees, including Jennifer Schranz ("the *Schranz Poster*"). The

*Schranz Poster* details Shire's SC administration of a high concentration C1-INH formulation to

HAE patients, resulting in an increase of C1-INH blood levels to 0.4 U/mL. D.I. 286-1: Ex. C at

¶¶ 184-94, 199; D.I. 286-1: Ex. D at ¶¶ 115-20; Ex. 7.████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ In fact, Shire's own experts

agree that persons of ordinary skill in the art know that SC injections should be limited to 1-2

mLs. Ex. 8 at 193:21-194:22; Ex. 9 at ¶ 295. In short, independent of the *Gatlin* reference, there

is no dispute amongst the experts that skilled artisans understood what acceptable SC injection

volumes would be.

Nonetheless, Dr. Craig is qualified to offer opinions on obviousness relying on the *Schranz Poster* and *Gatlin* and such opinions are reliable. Although Dr. Craig is not a formulator, he testified that ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████

Unlike the expert in the *Johns Hopkins University* case that Shire relies upon, Dr. Craig had seen the *Gatlin* reference prior to forming his opinions in this case. *See Johns Hopkins Univ. v. Alcon Labs., Inc.*, No. 15-525-SLR-SRF, 2018 U.S. Dist. LEXIS 70403, at *16-19 (D. Del. Mar. 1, 2018). Dr. Craig is certainly qualified to opine on the treatment burden of SC HAE treatments and the target SC injection volumes that are desirable for patients. For at least these reasons, Dr. Craig's obviousness opinions should not be stricken.

    **D.**    **Dr. Craig's Testimony Regarding** ████████████████ **Should Not Be Excluded**

In his Opening Report on Infringement, Shire's clinical expert, ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ ██████████████ ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████



; otherwise, CSL could not directly infringe the method claims of the '111 and '788 patents because CSL does not administer Haegarda®, subcutaneously or otherwise, to any patient.

    In paragraphs 6 and 24-25 of Dr. Craig's Responsive Expert Report, he responds to Dr. MacGinnitie's, Dr. Klibanov's, and Dr. Derendorf's assertions and relies on the agreements between CSL and ███████████████████████████████████████

████████████████████████; D.I. 286-1: Ex. B at ¶ 24. Thus, to the same extent Drs. MacGinnitie, Klibanov, and Derendorf are reaching conclusions regarding ███████

████████████████████, Dr. Craig is similarly opining on his reading of these very same documents. For these reasons, Dr. Craig is qualified to offer the opinions provided in paragraphs 6 and 24-25 of his report. To the extent Shire continues to allege that specialized legal or contract expertise is required, Drs. MacGinnitie, Klibanov, and Derendorf would be similarly disqualified to opine on the relationship between SPNN and CSL Behring, as they do in their reports.[8]

---

[8] 

**E.  Dr. Craig's Opinions Regarding Patient Treatment Preference are Based on His Decades of Experience Treating HAE Patients and Assisting Companies in Developing New HAE Treatments**

Contrary to Shire's assertion on page 14 of its opening brief, Dr. Craig's decades of experience in treating HAE patients combined with his involvement in the commercial development of numerous HAE treatment products, including Haegarda® and Takhzyro®, provides him with the specialized knowledge required under Rule 702 to offer the opinions expressed in paragraph 11 of his Responsive Report. D.I. 286-1: Ex. B at ¶ 11.

More specifically, in paragraph 11, Dr. Craig provides his opinions regarding HAE patient reception of Haegarda® and Takhzyro® and expansion of the prophylactic market for HAE treatments. D.I. 286-1: Ex. B at ¶ 11. Dr. Craig's opinions are based on his over two decades of experience treating HAE patients, including one of the largest HAE patient cohorts in the country ███████████████████████████████████████████

██████████████████████████████████ D.I. 286-2: Ex. M at 86:23-87:10, 90:20-91:4; D.I. 286-1: Ex. C at ¶¶ 5-8; D.I. 286-1: Ex. B at ¶ 2. Indeed, Dr. Craig was invited by Deutsche Bank in February 2017 to provide his expert views on new HAE treatments. *See* Ex. 15.███████████

████████████████████████████████████████████████████

██████████████████████ ████████ ██████████████████████

████████████████████████████████████████████████████

███████████████████████ Thus, it is clear Dr. Craig is qualified to render these opinions.

Shire's reliance on *Advanced Medical Optics, Inc. v. Alcon Inc.*, No. 03-1095-KAJ, 2005 WL 782809 (D. Del. Apr. 7, 2005) is inapplicable. There, the expert sought to opine on general preferences of surgeons with respect to surgical equipment used to perform cataract surgery, but conceded that he had only talked to one surgeon regarding his preferences before opining on

market share and was, at most, an "expert consumer" of such products. *Id*. at \*2-4. Here, as noted above, Dr. Craig is not simply an "expert consumer" of products used to treat HAE but is instead a thought leader in the HAE field, which provides him with broad exposure to the HAE field and relevant treatment developments and patient preference. D.I. 286-1: Ex. C at ¶¶ 3-11; D.I. 286-2: Ex. M at 86:23-87:10, 90:20-91:4. Moreover, Shire's criticism rings hollow, as its own medical expert, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████. For these reasons, Dr. Craig is qualified to offer the opinions expressed in paragraph 11 of his Responsive Report, and they should not be excluded.

### F.   Dr. Lisbeth Illum Has Not Offered Legal Opinions Regarding Inventorship or Contract Interpretation

Contrary to Shire's contentions, Dr. Lisbeth Illum has not offered impermissible legal[9] opinions regarding inventorship and contract interpretation. *See* D.I. 286 at 15-16. Dr. Illum, an expert in protein formulation, reviewed Shire's documents and FDA submissions, and concluded that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. Because Dr. Illum is an expert in protein formulation, her opinions ████████████████████████████████████████████████

████████████████████████████████████. *See Touchcom, Inc. v. Berreskin & Parr*, No.

---

[9] Shire's experts have rendered similar "legal" opinions on issues in this case. Ex. 9 at ¶¶ 435-40 (entire subsection titled, ████████████████████████████████); Ex. 10 at ¶ 89 (stating ████████████████); *see also* Ex. 11 at ¶ 138. To the extent Dr. Illum's opinions constitute impermissible legal conclusions, the opinions of Shire's experts should be similarly limited.

1:07cv114, 2010 WL 4393282, at *6-7 (E.D. Va. Oct. 29, 2010) (refusing to exclude expert's opinion regarding correct inventorship). Moreover, Dr. Illum's opinions are not legal in nature, but instead provide the technical predicate for the trier of fact to reach this conclusion. Such opinions are permissible. *See Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 511 (D. Del. 2017) (Bryson, J., sitting by designation) ("Although courts typically forbid parties from calling 'legal experts' to testify about the requirements of the law, technical experts are not forbidden from offering opinions on technical matters that lead them to particular conclusions that bear on ultimate issues in the case.").

Additionally, 

That Dr. Illum reviewed an agreement does not make her opinions inadmissible. *See Comcast Cable Commc'ns v. Sprint Commc'ns Co., LP*, 203 F. Supp. 3d 499, 546 (E.D. Pa. 2016) (denying a motion to exclude an expert's reliance on contractual language and holding, "an expert may testify based on a

---

10

document that has legal effect so long as he does not opine on the legal effect of the document"); *see also Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care*, 756 F. Supp. 2d 598, 605-06 (D. Del. 2010) (ruling that expert testimony of scientific expert relying on contractual agreement properly admitted). For these reasons, Dr. Illum's opinions in paragraphs 15 and 339-42 of her Opening Report and paragraphs 177-80 of her Reply Report should not be excluded.

### G.   Opinions of Mr. Godici Are Proper and Assist the Finder of Fact

In an attempt to discredit Mr. Godici's opinions, Shire has recast his opinions as interpreting legal framework, undermining the presumption of validity, and as generally unhelpful to the trier of fact. While incorrect, Shire will nonetheless have the chance to explore Mr. Godici's opinions on cross-examination. Thus, as discussed herein, Shire's motion to exclude Mr. Godici's opinions should be denied.

#### 1.   Mr. Godici Has Not Opined on "Legal Framework" and Intends to Assist the Finder of Fact with Helpful Testimony Regarding PTO Practices and Procedures

Having served as an expert in approximately 80-100 matters, Mr. Godici has an existing understanding of what opinions are permissible expert testimony and what testimony may be helpful to the trier of fact. D.I. 286-3: Ex. T at 9:15-22. In fact, Shire acknowledges that Mr. Godici has a general awareness of the types of opinion testimony courts find unhelpful and inappropriate. D.I. 286 at 18. Strangely, Shire attempts to use this awareness against him by challenging Mr. Godici's good faith attempts to provide testimony regarding patent office practices and procedures that is helpful and appropriate. *Id.*

Throughout his deposition, ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████



While Shire contends that Mr. Godici's opinions regarding PTO practice and procedure will not assist the finder of fact (*see* D.I. 286 at 20-21), Shire is incorrect. Indeed, courts, including courts in this District, have permitted testimony regarding PTO practices and procedures, including their relationship to inequitable conduct. *See W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, No. 11-515-LPS, 2015 WL 12815314, at *4 (D. Del. Nov. 20, 2015); *see also Brigham & Women's Hosp. Inc. v. Teva Pharm. USA, Inc.*, No. 08-464, 2010 WL 3907490, at *2 (D. Del. Sept. 21, 2010); *Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*, No. 04-940-JJF, 2006 WL 2241018, at *1 (D. Del. Aug. 4, 2006); *Revlon Consumer Prods. Corp. v. L'Oreal S.A.*, No. 96-192-MMS, 1997 WL 158281, at *3 (D. Del. Mar. 26, 1997). Shire's brief leans on two non-binding cases outside the Third Circuit, which previously excluded Mr. Godici from providing certain testimony regarding inequitable conduct. D.I. 286 at 18 (citing Ex. 27 (*Barry v. Medtronic, Inc.*, No. 1:14-cv-104 (E.D. Tex. Sept. 21, 2016)) and *Whitewater W. Indus. v. Pac. Surf Designs, Inc.*, No. 3:17-01118-BEN, 2019 WL 2211897 (S.D. Cal. May 22, 2019)). However, ████████████████████████████████████████████ ████████████████████ Indeed, in *W.L. Gore*, a Delaware case, the Court **did not**

unilaterally "reject this very same attempt to 'paint' his improper legal opinion testimony as 'PTO practices and procedures.'" D.I. 286 at 18-19. Although portions of Mr. Godici's testimony were excluded on limited issues, most of his opinions were allowed. *See W.L. Gore*, 2015 WL 12815314, at *4. It was further clarified that "[t]his Court has at times permitted testimony from such experts, ***including with regard to inequitable conduct allegations***, so long as the testimony clearly related to the ins and outs of internal PTO practices and procedures" because "it could be helpful to hear this case-specific summary of what was filed when in context with Mr. Godici's discussion of general PTO procedures that relate to such filings." *Id.* at *3-4 (emphasis added).

Shire further characterized Mr. Godici's testimony regarding file histories as not helpful. D.I. 286 at 21. However, this litigation would benefit from expert explanation regarding the extensive patent prosecution history and *inter partes* review proceedings related to this matter. Moreover, this background cannot be better presented by fact witnesses as suggested by Shire because there are none. *Id.*



███████████████████████████████████████████████████████████████

████████████████████████████████████████████████

Further, Shire believes Mr. Godici's testimony should have included a full recitation of

the patent prosecution histories and that Mr. Godici should have reviewed every page. D.I. 286 at

21, n.11.[14] Mr. Godici, however, made clear that ████████████████████████████████████

████████████████████████████████████████. *See* D.I. 286-3: Ex. T at 49:4-50:2; *see W.L.*

*Gore*, 2015 WL 12815314, at *4. Shire, nonetheless, will have the opportunity to cross-examine

Mr. Godici regarding any portions of the prosecution history Shire believes he improperly

overlooked. *Daubert*, 509 U.S. at 596.

### 2. Mr. Godici's Opinions Do Not Undermine the Presumption of Validity

Shire also accuses Mr. Godici of "undermining the presumption of validity" through

portions of his opening expert report that describe the typical hours dedicated to each patent

application, information regarding how the PTO operates, the ability to challenge issued patents,

and resources available to patent examiners when identifying prior art individually. D.I. 286 at

19. Mr. Godici's opinions do not undermine the presumption of validity, but instead provide

context for the trier of fact with respect to PTO practices and procedures.

Delaware has allowed experts to provide testimony "consistent with what the jury will

learn from the Federal Judicial Center video," as such testimony is "probative of the validity of

the patents-in-suit . . . ." *Int'l Bus. Machs. Corp. v. Groupon, Inc.,* No. 16-122-LPS, 2018 WL

3007662, at *1 (D. Del. June 15, 2018). Examples of permitted testimony included "[e]xaminers

---

[14] Despite alleging more testimony is required, Shire confusingly also complains that
Mr. Godici's testimony will be inappropriately duplicative of testimony Shire expects from CSL.
D.I. 286 at 21, n.11. Shire does not elaborate what testimony is expected to overlap and CSL
cannot address this argument without that information.

have a lot of work to do, and no process is perfect" and "the PTO has a heavy workload and all institutions make mistakes." *Id.*; *see also Intellectual Ventures I LLC v. Symantec Corp.*, No. 10-1067-LPS, 2015 WL 82052, at *1 (D. Del. Jan. 6, 2015). The video referenced in *International Business Machines* also discusses the fact that patents can be found invalid because mistakes at the PTO were made, important information was overlooked, and that there may have prior art that was not identified.[15] Further, district court litigation and proceedings such as *inter partes* review exist as a means to correct these "mistakes" and in fact, two of the three patents at issue were challenged at the PTAB. Mr. Godici intends to provide background on the complicated patent prosecution and *inter partes* review processes to assist the trier of fact in understanding how a patent is issued and potentially corrected, not to contravene law regarding the presumption of validity.

Mr. Godici is well positioned to assist the trier of fact in this litigation with careful and relevant testimony that does not usurp the responsibilities of the trier of fact. Mr. Godici's testimony should therefore be permitted.

### H.    Dr. Meyer's Rebuttal Damages Opinions Are Reliable and Admissible

CSL plans to present the testimony of its damages expert, Dr. Christine Meyer, to rebut the incomplete and incorrect lost profits and reasonable royalty opinions of Shire's damages expert, Dr. Gregory Bell.[16] Shire's primary attack is that various opinions of Dr. Meyer, including "the entirety of her lost profits opinions," are allegedly unreliable because they rely on

---

[15] *See* https://www.fjc.gov/publications/patent-process-overview-jurors.

[16] As set forth in Defendants' Memorandum in Support of their *Daubert* Motion, Dr. Bell's lost profits and reasonable royalty opinions should themselves be excluded. D.I. 287 at 3-15. Dr. Meyer will be presented in rebuttal by Defendants only if Dr. Bell's opinions are permitted to reach the jury.

"third-party data prepared by Adivo Associates ['Adivo']."[17] D.I. 286 at 22. Adivo market

analysis data is accepted and widely used in small, specialty pharma markets like the market in

which the parties in this case compete. 

. Dr. Meyer's reliance on this data was reasonable, her opinions are

reliable, and they are admissible under *Daubert*.

### 1.   Shire Ignores the Relevant Legal Standards

Courts typically evaluate a set of non-exhaustive factors in assessing reliability of an

expert's methodology, including: "(1) whether a method consists of a testable hypothesis;

(2) whether the method has been subject to peer review; (3) the known or potential rate of error;

(4) the existence and maintenance of standards controlling the technique's operation; (5) whether

the method is generally accepted; (6) the relationship of the technique to methods which have

been established to be reliable; (7) the qualifications of the expert witness testifying based on the

methodology; and (8) the non-judicial uses to which the method has been put." *E.g.*, *Alcoa, Inc.*

*v. Alcan Rolled Prods.-Ravenswood LLC*, No. 06-451-JFB, 2020 WL 433856, at *2 (D. Del. Jan.

28, 2020). The Third Circuit has recently confirmed that "[w]hile no one [factor] is dispositive,

***some analysis of these factors is necessary***." *UGI Sunbury LLC v. A Permanent Easement for*

---

[17] Shire argues in a footnote that opinions of Dr. Meyer regarding

should be excluded for "the same reasons" Mr. Lassman's
testimony should be excluded. D.I. 286 at 22, n.12. CSL disputes that the string cite of
paragraphs from Dr. Meyer's report address "why" Shire did anything. To the extent Dr. Meyer
reviews Shire documents and relies on Mr. Lassman's analysis, her opinions are not excludable
for the same reasons as Mr. Lassman's. *See* § II.A, *supra*. Regardless, the opinions of Shire's
FDA expert Ms. Sensabaugh and damages expert Dr. Bell on the same topics should also be
excluded if the opinions of Mr. Lassman and Dr. Meyer are excluded.

*1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020) (emphasis added). But Shire's motion does not even mention, let alone evaluate, these well-established factors. Instead, Shire's basis for exclusion of Dr. Meyer's opinions consists primarily of attorney argument and misstatements of Dr. Meyer's expert report and deposition testimony.

Not all of these factors apply here, but those that are relevant favor admissibility of Dr. Meyer's opinions. Relevant to at least the **first**, **fifth**, and **sixth** factors, as ███████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████ Indeed, as discussed below, both Dr. Meyer and other experts in the field have used Adivo data for damages calculations. To the **fourth** factor, contrary to Shire's dismissive characterization of any validation or checks for the Adivo methodology, █████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

Finally, to the **eighth** factor, as discussed in part above, ████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Based on public SEC filings, other companies also use Adivo data for similar purposes. *See, e.g.*, Ex. 20 at 5-6 (using

Adivo data to quantify market share, market spend, and market projections in the cell therapy space). Shire conspicuously omitted this factor analysis in its motion to exclude.

The cases Shire relies on are distinguishable. Each of the *Mosaid*, *Chemipal*, and *Legendary Art* cases dealt with improper expert reliance on *forward-looking* business "projections" prepared by the proffering parties themselves. Documents and data of that nature are completely different from *backward-looking* sales and switching data like the Adivo data Dr. Meyer relies on for her opinions. Indeed, courts within this circuit has previously stated that Shire's *Legendary Art* case is inapposite to an analysis of pharmaceutical patent damages. *See Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 234 n.12 (E.D. Pa. 2017) (noting that a damages expert who had testified in "several" pharmaceutical cases relying on allegedly unreliable data for "one piece of his overall analysis" was distinguishable from *Legendary Art*'s inexperienced expert basing an entire opinion on such data). █████████████████

█████████████████████████████████████████████████████████████████

███ When the reliability of the underlying data in this case is analyzed under the proper legal framework, Dr. Meyer's opinions and the data underlying them are reliable and admissible.

### 2.    Adivo Market Data Is Commonly Used and Reliable

Shire proclaims that the "unreliable and unverified Adivo Data is precisely the type of expert testimony Delaware courts routinely exclude under Rule 702." D.I. 286 at 24. Alternatively, Shire seeks to exclude Dr. Meyer's reliance on data from Adivo because it is allegedly "double hearsay" and potentially "so unreliable that no reasonable expert could base an opinion on them." *Id.* (quoting *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999)). Contrary to Shire's broad assertions, Delaware courts have not "routinely" excluded data like that compiled and provided by Adivo; they have allowed it and used it in deciding damages amounts.

For example, in a 2019 patent case similarly involving a blood-based product in the specialty pharma area, an expert witness testified at trial using similar Adivo data to provide insights on market share and patient switching.[18] *See* Ex. 21, *Bayer Healthcare LLC v. Baxalta Inc.*, No. 16-1122-RGA, Trial Tr., Jan. 30, 2019 (D.I. 494) at 769:16-772:9 (describing quantitative analysis using Adivo data; Adivo "capture[d] . . . shipment data" from the factory to "specialty pharmacies, treatment centers, hospitals" and calculated "quarter by quarter" market share). At the *Daubert* stage five days beforehand, the Delaware court found the expert's "analysis sufficiently reliable and related to the facts of this case" and "admissible under *Daubert*." *Bayer Healthcare LLC v. Baxalta Inc.*, No. 16-1122-RGA, 2019 WL 330149, at *9 (D. Del. Jan. 25, 2019). The same result should hold here.[19]



---

[18] ████████████████████████████████████████████████████████████████████

[19] CSL does not agree that Adivo data constitutes "double hearsay," but even if it is hearsay, Fed. R. Evid. 703 permits the use of such materials "so long as that hearsay is of the kind normally employed by experts in the field." *In re TMI Litig.*, 193 F.3d at 697.

Shire's apparent frustration that Dr. Meyer ██████████████████████████ ██████████████████████████████ is an artificially high, and wrong, standard.[20] The Third Circuit has stated that the Rule 702 reliability standard, while "higher than bare relevance," is "not that high." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994); *see also id.* at 744. ████████████████████████████████



Indeed, this district has previously rejected a *Daubert* challenge to "market share projections," noting that "[w]hether [an expert] relied on the best data in forming [her] opinions is a question for the jury." *Apotex*, 321 F.R.D. at 233. At the very least, any technical qualms that Shire may have with the survey-based audits of Adivo in producing its data go to the weight of that data and the opinions it supports, not its admissibility. *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 121 (3d Cir. 2004).

### 3. Shire's Eleventh-Hour Attempt at a Discovery Dispute Is Not an Evidentiary Issue

Shire argues in a footnote that the Court should separately exclude Dr. Meyer's opinions because of an alleged failure of CSL to previously disclose the data Dr. Meyer relied upon. D.I. 286 at 22, n.13. First, Shire never attempted to utilize this Court's discovery dispute procedures or filed a motion to compel regarding this topic, despite apparently being aggrieved about it since at least July 2019. Indeed, Shire never even set a meet and confer on the topic as required by

---

[20] If this were the standard, Shire's damages expert Dr. Bell would also be excluded. For example, ████████████████████████████████████████

D. Del. LR 7.1.1; it only half-heartedly threatened one. D.I. 286-3: Ex. Y. Second, "data" compiled by Adivo (and by IQVIA, which Dr. Meyer also relied on but Shire apparently does not contest) are ***publicly available*** market analyses and thus easily accessible to Shire in the same form that it was to CSL with the same burden.

Third, Shire made no apparent effort to (1) depose the CSL employee interviewed by

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████ [21] (2) serve third-party discovery on Adivo Associates, or (3) to enlist its own damages expert, Dr. Bell, to clarify whatever questions it had regarding the methodology of Adivo's data. Finally, Shire's "numerous, specific requests" for Adivo data from CSL is at odds with its current argument that this same Adivo data is unreliable. D.I. 286 at 22 n.13.

█████████████████████████████████████████████████████████

██████████████████████████████ ████████████████████████████████████

██████████████████████ CSL enlisted Dr. Meyer to rebut Dr. Bell's flawed theories with her own, supported by reliable and verified evidence including Adivo data. For at least these reasons, Dr. Meyer's testimony meets the requirements of *Daubert* and Fed. R. Evid. 702, and should not be excluded.

## III.    CONCLUSION

For the reasons stated above, CSL respectfully requests that Shire's motion to exclude expert testimony be denied and the testimony of Mr. Lassman, Dr. Craig, Dr. Illum, Mr. Godici, and Dr. Meyer be permitted under the parameters set forth in *Daubert* and Fed. R. Evid. 702.

---

[21] Ex. 18 at 387:6-13; D.I. 286-3: Ex. W at 23:5-19.

[22] █████████████████████████████████████████████████████████████████

/s/ Nathan R. Hoeschen
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
nhoeschen@shawkeller.com

*Attorneys for Defendants*

OF COUNSEL:
Sanya Sukduang
Jonathan R. Davies
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
(202) 842-7800

Amanda K. Murphy
Thomas J. Sullivan
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

Anthony C. Tridico
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
1 London Bridge
London SE1 9BG
United Kingdom
011.44.207.864.2888

L. Scott Burwell
Ryan P. O'Quinn
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
11955 Freedom Drive, Suite 800
Reston, VA 20190
(571) 203-2700

Dated: April 29, 2020

## CERTIFICATE OF SERVICE

I, Nathan R. Hoeschen, hereby certify that on April 29, 2020, this document was served

on the persons listed below in the manner indicated:

**BY EMAIL**

Karen Jacobs
Derek J. Fahnestock
MORRIS, NICHOLS, ARSHT
 & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
kjacobs@mnat.com
dfahnestock@mnat.com

Eric J. Marandett
Daniel C. Winston
Anita M. C. Spieth
G. Mark Edgarton
Bryana T. McGillycuddy
Jennie D. Wilusz
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
(617) 248-5000
emarandett@choate.com
dwinston@choate.com
aspieth@choate.com
medgarton@choate.com
bmcgillycuddy@choate.com
jwilusz@choate.com

Edgar H. Haug
HAUG PARTNERS LLP
745 Fifth Avenue, 10th Floor
New York, NY 10105
(212) 588-0800
ehaug@haugpartners.com

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
nhoeschen@shawkeller.com
*Attorneys for Defendants*

Exhibit 1
To
Exhibit 19

Redacted In Their Entirety

Exhibit 20

10-K 1 cdi10k20131231.htm 10-K

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2013**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number: 001-36021**

---

# CELLULAR DYNAMICS INTERNATIONAL, INC.
(Exact name of registrant as specified in its charter)

---

| **Wisconsin** | **26-1737267** |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |

| **525 Science Drive** | |
| **Madison, Wisconsin 53711** | **(608) 310-5100** |
| (Address of principal executive offices and zip code) | (Registrant's telephone number, including area code) |

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common stock, $0.0001 par value | The NASDAQ Global Market |

**Securities registered pursuant to Section 12(g) of the Act:** None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

(Check one:)

| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
|---|---|---|---|---|
| Non-accelerated filer | ☒ | (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

As of June 30, 2013, the last business day of the registrant's most recently completed second quarter, there was no public market for the registrant's common stock. The registrant's common stock began trading on The NASDAQ Global Market on July 25, 2013.

As of March 6, 2014, there were 15,761,725 shares of the registrant's common stock outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement for its 2014 Annual Meeting of shareholders are incorporated by reference in Part III of this Annual Report on Form 10-K where indicated. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2013.

# Cellular Dynamics International, Inc.

# Form 10-K

# Table of contents

Part I

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk factors | 22 |
| Item 1B. | Unresolved staff comments | 43 |
| Item 2. | Properties | 43 |
| Item 3. | Legal proceedings | 43 |
| Item 4. | Mine safety disclosures | 43 |
| | Executive officers of the registrant | 44 |

Part II

| | | |
|---|---|---|
| Item 5. | Market for registrant's common equity, related stockholder matters and issuer purchase of equity securities | 46 |
| Item 6. | Selected financial data | 49 |
| Item 7. | Management's discussion and analysis of financial condition and results of operations | 51 |
| Item 7A. | Quantitative and qualitative disclosures about market risk | 69 |
| Item 8. | Financial statements and supplementary financial data | 70 |
| Item 9. | Changes in and disagreements with accountants on accounting and financial disclosure | 93 |
| Item 9A. | Controls and procedures | 93 |
| Item 9B. | Other information | 93 |

Part III

| | | |
|---|---|---|
| Item 10. | Directors, executive officers and corporate governance | 94 |
| Item 11. | Executive compensation | 94 |
| Item 12. | Security ownership of certain beneficial owners and management and related stockholder matters | 94 |
| Item 13. | Certain relationships and related transactions, and director independence | 95 |
| Item 14. | Principal accountant fees and services | 95 |

Part IV

| | | |
|---|---|---|
| Item 15. | Exhibits and financial statement schedules | 96 |
| | Signatures | 101 |
| | Exhibit index | 103 |

2

Table of Contents

# Part I

## Item 1. Business

### Overview

We develop and manufacture fully functioning human cells in industrial quantities to precise specifications. Our proprietary iCell Operating System (iCell O/S) includes true human cells in multiple cell types (iCell products), human induced pluripotent stem cells (iPSCs) and custom iPSCs and iCell products (MyCell products). Our iCell O/S products provide standardized, easy-to-use, cost-effective access to the human cell, the smallest fully functioning operating unit of human biology. Customers use our iCell O/S products, among other purposes, for drug discovery and screening; to test the safety and efficacy of their small molecule and biologic drug candidates; for stem cell banking; and in research and development of cellular therapeutics.

iCell products are a consumable designed to be used once and then reordered. We manufacture our iCell products from our iPSCs. An iPSC is a cell that has the ability both to replicate indefinitely and to be transformed into any cell type in the human body. We develop and manufacture our iPSCs from ordinary blood or skin using proprietary techniques that expand upon those pioneered by our founder Dr. James A. Thomson. Once we produce an iPSC, it becomes a renewable source of starting material for our iCell products.

We market our products for use in *in vitro* research and development as well as applied product testing, stem cell banking and *in vivo* cellular therapeutics research and development. Each of the *in vitro*, stem cell banking and *in vivo* markets requires fully functioning cellular models that reproduce human biology. "Fully functioning" means a cell that functions much like a human cell of the same type in specified ways that are relevant to the product's intended uses. Our fully functioning human cells produced in industrial quantities are intended to displace the cells currently used in these markets which are based on models that are surrogates for true human cells.

Our products provide our customers access to human biology and are designed to increase the productivity of their *in vitro* therapeutic research and development; enable the pursuit of novel avenues of biological discovery; accelerate the regulatory analysis and market introduction of clinical products; improve quality control of manufactured clinical products; allow more precise applied and environmental testing; facilitate the development or augmentation of stem cell banks; and foster the development and commercialization of *in vivo* cellular therapeutics.

### Limitations of existing models

Historically researchers have had limited access to fully functioning human cells. Therefore they have been forced to conduct their experiments on surrogate models that do not accurately represent the human biology they want to study. We believe that human biological and therapeutic investigation has been stifled by the lack of access to a diverse set of standardized human cells in sufficient quantity to perform their experiments.

#### *In vitro* uses in life science, biopharmaceutical research and applied testing

The market for *in vitro* drug discovery, toxicity testing and applied testing, including chemical safety, historically has employed models—such as primary cells derived from human cadavers or sacrificed animals, transformed (immortalized) cells and live animals—that act as surrogates for fully functioning human cells. Researchers attempt to understand and predict the behavior of human cells by exposing these surrogates to various drugs, compounds and molecules. These models, however, are only an imprecise and inaccurate substitute for the human biology in question and their use leads to the slower

3

Table of Contents

pace of drug discovery, higher costs for drug development and costly late-stage drug development failure. Despite the billions of dollars spent annually on preclinical development activities, 84% of all drug candidates fail in human trials, including for a lack of human therapeutic activity or for an unacceptably high human toxicity that were not identified by using these surrogate models.

*Primary cells.* Primary cells harvested from either sacrificed animals or human cadavers fail to adequately reproduce human biology and result in a fundamentally flawed technology platform as a basis for drug discovery and development.

- Animal cells are fundamentally different from the human cells they are meant to approximate.
- Human cadaver cells are highly variable in quality due to variation in donor genetics, donor lifestyle (smoking, alcohol, diet, exercise, chemical exposure, etc.) and the timing and condition of the organ at harvest.
- Human cadaver cells also behave differently in test tubes than in the human body.

*Transformed cell lines.* Transformed cell lines are cells that have either been isolated from a tumor or genetically induced to become immortal. They tend to grow indefinitely in test tubes. As a class, they represent a very poor surrogate for human biology and a poor model system for research.

- Transformed cells proliferate rapidly and therefore lose the inherent physiological characteristics of the donor organ and cease to replicate the biology of the source organ or individual.
- Transformed cells tend to be genetically unstable and to routinely add, delete or swap chromosomes. These genetic changes tend to give the altered cell a selective growth advantage *in vitro,* often critically altering the cells' physiology.

*Live animals.* Live animals are often used as a surrogate for human biology to predict drug safety and activity in humans.

- Animal models represent fundamentally different biology than that of humans and therefore poorly predict drug safety and activity in people.
- The use of animal models is coming under increasing ethical pressures that in some markets, such as Europe, have taken the form of laws requiring companies to eliminate certain applications using animal research.

## Stem cell banking

*Traditional tissue and current iPSC banking.* Traditional tissue banks face limitations in the sourcing, quality and quantity of samples. iPSC banking has the potential to overcome these limitations. However, the manufacture of these large banks of iPSCs is particularly challenging because it is difficult to maintain consistent quality over long periods of time without deep expertise and experience in "footprint-free" iPSC manufacturing and a sufficiently robust quality management system. In addition, the information handling requirements and intellectual property issues are significant. We expect that building the banks will require a unique combination of capabilities to meet the quality, quantity and purity of cells needed by researchers.

*Multipotent cells and clinical stem cell banking.* We also believe that current clinical banking efforts based on multipotent stem cells from umbilical cord blood are of only limited value. At birth, a newborn's umbilical cord blood can be saved and shipped to a facility that isolates and preserves the blood system stem cells found in the cord blood. Because cord blood stem cells are multipotent, not pluripotent, they have only a limited ability to replicate and are predisposed to differentiate only into cells of the blood system. These two limitations make cord blood cells only applicable to the treatment of a very narrow set of diseases, and we expect that they will not be useful for the vast majority of possible diseases the donor

4

Table of Contents

might contract in the future. In addition, cells in these banks have generally been saved for use by the donor and are not available for research purposes or for wider clinical application.

### *In vivo* cellular therapeutics

*In vivo* cellular therapeutics refers to cells, tissue or whole organs that are inserted into living persons to cure debilitating disorders or regenerate damaged organs. While the majority of *in vivo* cellular therapeutics today involves organ transplants, the scarcity of donor organs leaves many patients requiring a transplant without a suitable source. Cellular transplantation and artificial organs offer promising alternatives for research and clinical inquiry. One significant limitation to further development of cellular therapeutics of these types is the lack of available manufactured human cells for experimentation and clinical application. Current approaches require the removal of terminal cells from an individual and, where possible, expanding the sample for transplantation or research use. Expansion of terminal cells and scaling this approach has proven difficult, expensive and critically limited by the paucity of cell types available.

## Our markets

Our largest customers today are in the life sciences and biopharmaceutical industry research markets (*in vitro* drug discovery, toxicity testing and chemical safety uses) and stem cell banking. We have also targeted the markets for cell-based therapies (*in vivo* cellular therapeutic use). We believe that over time our iCell O/S products, our manufacturing capabilities, the technical know-how we have acquired in developing those proficiencies and our intellectual property position will offer significant opportunities for revenue growth. According to Adivo Associates, the total spent on these three areas in 2011 by all participants was approximately $17.1 billion and is projected to grow to $40.5 billion by 2020.

### Cells for *in vitro* drug discovery, toxicity testing and chemical safety uses

Cells for *in vitro* use refers to cells studied under laboratory culture conditions for the purpose of drug discovery, toxicity testing and chemical safety analysis. According to Adivo Associates, the total spent on cell-based technologies for *in vitro* use was approximately $10.8 billion in 2011, of which $3.5 billion was spent on cells, and is projected to increase to $14.7 billion in 2020, of which $5.6 billion is expected to be spent on cells.

Currently biopharmaceutical industry and academic researchers use cells from human cadaveric tissue, immortalized cell lines and sacrificed animals for both toxicological research and drug discovery. Because our iCell products are fully functioning human cells, we believe they are more predictive of actual human biology and, therefore better suited for use in biological and biopharmaceutical research than current surrogate models.

### Stem cell banking

According to Adivo Associates, the stem cell banking market was approximately $1.3 billion in 2011 and is expected to grow to $4.4 billion in 2020. Currently this market is composed of two lines of business. First, the National Heart, Lung, and Blood Institute, the California Institute for Regenerative Medicine (CIRM), the European Union's Innovative Medicines Initiative, other government entities, academic institutions and industry have requested proposals to build banks of dozens to thousands of cell lines derived from numerous backgrounds to reflect various forms of cell line diversity, including ethnic, racial, gender, genetic, disease and drug reaction. These banks will permit researchers to choose the iPSC background from which to make or have manufactured the desired human cells. The iPSCs in these banks can later be differentiated into human cells for both research and therapeutic applications. We believe that there is significant revenue potential in manufacturing and differentiating the iPSCs that will be placed into these banks.

5

In March 2013, CIRM awarded CDI a $16.0 million grant to derive three iPSC lines from each of 3,000 different individuals, as part of California's $32.3 million stem cell banking initiative. Upon creation, these iPSC lines will be owned by CIRM. Terms of the award were finalized in October 2013 in the Derivation Agreement and we received our first quarterly payment from CIRM in November 2013.

We will also be the primary subcontractor on the $10.0 million grant the Coriell Institute for Medical Research (Coriell) received from CIRM to maintain a bank of the iPSCs derived by CDI under the terms of the Derivation Agreement. Among other things, CDI will expand, and create up to 3,300 distribution cell banks from the 3,000 iPSC lines derived by CDI and from up to 300 third-party pluripotent stem cell lines provided by California researchers. CIRM's agreement with Coriell and our subcontractor agreement with Coriell for $6.3 million were both finalized in late 2013.

We intend to take advantage of this potential as the manufacturer of the iPSCs and differentiated cells for additional iPSC banks. A second line of business in this market consists of cord blood banking. At birth, a newborn's umbilical cord blood can be saved and shipped to a facility that isolates and preserves the blood system stem cells found in the cord blood. Because cord blood stem cells are multipotent, not pluripotent, they have only a limited ability to replicate and are predisposed to differentiate only into cells of the blood system. We are positioned to augment the product offering of cord blood banks by creating iPSC lines for their existing and prospective customers.

### Cells for *in vivo* cellular therapeutics

Cells for *in vivo* use in humans generally refers to inserting cells, tissue or whole organs into living persons to cure debilitating disorders or to regenerate damaged organs. According to Adivo Associates, the global human stem cell, tissue and organ therapy market was $5.0 billion in 2011 and is projected to increase to $21.4 billion in 2020. Current *in vivo* use and related research efforts generally involve the use of cells or organs harvested from animals, cadavers or living donors, with the limitations discussed above. The lack of available manufactured human tissue matching the tissue to be repaired or regenerated particularly hinders the research and development of *in vivo* cellular therapeutics. Our scalable iPSC-based manufacturing platform allows us to then produce fully functioning, carefully specified human cells in large volumes, thereby enabling the research that may lead to the substitution of manufactured cells and tissues for the currently harvested cells, tissue and organs.We believe that as the research and development phase of this field grows, demand for our cells will increase substantially.

## Our products

Our iCell and MyCell products reproduce, rather than approximate, the operation of the fully functioning human cell. They are manufactured to precise specifications and exacting standards. These cells are designed for ease-of-use and to address our customers' desire to have better access to human cell biology.

6

Table of Contents

**The iCell O/S**

The iCell O/S currently consists of six products.

| Products | Product description | Applications |
|---|---|---|
| iCell Cardiomyocytes | Highly purified human heart cells comprised of a mixture of spontaneously electrically active atrial, nodal and ventricular-like cells | Model systems for pre-clinical drug discovery, toxicity testing, disease modeling and other life science research |
| iCell Neurons | Highly purified human neurons typical of the forebrain, comprised primarily of GABAergic and glutamatergic neurons | |
| iCell Endothelial Cells | Highly purified human interior surface blood vessel cells exhibiting characteristic endothelial cell functions, including tubular formation, acetylated LDL uptake, barrier function and wound healing | |
| iCell Hepatocytes | Highly purified human liver cells that exhibit hepatocyte morphology, characteristic gene and protein expression, transporter function and viral infectivity | |
| MyCell | Human iPSCs reprogrammed from customer-sourced samples<br><br>Human iCell products derived from MyCell iPSCs | Make iPSCs for stem cell banking and cell modeling of specific ethnic or disease populations and genetic engineering for *in vitro* research |
| Media and reprogramming kit | Combination of three reagents (Essential 8 Medium, Vitronectin and Episomal iPSC Reprogramming Vectors) used for reprogramming tissue into iPSCs | Making iPSCs for limited research use only |

*iCell Cardiomyocytes*. Derived from iPSCs, iCell Cardiomyocytes are highly purified human heart cells that beat in a dish and behave just like the heart cells found in the human body. These cells provide a biologically relevant model system for *in vitro* drug discovery, toxicity testing and chemical safety, as well as *in vivo* cellular therapeutics research and development and stem cell banking. For instance, our iCell Cardiomyocytes were used in a recent study by Hoffmann-La Roche published in the journal *Toxicological Sciences* to successfully identify multiple compounds known previously to be false-negatives or false-positives from various Roche drug development programs.

iCell Cardiomyocytes have been ordered by our customers for a variety of purposes, including:

- *In vitro*
  - To determine that their compounds do not adversely affect critical electrical, biochemical or mechanical cardiomyocyte function.
  - As a toxicity test system in standard assay offerings.
  - To examine their suitability to replace existing *in vitro* and animal-based tests for arrhythmia assessment and thorough QT studies in humans.
  
    To screen for compounds that could be cardioprotective against oxidative stress and hypoxia.

7

Table of Contents

- Stem cell banking
  ◦ To study 250 different patients with a form of heart disease known as left ventricular hypertrophy.
- *In vivo*
  ◦ To advance cell therapy research by making feasible the animal studies of cardiomyocyte patches that deliver healthy cells to the damaged area of the heart after a myocardial infarction.


*iCell Neurons.* Derived from iPSCs, iCell Neurons are highly purified human neurons typical of the forebrain. iCell Neurons provide a biologically relevant *in vitro* model system for pre-clinical drug discovery, neurotoxicity testing and disease modeling for Alzheimer's disease, Parkinson's disease and Huntington's disease among others. For instance, as reported in *Stem Cell Research*, researchers at an affiliate of GlaxoSmithKline plc (GSK) utilized iCell Neurons to identify several small molecules as effective blockers of the toxicity caused by the abnormal protein deposits associated with Alzheimer's disease, suggesting new ways to develop medicines for Alzheimer's disease. This is the first demonstration in a peer-reviewed publication of a high-throughput toxicity screen using iPSC-derived neurons.

iCell Neurons have been ordered by our customers for a variety of purposes, including:

- *In vitro*
  ◦ To model Alzheimer's disease for compound screening.
  ◦ To model infection and growth of clinically relevant strains of virus that cause chicken-pox and shingles (Varicella Zoster).
  ◦ To study the genetic basis of epilepsy.
  ◦ To study the unique biology of autism spectrum disorders.
  ◦ For applied testing, to replace an existing animal test for botulinum neurotoxin potency, with a superior *in vitro* assay based on iCell Neurons.


*iCell Endothelial Cells.* Derived from iPSCs, iCell Endothelial Cells are interior surface blood vessel cells. iCell Endothelial Cells provide a biologically relevant *in vitro* model system for use in vascular biology research including angiogenesis, atherosclerosis, inflammation and other life science research.

iCell Endothelial Cells have been ordered by our customers for a variety of purposes, including:

- *In vitro*
  ◦ For modeling viral infectivity.
  ◦ For modeling vascular disease and stroke.
- *In vivo*
  ◦ In preliminary regenerative medicine applications as a necessary co-culture along with other cells for tissue engineering studies for research into potential *in vivo* use.
  ◦ In preliminary regenerative medicine applications to vascularize three-dimensional matrices or decellularized organs for tissue engineering studies for research into potential *in vivo* use.


*iCell Hepatocytes.* Derived from iPSCs, iCell Hepatocytes are human liver cells that, as with our other products, are currently cryopreserved and sold frozen. These cells provide a biologically relevant *in vitro* model system for pre-clinical drug discovery, hepatotoxicity testing, disease modeling and other life science research.

iCell Hepatocytes have been ordered by our customers for a variety of purposes, including:

8

Table of Contents

- *In vitro*
  - To perform drug screening for viral infectivity.
  - To study metabolism and glucose regulation to better understand disease mechanisms.
  - To study viral infection and growth by clinically relevant strains of Hepatitis C virus and Hepatitis B virus.
  - To model the interaction between immune cells and liver cells that cause liver inflammation and toxicity.
- *In vivo*
  - For research into potential *in vivo* use in the treatment of liver disease. Researchers are currently using iCell Hepatocytes as the cellular material in bio-artificial liver devices and to repopulate decellularized livers.

*MyCell products.* MyCell products provide customers with iPSCs reprogrammed from customer-sourced sample and iCell products derived from those iPSCs. This product offering provides our customers with access to iPSCs and iCell products produced from specific genetic, ethnic or disease populations. Our expertise in genetically engineering iPSCs also allows our customers to order iPSCs that have been engineered to repair a specific gene mutation or to express additional genes in a manner non-disruptive to the remainder of the genome. MyCell products leverage our industrial manufacturing platform to handle the parallel production of multiple iPSC lines and iCell products. We are capable of manufacturing billions of cells in this manner to high quality and purity standards. Our ability to derive multiple iPSC lines in parallel also positions us to manufacture for the stem cell banking market.

MyCell products have been ordered by our customers for a variety of purposes, including:

- *In vitro*
  - To produce iPSCs and iCell products from human donors to study diseases such as heart failure and Parkinson's disease and to investigate potential cures.
  - To make hepatocytes derived from patients suffering from drug-induced liver injury (DILI) to study the genetic basis of this disease.
  - To produce iPSCs and iCell Cardiomyocytes from congenital muscular dystrophy patients to promote research into cures for this disease.
  - To produce genetically engineered iPSCs that can be used to produce differentiated cells on the industrial scale needed for drug screening.
- Stem cell banking
  - To produce three iPSC lines from each of 3,000 different individuals for CIRM.
  - To expand the iPSC lines made for CIRM and to produce up to 300 additional iPSC lines.

*Media and reprogramming.* Our medium, Essential 8, and our substrate, Vitronectin, are optimized for the consistent, reproducible derivation, growth and maintenance of human iPSCs. The combination of Essential 8 Medium and Vitronectin provides a defined culture system for robust, cost-effective and scalable iPSC culture. We have selected Life Technologies Corporation to manufacture and distribute these products as well as our Episomal iPSC Reprogramming Vectors. The combination of these three components creates a "kit" for reprogramming tissue into iPSCs. The reprogramming vectors and kit, as currently sold, permits the customer to use the iPSCs for limited research use only.

- *Essential 8 Medium.* Essential 8 Medium is a "feeder-free" medium comprised of eight well-characterized, highly consistent elements, unlike the BSA-based alternative media currently available.
- *Vitronectin.* Vitronectin is a defined, human protein-based substrate for cell attachment and growth. It replaces the current use of an undefined matrix derived from mouse tumor cells.

9

Table of Contents

- *Episomal iPSC Reprogramming Vectors*. Episomal iPSC Reprogramming Vectors leverage non-viral, non-integrating technology to deliver seven genes to initiate the reprogramming of human somatic cells to iPSCs. We refer to this process as "footprint-free" reprogramming. "Footprint-free" reprogramming provides researchers with a means of ensuring that no foreign genetic material is incorporated into the original donor DNA. iPSCs made from these kits, as currently sold, are licensed for research purposes only.

10

Exhibit 21

Case 1:17-cv-00414-MSG   Document 298   Filed 05/06/20   Page 50 of 77 PageID #: 16830
Case 1:16-cv-01122-RGA   Document 494   Filed 05/05/19   Page 1 of 77 PageID #: 37534

567

1

2                    IN THE UNITED STATES DISTRICT COURT

3                       FOR THE DISTRICT OF DELAWARE

4

5     BAYER HEALTHCARE LLC,              )
                                         )
6                       Plaintiff        )
                                         ) C.A. No. 16-1122(RGA)
7     v.                                 )
                                         )
8     BAXALTA INCORPORATED, BAXALTA      )
      US INC., and NEKTAR                )
9     THERAPEAUTICS,                     )
                                         )
10                      Defendants.      )

11                                       J. Caleb Boggs Courthouse
                                         844 N. King Street
12                                       Wilmington, Delaware

13                                       Wednesday, January 30, 2019
                                         8:46 a.m.
14                                       Trial Volume III

15
      BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
16

17    APPEARANCES:

18
                    MORRIS NICHOLS ARSHT & TUNNELL LLP
19                  BY:  RODGER D. SMITH, II, ESQUIRE

20                              -and-

21                  SIDLEY AUSTIN LLP
                    BY:  BRADFORD J. BADKE, ESQUIRE
22                  BY:  KEVIN J. O'BRIEN, ESQUIRE
                    BY:  SONA DE, ESQUIRE
23                  BY:  CHING-LEE FUKUDA, ESQUIRE
                    BY:  CAROLINE BERCIER, ESQUIRE
24                  BY:  GWEN STEWART, ESQUIRE
                    BY:  LAUREN C. KATZEFF, ESQUIRE
25
                                For the Plaintiff

Case 1:17-cv-00124-MSG   Document 202   Filed 05/06/20   Page 51 of 73 PageID #: 16834
Case 1:16-cv-00122-RGA   Document 494   Filed 05/05/19   Page 2 of 73 PageID #: 37533
568

```
 1    APPEARANCES CONTINUED:

 2
                    RICHARDS LAYTON & FINGER, P.A.
 3                  BY:  FREDERICK L. COTTRELL, III, ESQUIRE
                    BY:  KELLY FARNAN, ESQUIRE
 4
                              -and-
 5
                    HAUG PARTNERS
 6                  BY:  EDGAR H. HAUG, ESQUIRE
                    BY:  ANGUS CHEN, ESQUIRE
 7                  BY:  RICHARD KURZ, ESQUIRE
                    BY:  PORTER FLEMING, ESQUIRE
 8                  BY:  ELIZABETH MURPHY, ESQUIRE
                    BY:  GEORG REITBOECK, ESQUIRE
 9                  BY:  ERIKA SELLI, ESQUIRE

10                                   For the Defendants

11                  ***  PROCEEDINGS  ***

12                  THE CLERK:  All rise.

13                  THE COURT:  All right.  Be seated.  Good

14    morning.

15                  (Everyone said, Good morning, Your Honor.)

16                  THE COURT:  All right.  So I have these letters

17    about Exhibit 7A.

18                  So am I correct that I don't think or maybe you

19    handed it up yesterday.  Exhibit 7A is some kind of thing

20    that Baxalta submitted to the PTO; right?

21                  MR. FLEMING:  May I hand you a copy of it?

22                  THE COURT:  So my question is:  Does Nektar have

23    anything to do with this?

24                  MR. FLEMING:  Actually, Your Honor, it was

25    Nektar who submitted it to the Patent Office.  It was a
```

Case 1:17-cv-00414-MSG  Document 328  Filed 05/06/20  Page 52 of 77 PageID #: 16373
Case 1:16-cv-01221-RGA  Document 494  Filed 08/05/19  Page 106 of 273 PageID #: 37639

732

 1    Adynovate.

 2    Q.      Likewise for Adynovi?

 3    A.      Yeah.  Thousand Oaks is our only site for the

 4    PEGylation process.

 5    Q.      What exactly is PEGylated in that step?

 6    A.      So my understanding in a -- is -- the Factor VIII

 7    molecule is PEGylated.

 8    Q.      Is there any particular place on the molecule where

 9    it's PEGylated?

10    A.      My only understanding is that PEGylation is on the

11    lysine residue or lysine molecules.

12                    (End of videotape.)

13                    MS. FUKUDA:  Bayer calls Dr. Sumanth Addanki.

14                    THE CLERK:  Please state and spell your full

15    name for the record.

16                    THE WITNESS:  Sumanth Addanki.  S-U-M-A-N-T-H.

17    A-D-D-A-N-K-I.

18                    Sumanth Addanki, was examined and testified as

19    follows:

20                    MS. FUKUDA:  Your Honor, we'll be passing up

21    some binders.

22                    THE COURT:  Yes.

23                         DIRECT EXAMINATION

24    BY MS. FUKUDA:

25    Q.      Good afternoon, Dr. Addanki.

Case 1:17-cv-00424-MSG Document 828 Filed 05/06/20 Page 53 of 77 PageID #:16378
Case 1:16-cv-01222-RGA Document 494 Filed 08/05/19 Page 167 of 273 PageID #:37760

733

1    A.    Good afternoon.

2    Q.    Please introduce yourself to the jury.

3    A.    My name is Sumanth Addanki.

4    Q.    Could you tell the jury a little bit about your

5    educational?

6    A.    I grew up and went to college in India and studied

7    economics and engineering there.  I got my masters degree in

8    economics in India in 1980.  I worked for the government for

9    a few months there.  And then I came here to America that

10   same year to start the Ph.D. program in economics at

11   Harvard.

12   Q.    Did you obtain a degree from Harvard?

13   A.    I did.  In 1986 I got my Ph.D. in economics and I

14   specialized in what's called the economics of intellectual

15   property which is things like patent and trade secrets and

16   things like that.

17   Q.    Could we pull up PTX-1108.

18   A.    I have it.

19   Q.    What is this document?

20   A.    It's my CV.

21              MS. FUKUDA:  Bayer moves into evidence PTX-1108.

22              MR. FLEMING:  No objection, Your Honor.

23              THE COURT:  Admitted without objection.

24              (PTX-1108 was admitted into evidence.)

25   BY MS. FUKUDA:

Case 1:17-cv-00414-MSG Document 328 Filed 05/06/20 Page 54 of 77 PageID #:16374
Case 1:16-cv-01222-RGA Document 494 Filed 08/09/19 Page 166 of 273 PageID #:37761

734

1    Q.    Dr. Addanki, what is your current position?

2    A.    I am a managing director at a company call NERA

3    economic consulting.  NERA stands for National Economic

4    Research Associates.

5    Q.    What does NERA do, generally?

6    A.    Generally speaking NERA is a firm of consulting

7    economists, we're called micro economists because rather

8    than forecasting interest rates and things like that, what

9    we do is study how companies behave, how companies interact

10   with one another, how companies interact with consumers, and

11   how market outcomes get determined by how those companies

12   interact.

13   Q.    What kind of work do you do?

14   A.    I am a micro economist.  I do that work.  I do

15   economic research.  I do consulting in matters involving

16   intellectual property most of the time, things like

17   intellectual economic questions involving patents, economic

18   questions involving all kinds of intellectual property.  I

19   write articles on these subjects.  I testify on these

20   subjects.  I'm asked to speak at seminars and workshops on

21   these subjects.  That's what I do.

22   Q.    What other kinds of work do you do at NERA?

23   A.    Apart from my specialization in intellectual property

24   issues, I also work a fair amount in the economics of

25   antitrust and competition policy, which means studying

Case 1:17-cv-00414-MSG   Document 828   Filed 05/06/20   Page 55 of 77 PageID #: 16375
Case 1:16-cv-01222-RGA   Document 494   Filed 08/05/19   Page 169 of 273 PageID #: 37702

735

1    things like are companies monopolists, are they behaving

2    monopolists, how are they treating the consumer, things like

3    that.

4    Q.    Who generally speaking are your clients for the work

5    that you do at NERA?

6    A.    As you might imagine a lot of the time my clients are

7    companies, big companies, medium size companies, small

8    companies.  I have also done work for nonprofit

9    organizations, trade associations, even private individuals.

10   A fair amount of my work is done for government entities.

11   Q.    Could you tell us a little bit more about what you do

12   for government agencies?

13   A.    More of my work with government entities is on the

14   competition policy side of my practice.  The United States

15   Department of Justice has hired me many times to serve as

16   their outside economics expert when they were planning to

17   bring lawsuits challenging what firms were doing, either in

18   a merger or something a firm was doing that was making it a

19   monopolist.  So I would work as their outside specialist,

20   the special economist from the outside.

21            I worked for the Treasury Department.  I worked

22   for the Federal Trade Commission.  I worked for government

23   agencies in Canada.  I have worked for state government

24   agencies in New York and New Jersey.

25   Q.    Do you have experience analyzing economic damages in

1    patent infringement cases?

2    A.    I do.  I wrote actually in the '80's and '90s some of

3    the early economics articles on how to do patent damages in

4    a sound economic way.  I calculated patent damages, patents

5    infringement damages in many cases.  I have lectured on how

6    to do it.  I have been asked to lecture on how to do it.

7    And I have testified on my calculations of patent damages in

8    cases.

9    Q.    What experience do you have with the pharmaceutical

10   industry?

11   A.    Well, as I said, my research back at Harvard was in

12   the economics of intellectual property.  And we studied

13   industries that had a lot of intellectual property.  As you

14   might imagine, the pharmaceutical industry was an important

15   industry that we studied.  Going back then to 1980, '81 is

16   when any interest started and I started studying it then.

17   In my career at NERA in the last twenty years I have done a

18   great deal of work analyzing all kind of economics questions

19   that have come up in pharmaceuticals.

20   Q.    Have you published any articles on these topics?

21   A.    Yes, I have published articles.  I have been asked to

22   testify at the senate judiciary committee, they asked me to

23   testify about competition issues in pharmaceuticals.  I have

24   written book chapters.  I have been asked to speak at

25   various workshops and seminars.

Case 1:17-cv-00424-MSG Document 828 Filed 05/06/20 Page 57 of 77 PageID #: 16377
Case 1:16-cv-01122-RGA Document 494 Filed 08/05/19 Page 196 of 273 PageID #: 37729

762

1    A.    There is a slide that explains what I'm going after

2    here.

3    Q.    PTX 7.7.

4    A.    We've got Adynovate patients.  These are the patients

5    whom Baxalta was able to sell Adynovate.  The question we're

6    asking is if Baxalta hadn't been able to sell Adynovate,

7    what would have happened instead?  And those patients would

8    have divided into two groups.  One group would have been the

9    group that would have bought some other Baxalta product, and

10   I'm going to refer to it for short as Advate, but I mean

11   Advate and Recombinate; it's just clumsy to say.  The other

12   group they wouldn't have sold Advate or Recombinate to, they

13   would have bought some other competing product, some

14   non-Baxalta product, so it's those patients who are on the

15   right that are the additional patients that Baxalta was able

16   to sell to because it was able to offer Adynovate.  So we're

17   trying to capture, we're trying to measure what the relevant

18   sizes of those two groups were.  That's what we were trying

19   to do.

20   Q.    How did you quantify what the relative sizes were?

21   A.    I actually had two ways of doing it using two

22   different types of data sets, and I ended up with very

23   similar answers.

24   Q.    Can you describe your first method?

25   A.    The first method relied on what you might call micro

1    level data.  These were data on individual shipments to

2    patients.  I think Ms. Restivo had talked about it, call and

3    it really tracks for a large, large number of hemophilia

4    patients was actually being shipped to them shipment by

5    shipment, what product it is, date of shipment, and so on.

6    And Bayer made available that data set to me and I was able

7    to use that data.  I've actually got a sample record so you

8    know what we're looking at.

9    Q.    Turn to 7.8?

10   A.    So this is a single patient in that data, and there's

11   thousands of patients in the data.  So you can see that we

12   don't know the names or addresses on these patients, we've

13   just got an ID number so we can track a patient but we don't

14   know anything else about them.  The first patient, the data

15   set I got was in January of 2014, and if you scroll down,

16   you'll see that that patient kept getting Advate pretty

17   regularly, pretty regularly, and at some point, February of

18   2016, they switch over to Adynovate, and through the end of

19   the data set they buy Adynovate.  We've got data just like

20   this for thousands of patients.  So that was the data set I

21   used in the first instance.

22   Q.    How did you apply this data to your analysis?

23   A.    So most patients that ended up taking Adynovate

24   switched to Adynovate from some other product.  So what we

25   could do because we got these full patient histories is we

Case 1:17-cv-00424-MSG Document 828 Filed 05/06/20 Page 58 of 273 PageID #: 16379
Case 1:16-cv-01222-RGA Document 494 Filed 08/05/19 Page 198 of 273 PageID #: 37791

764

1    could analyze switching behavior among these factory

2    products, and what we can do is say, okay, the patients that

3    actually switched to Adynovate, can we look at some time

4    before Adynovate was available and get some idea of the

5    benchmark switching that was happening before Adynovate came

6    in and use that benchmark to figure out how many of the

7    patients that went to Adynovate would have stayed with, you

8    know, another Baxalta product and how many would have just

9    gone to some other product out there, and I'll show you how

10   we did that.

11   Q.    If we can pull up 7.9.

12   A.    This is where we're looking at our benchmark.  It's

13   what's happening before Adynovate comes in.  And in this

14   period, you've got, and the highlight of the block is

15   roughly the number of patients.  We've got patients

16   switching to two times a week dosed products, and at that

17   time, really the only product is Eloctate.  So we're talking

18   about that is setting the baseline how many patients wanted

19   to switch to a twice a week dose product and the product

20   which was Eloctate.

21             After Adynovate switches, you've got two things

22   going on.  You've got switches to Eloctate still going, so

23   that's  the somewhat lower blue block, but also switches to

24   Adynovate going on.  The thing is, and I think we heard

25   testimony roughly to this effect earlier, that red block is

Case 1:17-cv-00414-MSG   Document 238   Filed 05/06/20   Page 60 of 273 PageID #: 16390
Case 1:16-cv-01222-RGA   Document 494   Filed 08/05/19   Page 199 of 273 PageID #: 37792

765

1    really comprised of two types of patients.  There's patients

2    that really wanted to be on a twice a week product, and the

3    fact that it was Adynovate was nice so they went to

4    Adynovate.  And there's other patients who really wanted to

5    be on an Advate-like product, and the fact it was twice a

6    week was nice but they wouldn't have switched if it hadn't

7    been Adynovate.  And that black dotted line gives us a good

8    idea of how to divide up the red box into the lighter red

9    box and darker red box, because it tells us ow many patients

10   were switching for the twice a week a feature.  So the twice

11   a week dosing feature, the patients for whom that was

12   important was in the light red block, and the patients that

13   would have stayed with an Advate-type product from Baxalta

14   is the darker red block.  So the light red block is the

15   proportion of the total switches to Adynovate that really

16   Baxalta would have lost, because they really wanted a twice

17   a week product, if it hadn't been able to offer that.

18   Q.    And did you prepare a table summarizing your

19   calculation s of this patient switches analysis?

20   A.    Yes.  I'm afraid the table has got quite a lot of

21   numbers in it, so we'll take a look at it and hope I can

22   walk through it really quickly.

23   Q.    7.10.

24   A.    That's really small.  If you can blow up the

25   right-hand side a little bit, the numbers on the right, that

Case 1:17-cv-00124-MSG Document 208 Filed 05/06/20 Page 61 of 77 PageID #: 16331
Case 1:16-cv-01222-RGA Document 494 Filed 08/05/19 Page 200 of 273 PageID #: 37733

766

1    would be great.  So really here it's just the numbers that

2    go into those blocks we were looking at.  We've got a

3    before, which is a benchmark, this is before Adynovate was

4    launched, and that is in column A.  What we're calculating

5    there is the type of switching that was going on to twice a

6    week product.

7           And we've got two separate analyses, one is

8    patients switching from Advate, and the other is he have

9    patients switches from non-Adynovate because there's both

10   types of switching going on.  So that baseline we're

11   calculating in both cases.

12          Then over on the right what we've got is we've

13   got what happened when Adynovate came in, what was the

14   switching to Adynovate like.  And we're using the kind of,

15   the picture I showed you earlier to divide up those

16   Adynovate switches, the people switching to Adynovate and

17   those that would have switched or stayed on a Baxalta

18   product, and those Baxalta would have lost if it had not

19   been able to offer Adynovate.  And the bottom numbers in

20   those calculations for the Advate switches, it was

21   53-and-a-half percent roughly of the people switching from

22   Advate to Adynovate, that Baxalta would have lost had it not

23   been able to offer Adynovate.  And the people switching from

24   other products to Adynovate, non-Baxalta products to

25   Adynovate, it would have been slightly under 38 percent that

Case 1:17-cv-00414-MSG   Document 828   Filed 05/06/20   Page 62 of 77 PageID #: 16283
Case 1:16-cv-01122-RGA   Document 494   Filed 08/05/19   Page 201 of 273 PageID #: 37734

767

 1    Baxalta would have lost had it not been able to offer

 2    Adynovate.  And you need to put these numbers together to

 3    come up with an overall answer to the question, which I have

 4    done in the next table.

 5    Q.    Could we pull up 7.11?

 6    A.    Again, I apologize for how small these are.  If you

 7    can look at the main part is the top.  So the first block

 8    was the block in the previous table, the patients who

 9    switched to Adynovate from a Baxalta HSL product, then

10    column B are patients who switched to Adynovate from an HSL

11    product other than Adynovate.  And when you put the

12    calculations together, combine all of the types of patients,

13    48.7 percent of Adynovate patients were patients that

14    Baxalta would not have been able to sell Advate or

15    Recombinate to, they would have gone to other products.  So

16    those were the new patients Baxalta was able to keep or sell

17    to because it was able to offer Adynovate.

18           So if you go back to the stick figures there, we

19    can get there, we'll see this divides up into, from this

20    analysis, it's about 48 percent and 52 percent.

21    Q.    Okay.  Now, Dr. Addanki, just so we get into one set

22    of details about that analysis, you used a before period and

23    an after period in this analysis?

24    A.    That's right.  The before is the benchmark.

25    Q.    And when does your after period end?

Case 1:17-cv-00424-MSG   Document 898   Filed 05/06/20   Page 63 of 77 PageID #: 16393
Case 1:16-cv-01122-RGA   Document 494   Filed 08/09/19   Page 202 of 278 PageID #: 37735

768

1   A.      The after period ends right around the time of the

2   hypothetical negotiation.

3   Q.      Why did you stop it there?

4   A.      Because the information we're relying on is the

5   information that we would want the parties to know when

6   they're negotiating this deal.  And they would not know

7   anything that happened after that negotiation.

8   Q.      Now, what did you use for your before period?

9   A.      The before period was the period through the launch

10  of Eloctate all the way up to the launch of Adynovate.

11  Q.      Are you aware that Baxalta's damages expert is going

12  to come up here and say that that benchmark should be

13  limited to a shorter period, three months to be exact,

14  before Adynovate launches?

15  A.      Yes, I am.

16  Q.      Do you agree with him?

17  A.      No, that would actually be the wrong thing to do.

18  Because what we've done when we take the entire period from

19  Eloctate's launch to Adynovate's launch is we've got the

20  entire history of the impact that Eloctate had on the HSL

21  product, particularly Advate and Recombinate.  When you

22  limit your benchmark period, your pre period to just this

23  short period before Adynovate launches, now, Adynovate is a

24  product that's going to come in from the market leader,

25  right, from the company that sells Advate.  What is the

Case 1:17-cv-00414-MSG Document 328 Filed 05/06/20 Page 64 of 77 PageID #: 16384
Case 1:16-cv-01222-RGA Document 494 Filed 08/05/19 Page 205 of 273 PageID #: 37736

769

1     announcement if that happens?  Basically if you were an

2     Advate patient thinking of going to Eloctate, once the

3     market knows that Adynovate is coming in, two or three

4     months before it launched, the market knows that Adynovate

5     is coming, you would, right?  So any switches to Eloctate

6     would just get really depressed by the fact that the market

7     expects Adynovate to come in.  So if you're restricted to

8     there, you're missing the real impact that Adynovate has.

9     You're focusing on the period when there's an announcement

10    so you're getting a really complete picture of what's going

11    on.

12    Q.    Now, you testified that you also used a second method

13    to do this quantification.

14    A.    Yes, I did.

15    Q.    What is that second method?

16    A.    The second method, if you will, the second relied on

17    a micro look.  The second method was the other end of the

18    telescope, the macro look.  This was based on another data

19    set that Ms. Restivo described to you, the Adivo data, which

20    were the shipment to the manufacturers to the primary places

21    where this product, these factory products, are sold.  The

22    specialty pharmacies, treatment centers, hospitals, et

23    cetera.  So this company would capture all those shipment

24    data of the shipment data from manufacturers and calculate

25    market shares, calculate a total for our factory and what

Case 1:17-cv-00414-MSG   Document 828   Filed 05/06/20   Page 65 of 77 PageID #: 16395
Case 1:16-cv-01222-RGA   Document 494   Filed 08/05/19   Page 204 of 273 PageID #: 37737

770

1     share did each product have quarter by quarter for eight or

2     nine quarters, they provided the data for that.

3     Q.     What did you do with this shipment data?

4     A.     I used it again to get a handle, to get a measure of

5     what the additional sales of that Baxalta was able to make

6     because it was able to offer Adynovate.  We can see how I

7     did that on the chart.

8     Q.     Let's pull up 7.12 please.

9     A.     So what we've done is I've divided up the period, and

10    it's just the quarters that are going across on the axis,

11    and the shares that Adivo was reporting on the Baxalta, and

12    the blue line is telling us about the combined share of all

13    the Baxalta products that were abvailable at the time in the

14    he recombinant factory market, we're talking Advate or

15    Recombinate.  As you can see before Eloctate launches, of

16    the sales are not doing anything, there's not much of a

17    trend there, it's not obvious whether they're going up or

18    down.

19             Things changed after Eloctate launches.  And if

20    you look at the period between Eloctate launched and the

21    next big event, which was the Adynovate launch ing, it's

22    pretty clear there's a downward trend and there's a combined

23    share of Advate and Recombinate.

24    A.     But let's not rely on eyeballing it, I actually did a

25    statistical analysis of these numbers, did a simple trend,

Case 1:17-cv-00414-MSG Document 328 Filed 05/06/20 Page 66 of 77 PageID #: 16386
Case 1:16-cv-01122-RGA Document 494 Filed 08/05/19 Page 205 of 273 PageID #: 37798

771

1    what we call a regression, an econometric exercise which we

2    do all the time to capture what the data is telling us.  If

3    you show the trend lines there, you see there was a slight

4    upward trend before Eloctate launched and a definite

5    downward trend after Eloctate launched which is entirely

6    consistent with what we have seen from the documents and so

7    on.  Eloctate came in, a lot of competitive pressure on the

8    Baxalta products, the Baxalta products sales start

9    declining.

10            If you continue that dotted line into the period

11    after Adynovate launched, you got a pretty good sense of

12    what might have happened had there been no Adynovate.  It's

13    a continuation of the old franchise of Baxalta, Advate and

14    Recombinant.  In fact, when you put in what happens with

15    Adynovate, you get that orange line is showing all three

16    products now.  And that orange line is showing that they did

17    better, Baxalta did better once it was able to offer

18    Adynovate as well.  Better than the trend that it was on for

19    the period since Eloctate's launch.  Now, as you might

20    imagine, Advate and Recombinant dropped off because a lot of

21    the sales did go to Adynovate.

22            So what you got is a yellow shaded area that

23    represents Adynovate sales and the shaded areas above that

24    projection line, the trend line is the part that was

25    accounted for that was the extra sales that Baxalta was able

Case 1:17-cv-00414-MSG Document 128 Filed 05/06/20 Page 67 of 77 PageID #: 16383
Case 1:16-cv-01122-RGA Document 494 Filed 08/05/19 Page 206 of 273 PageID #: 37739

772

1    to make because it could sell Adynovate.  And that ends up

2    being, if you can do the numbers, about 47 percent of the

3    total Adynovate sales.

4           So as I was saying earlier, we had strikingly

5    similar answers to the question, what were the additional

6    sales that Baxalta was able to make because it was able to

7    sell Adynovate.  And one set of calculations we got 48

8    percent of Adynovate sales and in this we got 47 percent of

9    Adynovate sales.

10   Q.    What did you ultimately conclude from both of these

11   methods?

12   A.    Now, we can go back to the stick figures with both of

13   our numbers and at least 47 percent, that's the lower of the

14   two numbers, at least 47 percent of the Adynovate sales, or

15   Adynovate patients would have gone to other products had

16   Baxalta not been able to offer Adynovate.

17   Q.    Now, what did you do next to determine the high point

18   of that bargaining range?

19   A.    Well, what we have got here is how many extra

20   patients they could have sold to.  The question is, how

21   profitable would that have been, because it's the profits

22   that Baxalta makes on the initial patients that represent

23   the economic benefit to Baxalta.

24   Q.    How did you do that?

25   A.    Well, the profit is simply revenue minus cost.  So to

Exhibit 22
To
Exhibit 26

Redacted In Their Entirety

Exhibit 27

** NOT FOR PRINTED PUBLICATION **

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| MARK BARRY, M.D., | § | |
| | § | |
| *Plaintiff*, | § | CIVIL ACTION No. 1:14-cv-104 |
| | § | |
| v. | § | JUDGE RON CLARK |
| | § | |
| MEDTRONIC, INC., | § | PRD |
| | § | |
| *Defendant*. | § | |

### *IN LIMINE* ORDER GRANTING DEFENDANT MEDTRONIC'S MOTION TO EXCLUDE THE TESTIMONY OF NICHOLAS GODICI

Defendant Medtronic, Inc. moves to exclude the opinions and testimony of Mr. Nicholas Godici.  Dkt. # 299, ("Motion" or "Mot.").  Mr. Godici is Plaintiff Dr. Mark Barry's rebuttal expert on patent practice and procedure.

Medtronic's Motion (Dkt. # 299) is GRANTED.  Mr. Godici's opinions are inadmissible on several grounds.  First, the majority of his opinions are now irrelevant because the court has excluded Medtronic's patent law expert, Mr. James Carmichael (Dkt. # 294).  Second, Mr. Godici's opinions are independently inadmissible for many of the same reasons Mr. Carmichael's opinions were excluded (Dkt. # 294).  For example, Mr. Godici's opinions will not be helpful to the jury on any jury issue and his opinions as to what *would* have been mental impressions of the PTO examiners are speculative.  This Order is in limine, as Mr. Godici is a rebuttal witness, and the admissibility of his testimony is therefore inextricably linked to the evidence that Medtronic will actually enter and the issues actually presented at trial.

1

# I.    LEGAL STANDARD

Regional law governs a motion to exclude expert testimony on the basis of unreliability. *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 516 (Fed. Cir. 2012).   Federal Rule of Evidence 702 provides that a witness who is "qualified by knowledge, skill, experience, training, or education," may provide opinion testimony if that testimony will assist the trier of fact and: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.   FED. R. EVID. 702.   The witness must possess "knowledge, skill, experience, training, or education" in the relevant field to be qualified to express his expert opinion on the topic in issue.   *Id.*   "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.   Differences in expertise bear chiefly on the weight to be assigned to test testimony by the trier of fact, not its admissibility."   *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).   "The proponent of expert testimony . . . has the burden of showing that the testimony is reliable."   *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004).

The Supreme Court in *Daubert* charged trial courts with determining whether scientific expert testimony under Rule 702 is "not only relevant, but reliable."   *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (extending *Daubert* to all expert testimony).

> The *Daubert* opinion lists a number of factors that a trial court may use in determining an expert's reliability.   Trial courts are to consider the extent to which a given technique can be tested, whether the technique is subject to peer review and publication, any known potential rate of error, the existence and maintenance of standards governing operation of the technique, and, finally, whether the method has been generally accepted in the relevant scientific community.   These factors are not mandatory or exclusive; the district court must decide whether the factors discussed in *Daubert* are appropriate, use them as a starting point, and then ascertain if other factors should be considered.   But the existence of sufficient facts and a reliable methodology is in all instances

mandatory.  Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible.

*Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (internal citations omitted).

Although Federal Rule of Evidence 704 states that testimony that is otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact, the Fifth Circuit has long held that expert "opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant."  *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

## II.     ANALYSIS

Because the court has previously excluded the majority of opinions from Medtronic's patent law expert Mr. Carmichael, Mr. Godici's rebuttal testimony is irrelevant.  In particular, it is difficult to discern what of Mr. Carmichael's testimony, if anything, is left for Mr. Godici to rebut.  Moreover, even if it were somehow still relevant, Mr. Godici's testimony—much like Mr. Carmichael's—is independently inadmissible because it is not helpful to the jury or relevant to any jury issue, it is speculative, and it constitutes improper expert opinion.  As such, the court excludes all of Mr. Godici's opinions and testimony.

### A.     Mr. Godici's testimony is irrelevant in light of the court's prior Order.

Mr. Godici's testimony is irrelevant given the court's prior exclusion of Mr. Carmichael's testimony.  Evidence is relevant only if it has a tendency to make a fact of consequence more or less probable.  FED. R. EVID. 401.  Irrelevant evidence is inadmissible.  FED. R. EVID. 402.

Dr. Barry previously sought to exclude, and the court excluded, most of the opinions offered by Mr. Carmichael.  The court's prior order excluded Mr. Carmichael's opinions regarding the time limits faced by PTO examiners, the duties owed to the PTO, possible

3

examiner responses to prior art,[1] HIPAA confidentiality obligations, and fraud.   Dkt. # 294 (Order Excluding Carmichael Testimony) at 1.   Given what was excluded, it is difficult to see what is left to be rebutted by Mr. Godici.   For example, as Dr. Barry properly states, Mr. Godici's opinions regarding public use were only relevant to rebut Mr. Carmichael's excluded opinions.   Dkt. # 302 (Opp.) at 5.   This is true regardless of whether Mr. Godici is even qualified to testify to such opinions in the first place (which, like Mr. Carmichael, he is not).

Both parties mistakenly insinuate that Mr. Carmichael has opinions left to offer that were not excluded but would otherwise be helpful for the jury to hear.   But given Mr. Carmichael's report, the court does not see what non-excluded testimony from him would be helpful to even a single jury issue.   To the extent that a party—or both parties—seek to elicit testimony on general PTO procedures,[2] the jury will be shown the Patent Video and provided with a list of glossary terms, which may include general definitions of terms used at the PTO.   Counsel is free to use closing argument to point out the paper of the file wrapper that records what the PTO did or said,

---

[1] The parties seem to disagree as to whether Mr. Carmichael's opinions on prior use were excluded.   Dkt. # 311 (Reply) at 1.   The prior order excluded testimony based on speculation of the mental impressions of PTO examiners in part because Mr. Carmichael had no personal knowledge himself of the technology or the alleged prior use.   All of Mr. Carmichael's opinions about prior use were based on this excluded testimony.   Thus, Mr. Carmichael's opinions regarding prior use are inherently inadmissible per the court's prior order.   Because Mr. Carmichael's opinions are inadmissible and Mr. Godici's opinions as to prior use only served to rebut those opinions, Mr. Godici's opinions are irrelevant and therefore also inadmissible.

[2] Courts have allowed certain qualified experts to testify on general PTO procedures involved in the patent application process.   *See, e.g.*, *Bausch & Lomb, Inc. v. Alcon Labs., Inc.*, 79 F. Supp. 2d 252, 254–56 (W.D.N.Y. 2000) ("it may be helpful to the jury to hear someone experienced in [PTO] procedures explain how they operate in terms that a layperson can understand").   However, Mr. Godici's report does not include testimony regarding general PTO procedures that would be helpful to the trier of fact.   To the extent that any general procedures would be helpful to the jury, it would be cumulative of what jurors will learn from the Patent Video.   Certainly, Mr. Godici would not be permitted to testify as to "problems in the PTO," which this court and several others routinely exclude.   *See Bausch*, 79 F. Supp. 2d at 255–56 (listing cases).

or other information about the prosecution history of the patents-in-suit.  Using an expert to do so would be cumulative, unnecessary, and unhelpful given the numerous other issues that the jury *will* be asked to decide in this case.

As such, at this juncture, neither Mr. Godici nor Mr. Carmichael will be permitted to testify at trial.

**B.**   **Mr. Godici's testimony is independently inadmissible on similar grounds to those set forth in the court's order regarding Mr. Carmichael's testimony.**

Notwithstanding its irrelevance, Mr. Godici's testimony is inadmissible for many of the same reasons that Mr. Carmichael's testimony was excluded.  Namely, Mr. Godici's testimony is not helpful to the trier of fact, it is speculative, and Mr. Godici is unqualified to provide technical testimony or legal conclusions.

First, Mr. Godici's testimony would not be helpful to the jury.  The majority of Mr. Godici's opinions relate to inequitable conduct, an issue for the Court not the jury. While district courts may delegate aspects of the inequitable conduct inquiry to juries, inequitable conduct has long been held to be "most appropriately reserved for the court."  *Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009).  Absent unusual circumstances, this court will not submit the issue of inequitable conduct to the jury.  To the extent that Mr. Godici's testimony relates only to inequitable conduct, it is therefore not helpful to the jury's fact-finding.

Second, Mr. Godici's testimony is improperly speculative.  For example,[3] Mr. Godici's opinions allegedly support Dr. Barry's theory that the alleged misconduct surrounding Figure 6 from the patent specifications does not constitute "egregious misconduct" but rather would be

---

[3] There are other opinions in Mr. Godici's report outside of these examples that are inadmissible and those cited in this Order are by no means exhaustive.  *See, e.g.*, Dkt. # 299-2 (Godici report) at ¶ 79 (Godici opining that the mistaken submission of a photograph would be an error that could be corrected with a certificate of correction, which would "likely be granted by the PTO since such a correction would be minor.")

subject to a simple PTO "certificate of correction."  Dkt. # 299, Mot., at 4, 6.  Mr. Godici states

that "there is no evidence that the description of [F]igure 6 in the patent specification misled the

examiner" and that a drawing "that illustrates before and after depiction . . . *would be* at most []

ancillary."  Dkt. # 299-2 (Godici report) at ¶ 74.  However, his opinions on this issue entirely

rely on speculative assertions about what a PTO examiner *would* or *should* have done.  Just as

Mr. Carmichael lacked expertise in the field of "retroactive mind reading" of the thoughts of

patent examiners (Dkt. # 294 at 4), so does Mr. Godici.  Indeed, other courts have found such

testimony to be inadmissible.[4]  As such, Mr. Godici's similar opinions are inadmissible.

Finally, given Mr. Godici's qualifications, any technical testimony or testimony on legal

conclusions is also inadmissible.  With regards to technical testimony, "[a]dmitting testimony

from a person . . . with no skill in the pertinent art serves only to cause mischief and confuse the

factfinder."  *Sundance, Inv. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361–62 (Fed. Cir.

2008) (concluding that the district court abused its discretion by allowing patent law expert with

"no experience whatsoever" in the field of the patented technology to testify and explain

technical evidence to a jury).  Mr. Godici himself admitted that he is not an expert or a person of

ordinary skill in the art.  Dkt. # 299-2 (Godici report) at ¶ 74; Dkt. # 299-3 (Godici Depo. Tr.

(Ex. B to Motion)) at 33:19–24.  As such, Mr. Godici cannot testify as to technical aspects of the

patented technology, including those details about the patent specifications or Figure 6.

---

[4] *See Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.*, No. CIV.A. 09-40089-FDS,
2014 WL 7330777, at *8 (D. Mass. Dec. 19, 2014) (holding that an expert "may not speculate as
to what the examiner did or did not think, or how different information would have impacted the
examiner's opinions or thoughts. . . .  Speculation about the thought processes or reasoning of the
examiner is inadmissible."); *The Medicines Co. v. Mylan Inc.*, No. 11-CV-1285, 2014 WL
1516599, at *4 (N.D. Ill. Apr. 17, 2014) (precluding an expert from "opining on what the Patent
Office Examiner would have done or thought had she been given different information.").

Mr. Godici's articulation of the legal standards and his ultimate legal conclusions about inequitable conduct are also inadmissible. While expert testimony is not objectionable simply because it embraces an ultimate issue to be decided by the trier of fact, "Rule 704 does not allow experts to tell the jury what result to reach." *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 2010 WL 4595592, at *4 (S.D. Tex. Nov. 1, 2010) (quoting in part *Owen*, 698 F.2d at 240 (internal quotations removed)). In his report, Mr. Godici lays out Federal Circuit law on the issue of inequitable conduct and then suggests how to apply this law to facts about which he has no personal knowledge. It is for the court or the jury to make these factual findings and apply the law, not for Mr. Godici to tell either the court or the jury how to do so. For these reasons, Mr. Godici's opinions run afoul of the rules on permissible expert opinion and should be excluded.

## III.   CONCLUSION

Mr. Godici's testimony and report are not admissible. It is therefore ORDERED that Medtronic's Motion to Exclude Opinions and Testimony from Mr. Nicholas Godici (Dkt. # 299) is GRANTED. This Order is subject to the presentation of evidence by Medtronic at trial. It is conceivable, though not likely, as to Mr. Godici and Mr. Carmichael, that one party may open the door to the testimony of some limited aspect of the other party's expert. But, again, the parties should keep in mind that inequitable conduct will almost certainly be tried to the bench.

So **ORDERED** and **SIGNED** this **20** day of **September, 2016.**

_____
Ron Clark, United States District Judge

7

Exhibit 28

Redacted In Its Entirety